# CERTIFICATION OF RECORD

INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

## Office of Compliance & Review
### *STUDENT HEARING OFFICE*
#### SPECIAL EDUCATION

In the Matter RE:    W████, D██████ vs. **DCPS**

Case Information:    Hearing Dates: **10/19/2005**
Held at: **District of Columbia Public Schools Headquarters**
**825 North Capitol Street, N.E.**
**Washington, D.C. 20002**
Student Identification Number:  **9003083**
Student's Date of Birth: ████**/1990**
Attending School: **Devereux, Florida-Viera Campus**
Managing School: **Woodson SHS**
Hearing Request Date(s): **08/25/2005**

## CERTIFICATION OF RECORD

I, **Shawnta Maddox, Legal Assistant of the Student Hearing Office,**

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting of all letters, pleadings, orders,

exhibits and depositions.

I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this Thursday, December 13, 2007.

**LEGAL ASSISTANT**
**STUDENT HEARING OFFICE**

459

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**





# Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA)** and/or parents with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A.   INFORMATION ABOUT THE STUDENT:

Student Name: D█████ W██████          Birth Date: █████/90

Address:  Girls and Boys Town of Washington, DC 4801 Sergeant Rd. NE , Washington, DC 20017

Home School: _____

Present School of Attendance:   CHOICE Academy

    Is this a charter school? _____     (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student:   Ward

Address (if different from the student's above): _____

1

Phone/Contact Number: _____    Fax Number (if applicable): _____

**B.**   **Individual Making the Complaint/Request for Due Process Hearing:**

Name:   Fatmata Barrie, Esq.

Complete Address:   1003 K St. NW #565 Washington, DC 20020

_____

Phone: (h) 202-626-0040   (W) 202-626-0040   (Fax) 202-626-0048   (e-mail)

Relationship to the Student:

☐ Parent                  ☐ Legal Guardian              ☐ Parent Surrogate

☐ Self/Student            ☐ Local Education Agency (LEA) ☐ Parent Advocate

X  Court Appointed Educational Advocate

**C.**   **Legal Representative/Attorney (if applicable):**

Name:   Fatmata Barrie, Esq. (Law Offices, Christopher N. Anwah, PLLC)

Address: 1003 K St. NW #565 Washington, DC 20020

_____

Phone: (w) 202-626-0040        (Fax) 202-626-0048        (e-mail)_____

Will attorney / legal representative attend the resolution session?    X Yes        ☐ No

**D.**   **Complaint Made Against (check all that apply):**

☐ DCPS school (name of the school if different from page one)   DCPS
☐ Charter school (name of the charter school if different from page one) _____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**E.**   **Resolution Session Meeting Between Parent and LEA:**

I understand that it is my right to have a resolution meeting to resolve this complaint.  I also understand that I may voluntarily waive this right if I choose.  (Note:  All parties must agree to waive the resolution meeting to avoid having this meeting.)

☐ I wish to waive the Resolution Session Meeting

2

**F.    Mediation Process:**

IDEIA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session Meeting or as an alternative to a Due Process Hearing. Please check all that apply:

☐    I am requesting mediation as an alternative to the resolution session meeting.

☐    I am requesting mediation and a due process hearing.

☐    I am requesting mediation **only** at this time.

**G.    Facts and Reasons for the Complaint:**

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.    What is the nature of the problem, including the facts relating to the problem that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

    A.    DCPS failed to adhere to the "child find" statute because DCPS has yet to determine Dayshawn eligible for special education services. Since Elementary and middle school, D█████ has indicated behavioral problems that have impacted on her academics. However, DCPS did nothing to provide her with the appropriate services. In fact as early as 1996 and in 2003, it is documented that D█████ had behavior problems which were disruptive to her and the class and that she needed services like OT. However, to date, no IEP meeting has been held and no IEP has been provided for D█████. Therefore, violating the "child find" statute.

    B.    DCPS has failed to adhere to the 05/20/04 HOD because DCPS has yet to convene a meeting to determine D█████ eligibility even though the evaluations were provided to DCPS on 05/20/05. For the entire summer of 2004 and half of the 2004/2005 school year, D█████ was in a residential treatment center. Upon her return, she attended HD Woodson and her behaviors continued. In fact, her behavior was so out of control that Woodson expelled her and placed her at CHOICE Academy. However, D█████ complained that books were not offered. During a meeting at Woodson in April 2005 to address her behaviors, the principal and SEC indicated that although they had the psychological evaluation and other documents, it was not enough to determine if she qualifies for special education services. Additionally, the independent evaluations were completed and forwarded to DCPS per the 05/20/04 HOD but DCPS made no contact with the office to convene a meeting so as to review the evaluations, determine eligibility, discuss and determine placement, issue a PNOP and discuss and determine compensatory education. Therefore, violating the 05/20/04 HOD.

    C.    DCPS has failed to provide D█████ with an appropriate IEP because she does not yet have an IEP even though all the evaluations indicate such. Her clinical and psychiatric evaluations both indicate the need for intensive services. In fact her psychiatric indicated that she is need of a residential program and her clinical diagnosed her with conduct disorder and recommended a therapeutic program that can address her inappropriately acting out behaviors. Her psychiatric diagnosed her with ADHD, Mood disorder, ODD, conduct disorder and LD. However, she remains without an IEP or an appropriate placement. Therefore, exacerbating the problems she has to deal with.

    D.    DCPS has failed to provide D█████ with appropriate special education and related services because she does not have an IEP that is geared towards addressing her ADHD, Mood disorder, ODD, conduct disorder and LD and as a result, continues to be instructed within the regular

3

education setting in which she continues to fail both academically and emotionally. Therefore, DCPS has not provided her with all her needed special education and related services. DCPS has also not provided the opportunity to participate in a placement meeting to determine the appropriate placement for D███████.

E.  DCPS has failed to provide D██████ with an appropriate placement even though she has not progressed academically or emotionally. As stated above, her evaluations diagnosed her with ADHD, Mood disorder, ODD, conduct disorder and LD. However, she has yet to be placed in a placement that ca n address such disabilities. As a result, her emotional and academic issues have become worse.

F.  DCPS has failed to provide or determine any transition services for D██████ even though she is now 15.

G.  DCPS has failed to provide her with the needed compensatory education for not identifying her within the appropriate time frame even though her academics have always been below level, for not providing her with appropriate services and placement because she continued to not progress academically or social emotionally and for not providing her with an IEP for the reasons listed above.

2.  To the extent known to you at this time, how can this problem be resolved?

A.  DCPS to provide her with an appropriate residential placement of the court's choice.

B.  DCPS to convene a meeting to complete an appropriate IEP and transition services for the student.

C.  DCPS to provide compensatory education for 2 to 3 years of denial of FAPE.

D.  DCPS to pay attorney's fee.

3.  Issues presented:

A.  Whether DCPS denied D██████ a Free Appropriate Public Education (FAPE) when it failed to adhere to the "child find" statute, failed to evaluate her in all areas of suspected disability and failed to adhere 05/20/04 HOD?

B.  Whether DCPS denied D██████ FAPE when it failed to provide her with an appropriate IEP?

C.  Whether DCPS denied D██████ FAPE when it failed to provide her with appropriate special education and related services?

D.  Whether DCPS denied D██████ FAPE when it failed to provide her with an appropriate placement?

E.  Whether DCPS denied D██████ FAPE when it failed provide the opportunity for participation in a placement meeting to determine an appropriate placement for D██████?

F.  Whether DCPS denied D██████ FAPE when it failed to provide her with the needed compensatory education for the past and present denial of FAPE ie for 2 to 3 years?

## H.   <u>Accommodations and Assistance Needed</u>:

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type) _____
- Special Communication (please describe the type)

4

- Special Accommodations for Disability (please be specific) _____

- Other _____

**I.**  **Waiver of Procedural Safeguards:**

☐ I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**J.**  **Parent Signature and Affirmation:**

I affirm that the information provided on this form is true and correct.

_____           _____
Signature of Parent or Guardian                                    Date

**K.**  **Signature of Attorney/ Legal Representative:**

_____           08/25/05
Legal Representative / Advocate                                    Date

**L.**  **Signature of LEA Representative (if hearing requested by LEA):**

_____           _____
Representative of LEA                                                    Date

**Mail, fax or deliver this complaint notice to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**
**Fax number: 202/442-5556**

5

D███████ W█████ – ███90        464

# LAW OFFICES,
# CHRISTOPHER N. ANWAH, PLLC

Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
(DC, MD, NJ)
Fatmata Barrie, Esq.
(DC, FL)
Georgina A. Oladokun, Esq.
(MD)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

## FACSIMILE COVER LETTER

DATE: 08/25/05

TO:  SHO

COMPANY: SHO

FAX NUMBER: 202-442-5556

FROM:  Fatmata Barrie, Esq.

RE:  Hearing Request for D███████ W██████

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET        06

MESSAGE:

_____

_____

_____

If there is any problem with this transmission, please call as soon as possible at (202) 626-0040

### ***CONFIDENTIALITY NOTICE***

The pages accompanying this facsimile transmission contain information from the Law Office of Christopher Anwah, PLLC, which is confidential or privileged, or both. The information is intended to be for the use of the individual or entity named on this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately at (202) 626-0040 so that we can arrange for the retrieval of the original documents at no cost to you.

465

# STATE EDUCATION AGENCY
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | |
|---|---|
| In the Matter of: | ) |
| ~~D____ W.~~ | ) |
|  | ) BEFORE A SPECIAL EDUCATION |
|  | ) |
| **Petitioner** | ) |
|  | ) |
|  | ) HEARING OFFICER |
| Vs. | ) |
| DCPS-Choice Academy | ) |
|  | ) DISTRICT OF COLUMBIA |
| **Respondent** | ) PUBLIC SCHOOLS |

## SCHEDULING MEMORANDUM

1.  A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **The Student Hearing Office does not schedule or participate in resolution meetings.**

2.  The complaint notice was filed on *August 25, 2005.*

3.  The deadline for the resolution meeting is *September 9 2005* unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A.  ***Prior Written Notice Not Issued by the Local Educational Agency.*** If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

   1.  An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;
   2.  A description of other options that the IEP Team considered and the reasons why those options were rejected;
   3.  A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and
   4.  A description of the factors that are relevant to the agency's proposal or refusal.

466

B.   Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than *September 4, 05*

C.   ***Deficiency Notice***.   A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.   The deadline for filing a deficiency notice is *September 9, 2005*

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence.   A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice.   The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law.   Information about the time, date, and location of the resolution meeting will be provided by the school or the Local Education Agency responsible for scheduling the meeting.

467

**Complaint Intake Unit**
825 North Capitol Street, NE – 8th Floor
Washington, D.C. 20002

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
State Enforcement & Investigation Division
for Special Education Programs

# Fax

| Name: Fatmata Barrie, Esq. | Pages: | 3 |
|---|---|---|
| Fax Number: 626 0028 | Date: | August 26, 2005 |
| Telephone No: 626 0040 | | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

• Comments: Scheduling Memorandum

For: D███████ W███████

The document(s) accompanying this telecopy transmission contains confidential information that is legally privileged. The information is intended only for use of the individual or entity named Above. If you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is Strictly prohibited. If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

468

TRANSMISSION VERIFICATION REPORT

TIME : 08/26/2005 11:24

DATE,TIME
FAX NO./NAME
DURATION                            
PAGE(S)                             00:01:30
RESULT
MODE                                STANDARD
                                    ECM

**Complaint Intake Unit**
825 North Capitol Street, NE – 8th Floor
Washington, D.C. 20002

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
State Enforcement & Investigation Division
for Special Education Programs

# Fax

For: Principle

| Name: *Choice Academy* | Pages: | 9 |
|---|---|---|
| Fax Number: 576 - 5801 | Date: | August 26, 2005 |
| Telephone No: 576 5360 | | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

• Comments:

1) Complaint Notice
2) Scheduling Memorandum

For: D███ St██ W███████

The document(s) accompanying this telecopy transmission contains confidential information that is legally privileged. The information is intended only for use of the individual or entity named Above. If you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is Strictly prohibited. If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

470

TRANSMISSION VERIFICATION REPORT

```
┌─────────────────────────────────────────────┐
│      TRANSMISSION VERIFICATION REPORT         │
└─────────────────────────────────────────────┘
```

```
                         TIME : 09/22/2005 14:41
                         NAME : STUDENT HEARINGS OFF
                         FAX  : 2024425556
                         TEL  : 2024425432
                         SER.# : BROH3J608601
```

```
┌──────────────────────────────────────────────────────────┐
│   DATE,TIME          09/22  14:41                          │
│   FAX NO./NAME       96260048                              │
│   DURATION           00:00:27                              │
│   PAGE(S)            01                                     │
│   RESULT             OK                                     │
│   MODE               STANDARD                              │
│                      ECM                                   │
└──────────────────────────────────────────────────────────┘
```

# District of Columbia Public Schools
## *Office of Compliance*
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8ᵀᴴ Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



### HEARING NOTICE

MEMORANDUM VIA: [✓] FACSIMILE [ ] MAIL [ ] HAND DELIVERY

TO:    Parent (or Representative): **F. BARRIE**           Fax No.: **626-0048**

LEA Legal Counsel: **M. LEVY**

RE:    W̶̶̶̶̶, D̶̶̶̶̶̶     and (LEA) DOB: ▓▓/▓▓/90
            Student's Name

FROM:    **SHARON NEWSOME**
            Special Education Student Hearing Office Coordinator

DATE SENT: **9/22/05**

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on **9/25/05**. Please be advised that the hearing has been scheduled for:

DATE: **10/19/05**

TIME: **11:00 AM**

472

# LAW OFFICES,
# CHRISTOPHER N. ANWAH, PLLC

Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
(DC, MD, NJ)
Fatmata Barrie, Esq.
(DC, FL)
Georgina A. Oladokun, Esq.
(MD)
Tamika N. Jones, Esq.
(DC)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

October 24, 2005



Seymour DuBow, Esq.
Student Hearing Office
825 North Capitol St, NE
8th Floor
Washington, DC  20002

**Via Facsimile: 202-442-5556**

RE:    D▓▓▓▓ W▓▓▓▓
DOB: ▓▓▓/90

   This is in response to your request of suggestions for the members of the MDT for D▓▓▓▓,
W▓▓▓▓. I recommend that a psychiatrist be present who could review the psychiatric and
because a neuropsychological is recommended, a clinical psychologist for the clinical, a
psychologist and members of her current school staff because they know her.  An Occupational
Therapist would also be needed because it is recommended in her evaluations.  I also recommend
that the meeting be held at Devereaux since that is where she is attending at this time.
Furthermore, if she is determined eligible, they would be the people implementing the IEP.

Respectfully Submitted,

Fatmata Barrie, Esq.

cc: Michael Levy, Esq.

473

# LAW OFFICES,
# CHRISTOPHER N. ANWAH, PLLC

Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
(DC, MD, NJ)
Fatmata Barrie, Esq.
(DC, FL)
Georgina A. Oladokun, Esq.
(MD)
Tamika N. Jones, Esq.
(DC)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

## FACSIMILE COVER LETTER

DATE: 10/24/05

TO: Seymour DuBow, Esq.

COMPANY: OGC

FAX NUMBER: 202-442-5098

FROM: Fatmata Barrie, Esq.

RE: D██████ W██████-- Recommendation for MDT members

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET       02

MESSAGE:

If there is any problem with this transmission, please call as soon as possible at (202) 626-0040

### ***CONFIDENTIALITY NOTICE***

The pages accompanying this facsimile transmission contain information from the Law Office of Christopher Anwah, PLLC, which is confidential or privileged, or both. The information is intended to be for the use of the individual or entity named on this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately at (202) 626-0040 so that we can arrange for the retrieval of the original documents at no cost to you.

474



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**
*Office of the Superintendent*
**Office of the General Counsel**
825 North Capitol Street, N.E., 9th Floor
Washington, D.C. 20002-4232
202-442-5000 Fax # 202-442-5098
*www.k12.dc.us*

2005 OCT 25 PM 4: 57

DC PUBLIC
SCHOOL SYSTEM

Memorandum
*By Hand –SHO and Facsimile – Fatmata Barrie, Esquire (202)626-0048*

To:            Hearing Officer Sy Dubow, Esq.

From:        Michael Levy,
             DCPS Attorney Advisor

Date:        October 25, 2005

Re:          D█████ W████
             DOB: ████/1990

---

### RECOMMENDED MEMBERS FOR MDT/PLACEMENT MEETING

In accordance with the terms of discussions between counsel for DCPS and for the parent/student, and the hearing Officer at the hearing for the captioned student on October 19, 2005, DCPS now files this Memorandum proposing the following DCPS members for the prospective meeting:

DCPS' Residential Coordinator (Deirdre Council);
A DCPS Psychologist; and
A DCP Special Education Teacher.

475

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## ENFORCEMENT AND INVESTIGATION DIVISION

### SPECIAL EDUCATION DUE PROCESS HEARING

### CONFIDENTIAL

### HEARING OFFICER'S DETERMINATION

**STUDENT: D█████ W██████**            **DATE OF BIRTH:** ████/90

**ADDRESS: 4801 Sergeant Rd., N.E.**
**Washington, D.C.**

**PRESENT SCHOOL ATTENDING: Devereux, Florida-Viera Campus**
**HOME SCHOOL:  Woodson S.H.S.**

**DATE OF HEARING: October 19, 2005**

**TESTIFIED AT THE HEARING:**

Anthony Presnal*                 **Educational Coordinator, Devereux**
Noel Nawal-Aboulhosm*            **Mental Health Counselor**
(* Testified by telephone)

Student's Representative: Fatmata Barrie, Esq.
Address: 1003 K Street, N.W.
Washington, D.C. 20001
FAX: 202-626-0048

School System's Representative: Michael Levy, Esq.
Address: 825 N. Capitol Street, N.E., Washington, D.C. 20002

2005 OCT 28 AM 9: 24
DC PUBLIC SCHOOL SYSTEM

476

**INTRODUCTION:**

A hearing was held at the District of Columbia Public Schools (DCPS), 825 N. Capitol Street, N.E., Washington, D.C. 20002, on October 19th 2005, at the request of Fatmata Barrie, counsel for the student. Michael Levy represented DCPS, the other party to this hearing.

**JURISDICTION:**

The hearing was held and this decision was written pursuant to the Individuals with Disabilities Education Act (IDEA) (P.L. 101-476), reauthorized as the IDEA Improvement Act of 1997 (P.L. 105-17) 20 U.S.C. 1400 Et. seq.; and their current regulations, specifically the Code of Federal Regulations at 34 CFR Part 300; further reauthorized as the IDEA Improvement Act of 2004 (P.L. 108-446) and District of Columbia Municipal Regulations, Chapter 30, Education Handicapped, Title V, Sections 3000-3099.

**ISSUE:**

1.     Did DCPS fail to provide a Free Appropriate Public Education (FAPE) to the student by failing to determine eligibility, develop an IEP and determine an appropriate placement ?

2.     Is DCPS required to fund and place the student at Devereux Residential facility in Florida?

**DOCUMENTS SUBMITTED BY DCPS:**

**DCPS-1-DCPS-4**

**DOCUMENTS SUBMITTED BY STUDENT:**

**DW-1-DW-24**

**FINDINGS OF FACT:**

1.     The student is a fifteen-year-old female ward of the District of Columbia. On May 19th 2004, a Hearing Officer's Determination was issued ordering DCPS to conduct evaluations by a specific date and if not for DCPS to fund independent evaluations. The HOD further ordered the convening of an MDT meeting to determine eligibility within 15 school days of completion of the evaluations. If the student was found eligible, DCPS was to develop an IEP and determine placement.

477

2.  Independent evaluations were completed in April and May 2005. (DW-15-DW-18)

3.  On May 20ᵗʰ 2005, the office of counsel for the student sent a letter to DCPS placement specialist Tim Fitzgerald attaching the independent psychiatric, psycho-educational, clinical and social history evaluations on the student. The letter stated: "According to the 5/20/04 HOD, DCPS has 15 school days to convene the meeting to review the evaluations and determine eligibility. Please forward a meeting notice with three dates and times because this is a student in need of immediate services." (DW-19)

4.  The student withdrew from DCPS's H.D. Woodson S.H.S. on April 7ᵗʰ 2005. (DCPS-1)

5.  A Notice of Student Disciplinary Action Suspension Level II was hand delivered on April 5ᵗʰ 2005 to the parent/guardian advising that because the student physically assaulted a fellow student she would be excluded from Woodson from April 11ᵗʰ 2005 until the end of the school year on June 21ˢᵗ 2005. During this disciplinary period the student was to report to CHOICE Academy. (DCPS-3)

6.  The student was enrolled at Keystone Newport News Youth Center/Keystone Academy from June 17ᵗʰ 2004 until her withdrawal on January 17ᵗʰ 2005. The student's report card showed that she was a general education student participating in the 9ᵗʰ grade curriculum and received Bs in English 9, Algebra, World History, and Career Awareness and a C in Earth Science and PE. (DCPS-4)

7.  The student was accepted at Devereux Florida Residential Treatment Program. (DW-23) The student as a ward of the District of Columbia was placed by Child Family Services Agency of the District of Columbia at Devereux in September 2005.

**DISCUSSION AND CONCLUSIONS OF LAW:**

Counsel for the student is requesting DCPS to fund the student's residential placement at Devereux Florida Residential Treatment Program. DCPS has not convened an MDT meeting to determine if the student is eligible for special education services. An eligibility determination is a threshold question under IDEA that must be answered in the affirmative before counsel's request for relief can even be considered. The area of suspected disability is emotional disturbance. In order to be found eligible as a student with an emotional disturbance IDEA requires that the student must exhibit one of the characteristics indicative of an emotional disturbance "to a marked degree" over "a long period of time" that adversely affects the student's educational performance. 34 C.F.R. Section 300.7 (c )(4)(i). An appropriate MDT team will have to consider the independent

evaluations, the Keystone Academy grades ending in January 2005, as well as all other relevant materials in making an eligibility determination. If the student is found eligible, an IEP must be developed and only after that can the issue of placement be determined. This hearing officer concludes that it is appropriate for the MDT Team, professionals in special education and those who are familiar with the student, to first make the eligibility determination. The independent evaluations were only given to DCPS after the student had been withdrawn from DCPS's Woodson S.H.S. and the student had been expelled from Woodson until the end of the school year.

It is hereby **ORDERED** that:

1.　　DCPS shall convene an MDT meeting within 15 school days of issuance of the HOD to review the independent evaluations and determine eligibility. The MDT team shall consist of at least the following members: DCPS's Residential Coordinator (Deidre Council), a DCPS school psychologist, a DCPS special education teacher from Woodson S.H.S. who taught the student, and special education and clinical staff of Devereux Florida Residential Treatment Program who currently serve this student. DCPS shall convene the MDT meeting via a teleconference with Devereux staff and DCPS staff. If the student is found eligible for special education services, DCPS shall develop an appropriate IEP and discuss and determine placement. If a public placement is determined appropriate, a Prior Notice of Placement (PNOP) shall be issued within 5 school days of the MDT meeting. If a private placement is determined appropriate, a PNOP shall be issued within 30 calendar days of the MDT meeting. All meetings shall be scheduled at a mutually agreeable time through counsel for the student. There shall be one day of delay of the above time frame for every day of delay caused by the student, parent or counsel for the student.

　　　　This is the final administrative decision in this matter. Appeals on legal grounds may be made to a court of competent jurisdiction within 30 days of the rendering of this decision.

Seymour DuBow, Esq.
Impartial Hearing Officer　　　　　　　　　Date filed: October 28, 2005

Date Issued:

4

479

HK. S
Sheet : 11:44

# ATTENDANCE SHEET

| STUDENT'S NAME: | ▓▓▓▓▓▓ w▓▓▓▓ DOB ▓▓/30 | |
|---|---|---|
| HEARING DATE: | OCTOBER 19, 2005 | |

| PRINTED NAME | ON BEHALF OF DCPS OR STUDENT | TITLE |
|---|---|---|
| Fatmata Barrie | Student | Atty. |
| Suzanne McMichael | student (for CFSA) | social worker |
| MICHAEL D. LEVY | DCPS | ATTy. ADVISOR |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Impartial Hearing Officer

480

# LAW OFFICES,
# CHRISTOPHER N. ANWAH, PLLC

Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
(DC, MD, NJ)
Fatmata Barrie, Esq.
(DC, FL)
Georgina A. Oladokun, Esq.
(MD)
Tamika N. Jones, Esq.
(DC)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

October 12, 2005

Michael Levy, Esq.
Office of General Counsel
825 North Capitol Street, NE
9th Floor
Washington, DC 20002

**Via Facsimile: 202-442-5098**

RE: D████████, W████████
DOB: ████████/90

### Disclosure of Witnesses and Documents

Dear Ms. Puckett:

Pursuant to the five-day rule set forth in 34.C.F.R. 509 (a) (3), attached is a list of witnesses and documents, which we intend to rely on for the upcoming Due Process Hearing scheduled for October 19, 2005.

### Witnesses*

1. Suzanne McMichael – CFSA Social Worker
2. D████████ W████████ – Student
3. Linda Brooks and/or Designee-Devereux Residential
4. Educational Advocate and/or designee
5. Sharon Millis and/or designee – Expert/Experienced in special education
6. Psychological Therapist and/or designee

***Witnesses may testify by telephone**

481

## Documents

DW-01   April 2004 Psychological Evaluation
DW-02   08/12/96 Psychological Evaluation
DW-03   10/07/96 Occupational Therapy Evaluation
DW-04   06/03 Teacher's Comments
DW-05   Student Evaluation
DW-06   04/17/03 Diagnosis
DW-07   04/30/03 Diagnostic and Assessment Report
DW-08   04/27/03 Diagnostic/Assessment Report
DW-09   03/03/04 Progress Notes
DW-10   Parent/Guardian Questionnaire
DW-11   03/15/03 Behavior Healthcare and Diagnostic Services
DW-12   MDT Notes
DW-13   Notification of Pupil's Suspension and Suspension Reports
DW-14   Functional Behavior Assessments
DW-15   04/21/05 Psychiatric Evaluation
DW-16   05/12/05 Psycho-ed Evaluation
DW-17   04/25/05 Clinical Psychological
DW-18   05/16/05 Social Work Evaluation
DW-19   05/20/05 Letter to DCPS
DW-20   04/27/04 Letter from Therapist
DW-21   08/24/05 Scheduling Memorandum
DW-22   04/11/05 Meeting Notes
DW-23   08/12/05 Devereux Acceptance Letter
DW-24   08/25/05 Due Process Complaint Notice

We reserve the right to disclose additional documents as they become available, the right to rely on DCPS' witnesses and evidence as if disclosed by us and the right to rely on documents previously disclosed to counsel for any prior hearings or procedures. We also reserve the right to produce rebuttal witnesses and to object to expert witnesses without curriculum vitae. Should you have any questions or need additional information, please do not hesitate to contact me.

Sincerely,

Fatmata Barrie, Esq.

cc: SHO

482

**WATS** Washington Assessment
& Therapy Services

Ronald D. Wynne, PhD • President

## PSYCHOLOGICAL EVALUATION

Name: D_____ W_____          Date of Birth: _____/90

Dates of Testing: 4/8, 4/9/04          Age at testing: 13 yr. 11 mo.

Examined by: Marcia L. Gustafson, M.Ed.

### REASON FOR REFERRAL

D_____ was referred for evaluation by Linda Brown from First Home Care in order to assist in
making recommendations regarding D_____ educational and clinical needs.

### TESTS ADMINISTERED/ACTIVITIES UNDERTAKEN

Interview and observation
Comments, Ms. Areela Boadu (foster mother)
Wechsler Intelligence Scale for Children-Fourth Edition (WISC-IV)
Human Figure Drawing
Woodcock-Johnson III Tests of Achievement (WJ-III)
Jesness Inventory
Children's Depression Inventory (CDI)
Attention Deficit Disorders Evaluation Scale-home version
SIB-R Problem Behaviors Scale, informant Ms. Boadu

### BACKGROUND INFORMATION

D_____ is one of 6 children. Her mother who is 28 is not able to care for her children due to
neglect and lack of supervision caused by emotional issues. D_____ has been in the foster care
system since January of 2003 and has been in a number of foster homes. She has supervised visits
with her mother. D_____ has been in therapeutic foster care with Ms. Boadu for the past 4
months. A regular education student, she is currently failing seventh grade and has been
suspended numerous times for poor behavior. She is in therapy and takes medication, but her
behavior has not improved since she has been with Ms. Boadu, who is not planning to keep her.
There is a possible plan for her to go live with her godmother. D_____ is reported to be
sexually active and has contracted herpes.

### BEHAVIORAL OBSERVATIONS

D_____ initially seemed resentful about being evaluated, stating "I don't need to be here."
However, she quickly settled down and became quite friendly and motivated. She cooperated well
and worked hard. She demonstrated a somewhat impulsive response style, with careless scanning
leading to careless errors and a need to repeat instructions. Test results appear to accurately
demonstrate her abilities at this time.

☐ 4455 Connecticut Avenue NW • Suite A400 • Washington, DC 20008 • Tel: 202-537-1780, Option 3 • Fax: 202-966-8903
☐ 8737 Colesville Road • Suite 700 • Silver Spring, MD 20910 • Tel: 301-588-8881, Option 1 • Fax: 301-588-8880
☐ 12800 Middlebrook Road • Germantown, MD 20874 • Tel: 301-588-8881, Option 2 • Fax: 301-528-4315
☒ 5900 Princess Garden Parkway • Suite 300 • Lanham, MD 20706 • Tel: 301-588-8881, Option 4 • Fax: 301-577-8863
☐ 16944 Luanne Drive • Gaithersburg, MD 20877 • Tel: 301-588-8881, Option 5 • Fax: 301-990-4001

483

D███████ W████████                                                                    2

D███████ said that she would like to live with her godmother whom she described as "fun."
When asked for three wishes, she responded, "To live with my godmother, to get to Friendship
Edition, and to Harvard Medical School in order to be a doctor (which would be "fun.")
D███████ denied that therapy is useful. She admitted that she skips class and does not do the
work. She said that she "can't sit still long," that class is "boring," and that her friends "distract"
her. She said she would like to go to the Friendship Edition Charter School, where "I don't know
anybody."

## TEST SCORES

Wechsler Intelligence Scale for Children-Fourth Ed. (WISC-IV)

| Scale | IQ and range (90% confidence) | Percentile |
|---|---|---|
| Full Scale | 77 (74-82) | 6 |
| Verbal Comprehension | 77 (73-84) | 6 |
| Perceptual Reasoning | 79 (74-87) | 8 |
| Working Memory | 91 (85-98) | 27 |
| Processing Speed | 83 (78-93) | 13 |

(Range of scaled scores is 1-19; average range = 8-11)

| Verbal Subtests Scaled Scores | | Perceptual Reasoning Scaled Scores | |
|---|---|---|---|
| Similarities | 6 | Block Design | 5 |
| Vocabulary | 5 | Picture Concepts | 9 |
| Comprehension | 7 | Matrix Reasoning | 6 |

| Working Memory Subtests Scaled Scores | | Processing Speed Subtests Scaled Scores | |
|---|---|---|---|
| Digit Span | 13 | Coding | 6 |
| Letter-Number Seq. | 4 | Symbol Search | 8 |

Woodcock-Johnson III Tests of Achievement (normed by age)

| Test | Grade Equiv. | Standard Score | Percentile |
|---|---|---|---|
| ACADEMIC SKILLS | 5.3 | 85 | 16 |
| ACADEMIC APPLICATIONS | 5.3 | 86 | 18 |
| Letter-Word Identification | 4.8 | 86 | 17 |
| Calculation | 7.3 | 95 | 38 |
| Spelling | 4.4 | 83 | 13 |
| Passage Comprehension | 6.7 | 94 | 35 |
| Applied Problems | 5.1 | 86 | 18 |
| Writing Samples | 4.3 | 83 | 13 |

Human Figure Drawing
    Standard Score: 64 (deficient range)

Children's Depression Inventory
    Score: 7 (mild symptoms)

D██████ W██████                                                                3

SIB-R Problem Behavior Scale

| Maladaptive Indexes | Score | Level of Seriousness |
|---|---|---|
| GENERAL MALADAPTIVE INDEX | -54 | Very serious |
| Internalized | -31 | Serious |
| Asocial | -45 | Very serious |
| Externalized | -42 | Very serious |

Attention Deficit Disorders Evaluation Scale-home version
(Standard Scores range from 0 to 20)

| Subscale | Standard score | Percentile |
|---|---|---|
| Inattentive | 0 | 0 |
| Impulsive/hyperactive | 0 | 0 |
| Percentile: | | 1 |

## DIAGNOSTIC INTERPRETATIONS

Intellectual ability:  According to current test results, D██████ is functioning in the "borderline" (below average) range of intelligence. Her demonstrated intellectual ability is at around the nine year level for both verbal comprehension and perceptual-reasoning skills. Her working memory is average, while her perceptual speed is also borderline. The quality of her human figure drawing, used as a nonverbal estimate of intelligence, is below the average range, consistent with other test scores.

Language skills: D██████ scored in the "borderline" range (nine year level ) on tests of language processing. Her articulation is clear, and all her speech intelligible. D██████ receptive and expressive language skills are immature for vocabulary development, verbal concept formation and general comprehension. Her rote memory for information is better developed than her verbal reasoning skills. As a result of her mild language processing deficit, D██████ is likely to have difficulty understanding and retaining what is said to her, particularly if it is lengthy, complex and abstract.

Perceptual-motor skills: D██████ visual-motor skills are also below average (borderline and at the nine year level), consistent with other cognitive abilities. He writes in a large, immature, but legible cursive scrawl. She performed well below average on measures assessing spatial organization and nonverbal reasoning. Her graph-motor speed is low average. Overall, D██████ mild difficulty comprehending and organizing visual stimuli is likely to affect both work speed and mastery of visually presented information. She has a slightly difficult time absorbing complex information visually and works slowly and with a trial and error approach when dealing with manipulative and visual elements.

Academic skills: As evaluated by the WJ-III, D██████ academic skills are variable but generally fall in low average range. While her academic skills fall about three years below average, they are at least commensurate with intelligence. Both her academic skills and ability to apply

Apr 21 04 04:02p    Linda Brown                    2022489809                  p.6

D███████ W██████                                                                    4

those skills falls in the low average range and at the fifth grade range (two years below present grade placement. According to background information available, D███████ has done so little work in her regular seventh grade class, she will have to repeat the grade.

D███████ scored in the low average range (fourth grade level) on a test of reading recognition skills. Despite her difficulties with verbal reasoning, her reading comprehension is average and at the high sixth grade level. Her reading skills, while mildly below average overall, are consistent with intelligence.

D███████s writing skills are in the fourth grade range (low average). Both her spelling and the quality of her writing samples are at the fourth grade level and are commensurate with intelligence.

D███████ scored in the average range on a test of math calculation. Her applied math skills re in the fifth grade range (low average). As with her other academic skills, her math skills are mildly below grade level but are commensurate with intelligence.

Social/emotional functioning: As reported by her foster mother, D███████ behavior is disintegrating rather than improving, despite placement in a therapeutic foster home. Ms. Bondu described D███████ as "disrespectful, defiant and stubborn." Her foster mother perceives her to 'be out of control" and in need of residential placement.

Results of a behavior rating scale indicate that D███████ shows a very serious level of maladaptive behavior. She is frequently self-injurious (pulling out her hair, picking her skin and biting her nails).Occasionally she is aggressive. Quite often she is destructive of property. She is often disruptive (teasing, arguing, picking fights, yelling and screaming). She talks to herself, eats too much and makes odd noises. She engages in a good deal of socially offensive behavior, including talking too loudly, swearing, lying, standing too close to others and touching them too much, etc. On at least one occasion in recent times she has urinated on herself. Both at home and in school D███████ is reported to be uncooperative and oppositional. She often refuses to attend school or do her work. She cheats and steals. In addition, she appears to be sexually promiscuous.

Results of the ADDES-home version suggest that overall D███████ capacity for attention, impulse control and activity control are severely deficient. She is currently exhibiting marked symptoms of Attention Deficit Hyperactivity Disorder. These symptoms are exacerbated by her low language skills and high degree of emotional distress, which also interferes with attention and focus.

D███████ score of 7 on the CDI, along with interview and other information, suggests that she may be mildly depressed. She admits to often feeling sad and often does not have fun. She admits that her school work is not as good as it used to be, that she does not do what she is told, and that she fights a lot. D███████ low self-esteem and feelings of discontent tend to be expressed more through irritability and anger than through fearfulness.

486

Test results suggest that D[redacted] sees little reason to question her way of life or seek change in herself. She tends to minimize her problems and attribute their origin to the external world (e.g., authority figures). She thereby avoids taking responsibility for her actions and is able to perceive her own anger and acting out behaviors as reasonable and justified responses to external insult and injury. She is able to keep up a surface conformity with the perceived power structure and may often be cooperative when she feels be can trust an adult's authority, as was evident during testing. She does not rely, however, primarily on the adult power structure for approval and is actually quite emotionally distant and alienated from most adults. She relies rather on her peers for social approval and satisfaction of needs. Much of her misbehavior, including her promiscuity, can be attributed to her attempts to gain or maintain peer acceptance; as is common among foster children with low language skills, she is quite vulnerable to poor social judgment and negative peer influence.

On the positive side, D[redacted] clearly craves for positive attention from adults and is quite responsive to empathy and support from adults when she does not feel threatened or judged.

**DIAGNOSIS AND SUMMARY**

**DSM-IV Diagnostic Impression:**

Axis I: 313.81 Opposition Defiant Disorder
314.01 Attention Deficit Hyperactivity Disorder, Combined Type
300.4 Dysthymic Disorder
315.9 Learning Disorder NOS
995.5 Neglect of a child
Axis II: none
Axis III: none known
Axis IV: Psychosocial and Environmental Stressors: early neglect, foster care placement
Axis V: Global functioning (GAF): 50 (moderate to severe symptoms)

D[redacted] W[redacted] is an angry, immature 13 year old girl with a long history of maternal neglect. Since coming into the foster care system in 1/03, she has had multiple placements due to poor adjustment, culminating in her present foster home. She is continuing to exhibit serious behavioral problems both at school and at home, including sexual promiscuity, as well as symptoms of ADHD. She is functioning in the "borderline" (below average) range of intelligence, with functioning at the nine year level for both language processing and perceptual-motor skills. Her academic skills are low average, at least commensurate with intelligence. However, she is skipping school and doing little work.

**RECOMMENDATIONS**

Educational recommendations:

1. D[redacted] does not appear to be able to function in a regular school environment and will need

Apr 21 04 04:02p     Linda Brown          2022489809                    p.8

D▇▇▇▇ W▇▇▇▇                                                                      6

to be referred for special education assessment. Present test results, along with whatever supplemental measures her school team deems appropriate, may be used for this purpose.

2. If not already done, D▇▇▇▇ requires an updated speech/language evaluation to determine her need for speech/language therapy.

3. D▇▇▇▇ may also require classroom accommodations to help her focus, including preferential seating, modified assignments, a behavior modification plan, and increased time to do her work.

Clinical recommendations:

1. D▇▇▇▇ would benefit from weekly therapy.

2. D▇▇▇▇ medication should be closely monitored and adjusted as needed through regular psychiatric consultation.

3. If D▇▇▇▇ is unable to adjust to a therapeutic foster home within the next few months, residential placement may be necessary.

**This is a confidential report. The material contained in this evaluation may become invalid over time, so bear in mind the date of this report.**

Report prepared by:                           Report prepared under supervision of:

*Marcia Gustafson*

Marcia L. Gustafson, M.Ed.                    Ronald D. Wynne, Ph.D.
Psychology Associate                          Supervising Psychologist
MD School Psychologist II

                                              *Ronald Wynne PhD*  4/19/07
                                              D.C. License No. 747    Date

TOTAL P.08

488

Date of Evaluation: 8-12-96

DW-02

School: Stanton Elementary
Grade: first

610-2877

# GEORGETOWN UNIVERSITY PEDIATRIC MOBILE CLINIC
## PSYCHOLOGICAL REPORT

**Referral:** D_____ was referred for an evaluation by the Georgetown University Pediatric Mobile Unit which provides her primary medical care. The evaluation was sought in order to gain information about D_____ overall level of cognitive functioning and to help make recommendations for her future educational needs. D_____ is a first grader at Stanton Elementary.

## TESTS ADMINISTERED:

Wechsler Intelligence Scale for Children- Third Edition (WISC-III)
Wechsler Individual Achievement Test (WIAT)

**BEHAVIORAL OBSERVATIONS:** D_____ was accompanied to the evaluation by Janet Estes from the van team. She presented initially as an appealing but unhappy child. Throughout the session, she gradually became more comfortable and spontaneously sang little songs. She clearly enjoyed the individual attention and asked to visit the examiner. Her motor activity level was high. She wrote at times with her eyes close to the page.

Some evidence of language processing problems was noted. In response to oral and to conversation, D_____ repeatedly responded with "huh?" as if she could not hear or understand. She also confused prepositions (describing an umbrella as going "under your head").

10/7/96 Janet Thomas
Dewe

does have adeg. finger dexterity
visual proc. prob.
and motor integration

489

**RESULTS:**  The WISC-III measures thinking and problem solving skills using a variety of language tasks and puzzles and games.  Overall, D████████ performance reflects intellectual functioning in the borderline range (Full Scale IQ= 75).  When compared to other children her age, D████████ score ranks at the 5th percentile.  It should be noted that this score may underestimate D████████ potential due to her apparent downcast mood at the start of the evaluation,  her apparent inability to understand some questions and  cultural bias reflected in most tests of this kind, particularly in the verbal scores.  These scores, accordingly, should be used for short term planning only.

A very significant discrepancy was noted between  D████████ strong verbal skills and weaker non-verbal abilities.  Her language related abilities were low average to average  (Verbal IQ = 88) while her skills were deficient on visual tasks that involved  less language (Performance IQ = 65, deficient range).  A discrepancy of this magnitude (23 points)  between Verbal and Performance scales is very unusual and provides a measure of the variability of her skill.

There was little variation in D████████ score within the Verbal Scale.  She was able to answer long term memory and social reasoning questions at an age appropriate level.  She had slightly more difficulty on vocabulary, relating two ideas or objects to each other, short term memory for numbers and mental arithmetic.

Within the Performance Scale, there was variation in D████████ scores across skill areas. Specific relative strength was observed on the ability to analyze small details in drawings, although this was still below average.  D████████ had much more difficulty with tasks that required her to complete puzzles or paper and pencil tasks.

Academic testing with the WIAT showed skills at the Kindergarten level as follows:

| | |
|---|---|
| Basic Reading | K:1 |
| Mathematics Reasoning | K:3 |
| Spelling | K:7 |

These scores are commensurate with D████████ scores as tested on the WISC-III.

**SUMMARY:**

D████████ W████████ was seen for a psychological evaluation at 6 years and 4 months of age. Overall, she  scored in the borderline range of development but with far higher verbal than non-verbal scores.  Verbal scores were  in the low average to average range, in contrast to nonverbal scores in the deficient range.  This reflects dramatic variation in skills and suggests  that D████████ is at significant risk for learning disability.  This finding must be interpreted with caution because of D████████ age, mood at the start of testing and apparent difficulty understanding many of the things said to her.  Strengths identified were long term memory for information, social judgement and reasoning and verbal skills in general.  Visual tasks presented

490

much more difficulty for D███████. Academic scores are at the beginning Kindergarten level for reading and mathematic reasoning and at the late Kindergarten level in spelling.

## RECOMMENDATIONS:

1.    Visual acuity testing should be completed as soon as possible if this has not been done in the last year.

2.    Audiological assessment to rule out hearing loss as a cause of D███████ repeated queries of "huh?'

3.    Occupational Therapy evaluation concerning the visual processing difficulties noted during this testing.

4.    Language assessment because of the instances of difficulty with language processing during the assessment.

5.    D███████ will need special education services of a learning disability specialist for at least one hour three times a week at school on an individual or very small group basis.

6.    Monitor affect in school and during ongoing contacts with the van team and obtain further information from Ms. Dorn. If concern about D███████ mood is noted, updated clinical evaluation by the van team would be indicated.

7.    Retesting in one year is recommended to determine if the interventions instituted at the school have been sufficient or if a higher level or service is needed.


Diane M. Jacobstein, Ph.D.
Licensed Clinical Psychologist

# ADDENDUM
## Summary of Scores

## WECHSLER INTELLIGENCE SCALE FOR CHILDREN - THIRD EDITION

|  | Scaled Scores | Percentile |
|---|---|---|
| Information | 9 | 37 |
| Similarities | 7 | 16 |
| Arithmetic | 7 | 16 |
| Vocabulary | 7 | 16 |
| Comprehension | 9 | 37 |
| (Digit Span) | 7 | 16 |
|  |  |  |
| Picture Completion | 6 | 9 |
| Coding | 4 | 2 |
| Picture Arrangement | 4 | 2 |
| Block Design | 4 | 2 |
| Object Assembly | 3 | 1 |

| Summary Score |  | percentile | range at 95% confidence level |
|---|---|---|---|
| Verbal IQ = | 88 | 21 | 82-95 |
| Performance IQ = | 65 | 1 | 60-76 |
| Full Scale IQ = | 75 | 5 | 70-82 |
| | | | |
| Verbal Comprehension Index | 89 | 23 | 83-96 |
| Perceptual Organization Index | 67 | 1 | 62- 79 |
| Freedom from Distractibility Index | 84 | 14 | 77-95 |
| Verbal Comp. Index= 89 | | 23 rd perc | |

492

DW-03



GEORGETOWN UNIVERSITY MEDICAL CENTER

Child Development Center
*Center for Child Health and Mental Health Policy*

NAME:       D▮▮▮▮▮▮ W▮▮▮▮▮▮
DOB:        ▮▮▮/90
DOE:        10/7/96
AGE:        6 years, 6 months

## GEORGETOWN UNIVERSITY PEDIATRIC MOBILE VAN
## OCCUPATIONAL THERAPY EVALUATION

**REFERRAL:** D▮▮▮▮▮▮ was referred from the Van for an occupational therapy evaluation as part of a complete evaluation .

**GENERAL OBSERVATIONS:** D▮▮▮▮▮ willingly entered the testing situation. D▮▮▮▮▮ was friendly, engaging and very cooperative. She sat at the table and attempted all tasks presented to her. D▮▮▮▮▮ was attentive and appeared to be doing her best. The test results, therefore, should be a fairly accurate reflection of how she is currently functioning in the various areas addressed:

**TESTS ADMINISTERED:**

Bruininks-Oseretsky Test of Motor Proficiency:
    Visual-Motor Control Subtest
    Upper Limb Speed and Dexterity Subtest
Peabody Developmental Motor Scales
    Fine Motor Scale
Developmental Test of Visual-Perception-2

**Bruininks-Oseretsky Test of Motor Proficiency:** Fine motor skills are those which require the use of the small muscle groups, especially the muscles of the wrists and hands. Skills such as writing, cutting, and stringing beads are examples of fine motor skills. Two fine motor subtests from the Bruininks-Oseretsky Test of Motor Proficiency were given to D▮▮▮▮▮ to determine her fine motor functioning. Areas assessed included the following: visual-motor control and upper limb speed and dexterity. Scores obtained on these subtests can fall in one of five categories. The categories are high, above average, average, below average, and low.

The visual-motor control subtest looked at D▮▮▮▮▮ ability to coordinate eye and hand movements. She was required to do tasks such as cut out a circle, draw lines between boundaries, and copy geometric designs. D▮▮▮▮▮ experienced a lot of difficulty while cutting as she lacked accuracy while cutting on a curved line. D▮▮▮▮▮ did, however, trace fairly accurately through various pathways. D▮▮▮▮▮ copied a couple of simple designs but had more difficulty copying more complex designs. Her score on this subtest fell in the below average range as she achieved an age equivalent of 4 years, 8 months.

493

W██████, Da███████
Occupational Therapy Evaluation
DOE: 10/7/96
Page 2

Da████████ upper limb speed and dexterity was also measured on the Bruininks. On this subtest, Da███████ was required to manipulate a variety of small objects. She was required to perform tasks such as stringing beads, placing pegs, drawing lines, and sorting cards while being timed. De███████ was proficient at handling these objects as she achieved an average score with an age equivalent of 6 years, 8 months.

**Developmental Test of Visual-Perception-2:**  General visual perception is the ability to process information received through the eyes. The Developmental Test of Visual-Perception (DTVP-2) was given to De███████ to determine her visual perceptual skills. This evaluation looks at two main components of visual perception: motor reduced visual perception and visual-motor integration.

The motor reduced visual perception quotient is described as the most direct measure of visual perception in that only minimal motor skills (i.e., pointing) are required to complete the tasks. In other words, there are no drawing or pencil activities involved on this aspect of the measure and therefore, it looks strictly at visual perception.  On this section of the evaluation, D███████ was required to match shapes, pick out figures hidden in complex backgrounds, and recognize part to whole relationships.  D███████ was able to match like shapes such as squares, rectangles, circles, and ovals when presented slightly altered.  She experienced more difficulties when searching for information. She also had difficulty with tasks involving spatial orientation such as distinguishing the difference between diagonal lines oriented one way verses the other way (i.e., / \). Da███████ achieved a median motor reduced perceptual age equivalent of 4 years, 1 month with a composite score of 77 for a percentile rank of 6. These scores represent below average performance.

The visual-motor integration section measures the ability to put together information received from the visual channel with a motor response.  On this section, D███████ was required to copy geometric figures, draw lines through a variety of mazes, connect dots in a given pattern and draw marks in shapes within a given timeframe. D███████ again was fairly accurate while tracing.  She was able to copy simple shapes but not complex ones.   Da███████ achieved a median visual-motor integration age equivalent of 5 years, 5 months with a composite score of 88 and a percentile rank of 21.  These scores represent low average performance on this aspect of the test.

Overall, D███████ general or composite visual perceptual skills which is a combination of both aspects of this test approximates a 4 1/2 year developmental level with a standard score of 82 and a percentile rank of 12.  These scores represent below average performance. Children experiencing difficulties with visual perceptual and visual-motor integration are likely to experience difficulty with a range of tasks related to school activities such as reading, copying, writing and drawing.

494

Wil████, Da████████
Occupational Therapy Evaluation
DOE: 10/7/96
Page 3

**Peabody Fine Motor Scale:** The Fine Motor Scale from the Peabody Developmental Motor Scale was also given to D███████ to further evaluate her fine motor functioning. On this scale, her skills ranged from approximately a 4 year developmental level up to her age range. She achieved an overall age equivalent of 62 months. This represents a delay as well.

Four areas are assessed on this tool. These areas include grasping, hand use, eye-hand coordination, and manual dexterity. D███████ profile was uneven in that some of her skills were adequate while she struggled with others. D███████ demonstrated adequate manual dexterity or the ability to manipulate small objects. Her grasping skills were also well developed as she picked up a variety of small objects. D███████ would benefit from learning to hold a writing tool closer to the point. She demonstrated a predominance for her left hand although she was seen to switch to her right hand while cutting. D███████ experienced the most difficulty in the area of eye-hand coordination as she struggled with task such as cutting, copying, and drawing. D███████ will continue to benefit from tasks which challenge the development of her eye-hand coordination such as drawing, coloring, tracing, copying, cutting, and printing.

**SUMMARY:** D███████ is a 6 year, 6 month old child referred for an occupational therapy evaluation from the Van as part of a complete evaluation. D███████ fine motor skills, visual processing, and visual-motor integration were formally evaluated through the use of a variety of standardized tools. D███████ demonstrated an uneven profile in that her finger dexterity and manipulative skills were adequate while her visual processing and visual-motor integration were significantly delayed and these skills approximated a 4 1/2 - 5 1/2 year developmental level.

**RECOMMENDATIONS:** D███████ would benefit from occupational therapy services to support her in meeting her educational goals. Occupational therapy should focus on the following: enhancing her ability to process visual information, help her develop better eye-hand coordination, improve her pencil grip, help her develop precision in cutting and facilitate her handwriting skills. Consultation and collaboration with her classroom teacher will also be essential.

*M. Janet Thomas, MEd, OTR/L*
M. Janet Thomas, M.Ed., OTR/L
Occupational Therapist

495

# TEACHER'S COMMENTS

DW-04

| First Quarter - Date:_____ | Parent Signature_____ |
|---|---|
|  |  |

| Second Quarter - Date:_____ | Parent Signature_____ |
|---|---|
|  |  |

| Third Quarter - Date:_____ | Parent Signature_____ |
|---|---|
|  |  |

**Fourth Quarter- Date:** 6/23          Parent Signature_____

Da▓▓▓▓ came to Mattaponi on May 21st. She spent the first half of the grading period at C. T. Reed, however, no grades were submitted for the first half. The grades recorded reflect a summary of assignments done during a few weeks at Mattaponi.
I noticed that D▓▓▓▓ did not have basic math concepts required for sixth grade.

P. Green

|  | 1<br>Month/Day/Year | 2<br>Month/Day/Year | 3<br>Month/Day/Year | 4<br>Month/Day/Year |
|---|---|---|---|---|
| Conference Requested |  |  |  |  |
| Conference Held |  |  |  |  |
| Telephone Conference Held |  |  |  |  |
| Child is being considered for retention |  |  |  |  |

496

PGIN 7540-2500  10/94

DW-05

7. Based on your observations, evaluate the student in comparison to other students in the same grade by checking problems frequently observed:

**LISTENING COMPREHENSION**
___ Difficulty understanding spoken language
___ Difficulty following verbal directions

**ORAL EXPRESSION**
___ Difficulty expressing thoughts and ideas
✓ Limited speaking vocabulary

**READING**
✓ Difficulty with letter/word recognition
___ Word guessing
___ Slow, constant sounding out of words
___ Difficulty with comprehension (factual, critical)

**WRITTEN EXPRESSION**
___ Difficulty with spelling
✓ Difficulty with writing speed
✓ Difficulty completing written work
___ Difficulty with punctuation
✓ Difficulty writing a sentence
✓ Difficulty organizing sentences and ideas into meaningful paragraphs

**MATHEMATICS**
___ Difficulty with number recognition
___ Difficulty with number concepts
___ Difficulty with basic operations
    ___ Addition          ___ Multiplication
    ___ Subtraction       ___ Division
___ Difficulty understanding place value
___ Difficulty solving word problems

**DISCRIMINATION**
___ Difficulty discriminating letter symbols
___ Difficulty discriminating letter sounds

**MEMORY**
___ Difficulty remembering what is seen
___ Difficulty remembering what is heard
___ Difficulty retaining information over a period of time

**VISUAL MOTOR COORDINATION**
___ Difficulty with small motor tasks
___ Difficulty with paper/pencil tasks
✓ Difficulty copying from the board

**ATTENTION/ORGANIZATION/ACTIVITY LEVEL**
✓ Difficulty beginning a task
✓ Difficulty maintaining attention
✓ Easily distracted
✓ Loses or forgets work and/or materials
___ Difficulty with organization
___ Late for class
✓ Difficulty completing tasks
✓ Difficulty with changes in routine
___ Overactive
___ Underactive

**SOCIAL/EMOTIONAL**
✓ Lacks motivation
✓ Lacks self-control
✓ Easily frustrated
✓ Sudden changes in mood throughout day
✓ Inconsistency in performance
✓ Needs constant approval
___ Interrupts and distracts class
✓ Unusually aggressive toward others
___ Unusually shy or withdrawn
✓ Difficulty interpreting social cues
___ Difficulty making and keeping friends
✓ Doesn't accept responsibility for own behavior
___ Easily influenced by others

**SPEECH**
___ Stutters
___ Difficulty articulating speech sounds
___ Unusual voice quality

**OTHER COMMENTS:**

497

(2 of 9)

DW-06

4/17/03

D███████ W██████        DOB ███90

Diagnoses:

DSM - IV (TR) APA, 2000

AXIS I : 309.4 Adjustment Disorder with Mixed Disturbance of
         Emotions and Conduct
         R/O A D H D

AXIS II : No evidence
AXIS III : Facial acné
AXIS IV : Mentally ill custodial mother; non-engaged father;
          multiple F.H. placements;
AXIS V : GAF (current) 55

                                    A███████, M.D.

AKE MATTSSON, M.D.
First Home Care
1012  14th St., NW
Washington, D.C. 20005

498

DW-07

First Home Care Corporation

FORMAT FOR TYPED DIAGNOSTIC AND ASSESSMENT REPORT

Client Name: D▬▬ W▬▬    Date of Interview(s): _____

Client's Date of Birth: ▬▬1990

Interviewer: Stanislaus, Lorraine    Date of Report: _____

## Chronological Behavioral Health History

**a. Consumer's Current Symptoms/Presenting Problems**
D▬▬ William▬ is currently having issues with her academics, her sexual promiscuity, she has been known to runaway, and she will also needs individual and family therapy to deal with her separation from her family. She also needs a medical evaluation to deal with the problems that she has stated she is having with her vision.

**b. Mental Status**
D▬▬ stated that she feels sad when she thinks that she should not have told the social worker that she wanted to go into a group home.

**c. Current Mental Health/Psychiatric Treatment**
She is currently getting some therapy sessions at the agency.

**d. Mental Health/Psychiatric Treatment History**
As per D▬▬ does not have any past mental health or psychiatric issues.

**e. Current Medications/Allergies**

## Physical Health Concerns

**a. Prebirth, Delivery, Childhood Trauma**
NA

**b. Developmental Milestones**
NA

**c. Allergies**
NA

**d. Other Physical Health Concerns**
NA

## Life Dimensions

**a. Biological Strengths and Concerns**
D▬▬ has had an STD in the past and is still sexually active.

**b. Familial Strengths and Concerns**
D▬▬ has stated that she speaks to her mother daily and that she also has regular contact with her maternal and paternal relatives.

1    499

5/10/2003

c. Social Strengths and Concerns
Academically D███████ has stated that she needs help in math, Engish and Science and would also like a tutor as well as someone who is able to 'show her how to study'. D███████ stated that she enjoys singing, dancing and writing.

d. Client History of Abuse and/or Neglect
D███████ is in foster care because she stated to a mandated reporter that she had once been beaten while she was in the bath tub and that her mother had also beat her with an extension cord.

## Alcohol/Substance Abuse History

a. Substance Abuse Assessment findings
D███████ has stated that she has never abused any drugs or alcohol.

b. Substances Used Currently
NA

c. Substances Used in the Past
NA

d. Intergenerational Family History of Substance Abuse
D███████ has stated that she has never seen her mother abuse drugs or alcohol.

e. Withdrawal Risk
NA

f. Medical and Behavioral Risk Secondary to Intoxication
NA

g. Evaluators' Findings – Substance Abuse as a Dependency Issue or Co-Occurring Treatment Need
NA

## Self/Other Harming Concerns

Risk of Harm:
D███████ ran away from her previous foster home to go to a concert in December 2002.

If there are no concerns specifically indicate in writing in the report.

Name(s) of Client's Significant Other(s): Biological mother, foster mother and foster sister

## DSM- IV Diagnosis

Axis I:     309.9 Adjustment Disorder, unspecific (chronic)
Axis II:    V71.09 No Diagnosis
Axis III:   None
Axis IV:    Foster Care Placement; Mild Academic Difficulty
Axis V:     GAF= 74

2     500

5/10/2003

Loraine Adamkaus, Case Mgr.

_____
Signature, Qualified Practitioner with Supervision

4/30/03
_____
Date

_____
Signature, Qualified Practitioner with Supervision

_____
Date

3    501

DW-08

# DIAGNOSTIC / ASSESSMENT REPORT

Client's Name: D█████ W██████    Case No.: 273    DOB: ████1990

### SUMMARY OF FINDINGS & RECOMMENDATIONS FOR SERVICE DELIVERY
#### (INCLUDING ANY BARRIERS TO BE ADDRESSED DURING TX)

D█████ W███████ is a 13 year old AA female who is currently residing with a foster family due to her disclosing that to a social worker that she was beat by her mother while she was in the tub and she was also beat by her mother with an extension cord. D████████ has complained about feeling sad when she thinks about telling the social worker what her mother did to her because she wants to go home. D████████ is sexually active and has requested help in reading, math and science. As per D████████ she has never been hospitalized for any mental health or psychiatric reasons. D████████ stated that she has never had thoughts of harming herself or others and that she has never abused drugs. D███ ██████ recently ran away from one of her placements in December of 2002 to go to a concert.

Lorraine Stanislaus

Signatures (at least two are required)

Qualified Practitioner: *Loraine Stanislaus, Cas?M██* Date: 4/27/03

Qualified Practitioner: Date:

502

Dr. Weiner

DW-09

# PROGRESS NOTES

Consumer's Name: ~~Washington~~ / ~~Wendy~~

FHCC/Mental Health Rehabilitation Services

Account # ~~_____~~ / First

Service Date: __3__ . __03__ . __04__
MM   DD   YY

[ ] g: [ ] Natural [✓] FHCC Office
Attendance: [✓] Show [ ] No Show
Authorization Category: (Check One) [ ] Pre-Auth [ ] IAP [✓] ISSP

Time: Start 12:30 A.M./(P.M.)   Time: End 12:55 A.M./(P.M.)

Service Type (Check One)

[ ] DMH01 – D/A Interview

Duration _____ / _____
Hrs.      Min.
(15 Minutes Increments)

[ ] DMH02 – Medication – Somatic Treatment-Group
[ ] DMH03 – Medication – Somatic Treatment-Individual
[ ] DMH09 – Community Based Intervention

[ ] DMH11 – Counseling Group
[ ] DMH12 – Counseling – On Site
[ ] DMH13 – Counseling – Off
[ ] DMH04 – Community Support – Group
[ ] DMH05 – Community Support – Individual (Face to Face)
[ ] DMH05 – Community Support – Individual (Non Face to Face)

| Date | Progress Note: |
|------|----------------|
| | x 1 wk. |
| (3/3/03) | c/o of behavior problems. FM rts behavior problem 10/10. Sleeping fine since off concerta. Very easily gifted. Some moodiness. Pt feels she can control her mood. Ø sleep problems off medication. Approx 2 episodes of irritability at home daily. Very irritable while at school. Weight 163. |
| | MSE: A+O×3. Cooperative. Mood "OK". Affect full range. ØSI/HI/AH/VH. |
| | Plan: Discussed possible Bipolar Dx. and plan to try Risperdal to control irritability/mood lability. Risks/benefits s/w FM + pt. FM + pt. probable will give trial of risperdal 0.5 mg gh.s. #31   [?] begins to ask suspects dx   FU in 3 weeks. |
| | [signature] (WEINER, MD) |

[ ] ider (signature/credentials) _____ Date _____

Joshua Weiner, MD

Qualified Practitioner (signature/credentials) _____ Date _____

503

DW-10

# PARENT/GUARDIAN QUESTIONNAIRE

All information on this form will be used to assist in determining an appropriate educational program for your child.

If you have any questions please call **Sharon Merrill   Counselor     (30) 918-8716**
                                                        *Name*                                    *Telephone*

Today's Date **3-20-03**                    School **C.T. Reed Elementary**

Student **D██████ W████████**        Teacher **Mrs. Edwards**

Birthdate **██-90**                              Grade **6**

## Family Data

| Age | Household Members: Relationship | Occupation (If Appropriate) |
|---|---|---|
| (Biological) | | |
| 27 | Mother | |
| 10 | Brother | |
| (Foster home) | | |
| | Mother | USPS |
| | Father | USPS |
| 16 | Child | |
| 15 | Child (foster) | |

Describe any serious concerns you have about your child.

**emotional disturbance
behavioral concerns**

Describe any school-related problems other family members have experienced.

**truancy**

Is English the usual language spoken at home?  ✓ Yes ____ No   Other Language _____

## Pregnancy and Birth

Describe any serious health problems the mother experienced during the pregnancy.

_____

_____

During what month(s) of the pregnancy did these problems occur? _____

_____

Birthweight _____ Apgar Scores _____ / _____

Did any of the following occur during the birth process?

____ Premature                    ____ Transfusion              ____ Caesarian section
____ Breech birth                 ____ Prolonged labor        ____ Oxygen problem
____ Blood incompatability (RH Factor)                           ____ Fetal distress

504

Other birth problems and/or concerns: _____

_____

_____

Describe any difficulties your child had in learning to eat, sleep, sit, walk, or talk. _____

_____

_____

Briefly describe any traumatic events which the child has experienced, for example: death of close relative, divorce, family crisis. removal from biological home, placement in foster care, abscondances & multiple placements

**Medical History**

Please check below any illness or problems the child has had:

_____ Physical defect
_____ Eye problems
_____ Ear problems
_____ Operations
_____ Temperatures above 104°

_____ Frequent colds
_____ Frequent sore throats
_____ Headaches
_____ Heart disease

_____ Allergies
_____ Asthma
_____ Epilepsy
_____ Diabetes
✓ Other: STD

_____ Speech problems
_____ Dietary problems
_____ Serious accidents
        or injuries

Describe any of the problems checked above: _____

_____

_____

Has the child ever been hospitalized? _____ No  _____ Yes  Reason: _____

Age at time of hospitalization: _____  How long in hospital? _____

Is the child under treatment or medication at present?  (If yes, please explain) Child had psychiatric eval

How would you rate the child's general health?  *(check)*  _____ excellent  ✓ good  _____ fair  _____ poor

_____

**SOCIAL BEHAVIORAL CHARACTERISTICS** – *Please check the statements which describe your child:*

_____ Doesn't seem to understand
        questions or directions
_____ Gets ideas quickly
_____ Creative
_____ Difficulty expressing throughts
        and ideas
_____ Enjoys reading
_____ Avoids reading
_____ Difficult time with paper/
        pencil tasks
_____ Enjoys writing tasks
_____ Difficulty using numbers
_____ Cannot tell time
_____ Enjoys math tasks
_____ Reverses letters or numbers
_____ Other _____

_____ Difficulty remembering
        information
_____ Remembers most information
        learned
✓ Short attention span
_____ Avoids homework
_____ Organized
_____ Disorganized
_____ Forgetful
_____ Difficulty with changes in
        routine
_____ Difficulty completing jobs and
        activities
_____ Often talks to self working
_____ Overactive
_____ Underactive

_____ Lacks motivation
_____ Frequently late
_____ Lacks self control
_____ Inconsistent behavior
_____ Self confident
_____ Difficulty making and keeping
        friends
_____ Shy or withdrawn
_____ Aggressive towards others
_____ Cooperative
_____ Doesn't accept responsibility
        for own behavior
✓ Tells lies
✓ Likeable
_____ Difficulty with speech
_____ Easily influenced by others 505

DW-11

# Behavior Healthcare and Diagnostic Services

## Therapeutic Summary

**Name:** D̶̶̶̶̶̶̶̶ W̶̶̶̶̶̶̶          **Date:** <u>03/15/03</u>

**Session Length:** <u>30 minutes</u>     **Session #** <u>1</u>

**Therapeutic Modality:**      <u>Parent/Child</u>

---

**Behavior Problem:**
1. Poor self-concept/self-esteem.
2. Depressed mood, irritability and low motivation
3. Difficulty with compliance to commands

**Treatment Goal:**
1. Improve self-concept, self respect, and self confidence
2. Elevate mood, decrease irritability and motivate the client.
3. Establish appropriate alternative cooperative behavior.

**Intervention.**
1. Work through the dynamics of self-concept
2. Apply cognitive restructuring to decrease negative self-talk.
3. Reward planning- client will list positive behaviors enjoyed in the past or anticipated future.
4. Develop appropriate use of contingency management both at home and at school.

**Recommendations:** Individual counseling is recommended for seven sessions.

---

Pamela McCollum-Butler,Ph.D.
Associate Psychologist

Supervised by:
Emmanuel Olarinde,PhD, DABPS
Licensed Clinical Psychologist

506

# Multidisciplinary Team Meeting Summary Notice

| | | |
|---|---|---|
| Meeting Date: 05/20/2003 | Notice Date: 05/21/2003 | Initiation Date: |

| | |
|---|---|
| Time Meeting Started: 1:30 PM | Time Meeting Ended: 2:30 PM |

| | | |
|---|---|---|
| Student's Name: D_____ W_____ | ID: 000462802 | Grade: 06 |
| School: CATHERINE T REED ELEMENTARY | Age: 13 | D.O.B.: ___/1990 |

**Reason For Meeting:**

to review existing/additional information

## Actions Proposed, with Explanations of Why Proposed

The MDT recommended that the student continue in the general education program.
She has been diagnosed with Adjustment Disorder with Mixed Disturbance of Emotions and Conduct.
The student has moved to a new foster family and will be going to her home school Mattaponi in Upper Marlboro, MD.
The team has recommended that her new school should consider a 504 Plan to assist the student with her educational program.

## Actions Refused, with Explanations of Why Refused

Actions Proposed
General education classroom without the appropriate modifications. The student is in need of appropriate modifications to maintain in a general education classroom.

## Other Options Considered and Reasons Rejected

Prior to determining the need for the action we are proposing, the MDT considered the following options for the student:

General education classroom without the appropriate modifications.

## Basis for Determination

The basis for the proposed action considered by the team includes results of a review in the following areas:

behavior/social/emotional
fine motor

## Other Relevant Information

The multidisciplinary team (MDT) is not aware of any other factors than those previously addressed.

## Procedural Safeguards

You were provided a copy of the "Procedural Safeguards: Parental Rights" document at the meeting and any questions you had were addressed. If you desire to seek assistance on filing a complaint, refer to the section on resolving disagreements. You were also asked to sign a receipt for our records. If you have further questions, please contact the MDT Chairperson.

## Contacts for Assistance

If you desire additional sources of assistance, you may contact the Prince George's County Special Education Parent Center at 301-925-2811, or The Parents Place of Maryland, Inc at 1-410-859-5300.

If you have any questions regarding this meeting or the student's program or, if you wish to schedule another meeting, please call the MDT Chairperson.

507

# Multidisciplinary Team Meeting Summary Notice

**Meeting Date:** 04/29/2003      **Notice Date:** 05/01/2003      **Initiation Date:**

| | |
|---|---|
| **Time Meeting Started:** 10:45 AM | **Time Meeting Ended:** 11:30 AM |

**Student's Name:** D███████ W██████      **ID:** 000462802      **Grade:** 06

**School:** CATHERINE T REED ELEMENTARY      **Age:** 12      **D.O.B.:** ██/██/1990

**Reason For Meeting:**

To review existing data and determine the need for assessment(s).

## Actions Proposed, with Explanations of Why Proposed

The MDT recommended that the student continue in the general education program.

The foster parents will be going to surrogacy training on May 13, 2003. Until then the foster parents are unable to sign anything.

The student has had a psychiatric evaluation at Foundations for Home and Community. An official report has not been submitted to the social worker at this time.

From previous evaluations the student has been diagnosed with Adjustment Disorder and with Mixed Conduct Disorder per social worker.

The team has requested psychological, psychiatric, educational, and behavioral scales to assist with educational programming.

The team has given out a permission to release information to the social worker.

## Actions Refused, with Explanations of Why Refused

The MDT considered but rejected placement in the general education setting without modifications. To meet the instructional outcomes of the general education setting the student requires some modifications.

## Other Options Considered and Reasons Rejected

Prior to determining the need for the action we are proposing, the MDT considered the following options for the student:

General education classroom without modifications.

## Basis for Determination

The basis for the proposed action considered by the team includes results of a review in the following areas:

behavior/social/emotional
math
classroom observation
reading
written language

## Other Relevant Information

The multidisciplinary team (MDT) is not aware of any other factors than those previously addressed.

## Procedural Safeguards

You were provided a copy of the "Procedural Safeguards: Parental Rights" document at the meeting and any questions you had were addressed. If you desire to seek assistance on filing a complaint, refer to the section on resolving disagreements. You were also asked to sign a receipt for our records. If you have further questions, please contact the MDT Chairperson.

## Contacts for Assistance

If you desire additional sources of assistance, you may contact the Prince George's County Special Education Parent Center at 301-925-2811, or The Parents Place of Maryland, Inc at 1-410-859-5300.

If you have any questions regarding this meeting or the student's program or, if you wish to schedule another meeting, please call the MDT Chairperson.

508

DW-13



PRINCE GEORGE'S COUNTY PUBLIC SCHOOLS
Upper Marlboro, Maryland 20772

# Notification of Pupil's Suspension
## *(Short Term)*

TO: JULLANA CARTER
*Parent or Guardian*

9017 CHEVAL LA
*Address*

UPPER MARLBORO, MD 20772

(301) 952-1113
*Home Phone*                    *Work Phone*

James Madison Middle School
*School*

10/23/2003
*Date*

Special Education:    Yes    No
Section 504:          Yes    No

Cumulative Days of Suspension
for the Current School Year:    0

RE: D.███████ D. W███████
*Pupil's Name*

000462802        ███████, 1990        07
*ID Number*       *Birth Date*      *Grade*

This is to confirm the suspension of your (son) (daughter) as of   10/24/03  , for   5   days . The reason(s) for this suspension (is) (are):

Persistent Disobedience

Insubordination

Guidance/Disciplinary Procedures utilized prior to this suspension:

## Guidance Procedures

Teacher-student conference
Teacher-parent conference or contact
Teacher-counselor conference
Teacher-administrator conference
Counselor-student conference
Counselor-parent conference

x   Administrator-student conference
x   Administrator-parent conference
    Student program adjustment
    Referral to Pupil Services
    Pupil Services-student/parent contact

## Disciplinary Procedures

Detention Hall
Behavioral Probation
Temporary removal from class

Other:

To be noted if it applies:

The above alternatives have been considered in this instance and are reasonably held inappropriate to resolving the problem.

It will be necessary for you to have a conference at school regarding the reason(s) for the suspension before your (son) (daughter) may be readmitted to school. Therefore, we are making a tentative appointment for you to come to school at (Time)    9:30 a.m.  on (Date)    11/03/03    . If you cannot come at the time indicated above, please call (Name)    Mr. I. Jabbie at (Phone No.)    (301) 599-2422    to arrange for another appointment. If we do not hear from you to the contrary, we will expect you at the time indicated above. Suspended students are not permitted on any school premises during the period of this suspension.

Following the conference that will be scheduled for you concerning this suspension, if you wish a review of the decision(s) that result from the conference, you may do so by writing to the Chief Divisional Administrator for Pupil Services, Prince George's County Public Schools, Upper Marlboro, Maryland 20772, within ten days.

cc:    Mrs. Grayson          301-952-2400
       *Pupil Personnel Worker*      *Phone*

*Bruce Tyler (CAP)*
*Principal's Signature*

1st Copy: To be sent to parent        2nd Copy: To be given to pupil for transmittal to parent        3rd Copy: To be sent to PPW
4th Copy: Cumulative Folder           5th Copy: School Administrator

PS-31 (11/01)
PGIN 7540-3031

509


QUEST
Quality Education
for Every Student

PRINCE GEORGES COUNTY PUBLIC SCHOOLS
Upper Marlboro, Maryland 20772

# Notification of Pupil's Suspension
## (Short Term)



TO: __Mr. and Mrs. Joseph A. Powell, Jr.__          __Catherine T. Reed Elementary__
          *Parent or Guardian*                                    *School*

    __8109 Hollydale Drive__                                __March 27, 2003__
          *Address*                                             *Date*

    __Glenn Dale, MD    20769__                    Special Education: Yes _____    No _x_
                                                       Section 504:        Yes _____    No _x_
    __301-352-0218__          __301-883-7422__        Cumulative Days of Suspension
       *Home Phone*              *Work Phone*          for Current School Year: _____ __1__

RE: __D███████ W███████__                   ____/90____               __6__
      *Pupil's Name*                              *Birth Date*            *Grade*

This is to confirm the suspension of your (son) (daughter) as of __3/28__, for __1__ days. The reason(s) for this suspension (is) (are):

__Suspended for one day for continued class disruption and insubordination.__

Guidance/Disciplinary Procedures utilized prior to this suspension:

**GUIDANCE PROCEDURES**                                              **DISCIPLINARY PROCEDURES**
☑ Teacher-student conference          ☑ Administrator-student conference      ☐ Detention Hall
☐ Teacher-parent conference or contact ☑ Administrator-parent conference      ☐ Behavioral Probation
☑ Teacher-counselor conference         ☐ Student program adjustment           ☑ Temporary removal from class
☑ Teacher-administrator conference     ☐ Referral to Pupil Services
☑ Counselor-student conference         ☐ Pupil Services-student/parent contact
☑ Counselor-parent conference

Other: _____

To be noted if it applies:
☐ The above alternatives have been considered in this instance and are reasonably held inappropriate to resolving the problem.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
  It will be necessary for you to have a conference at school regarding the reason(s) for the suspension before your (son) (daughter) may be readmitted to school. Therefore, we are making a tentative appointment for you to come to school at *(Time)* __8:30 a.m.__ on *(Date)* __3/31/03__. If you cannot come at the time indicated above, please call *(Name)* __Mrs. Gwendolyn Jefferson__ at *(Phone No.)* __301-918-8716__ to arrange for another appointment. If we do not hear from you to the contrary, we will expect you at the time indicated above. Suspended students are not permitted on any school premises during the period of this suspension.

  Following the conference that will be scheduled for you concerning this suspension, if you wish a review of the decision(s) that result from the conference, you may do so by writing to the Director for Pupil Services, Prince George's County Public Schools, Upper Marlboro, Maryland 20772, within ten days.

cc: __Ms. JoAnn Yates__                                              _____
    *Pupil Personnel Worker*                                    *Principal's Signature*

## Filing Instructions:
– File the appropriate copy of this form in the Cumulative Folder with the student's other school records. A copy may be maintained in a separate disciplinary file by the principal or his/her designee.
– Discipline Records must be maintained until the student graduates or completes his/her education program or the student —becomes 21 years of age.

White Copy: To be sent to parent          Green Copy: To be given to pupil for transmittal to parent          Canary Copy: To be sent to PPW          510
Pink Copy: Cumulative Folder              Goldenrod Copy: School Administrator

PS-31 (6/02)
PGIN 7540-2031

PRINCE GEORGE'S COUNTY PUBLIC SCHOOLS
Upper Marlboro, Maryland 20772

# PUPIL DISCIPLINE REFERRAL

SCHOOL [illegible] PUPIL [redacted] TEACHER [illegible] SUBJECT

GRADE 6 TIME REFERRED 2:15 PERIOD DATE 3/27/03

## CHECK CONDUCT OF PUPIL BELOW

- ☐ Alcoholic beverages
- ☐ Arson
- ☐ False alarms
- ☐ Possession of fireworks or explosives
- ☐ Inciting others to violence or disruption
- ☐ Physical attack and/or threat thereof
- ☐ Possession or use of weapons
- ☐ Shakedown and/or strong arm
- ☐ Possession, use or distribution of a controlled dangerous substance
- ☐ Vandalism and/or destruction of property
- ☐ Fighting
- ☐ Theft
- ☑ Continued class disruption
- ☑ Disrespect
- ☐ Distribution of unauthorized printed materials
- ☐ False reports
- ☐ Forgery
- ☐ Gambling
- ☑ Insubordination
- ☐ Loitering
- ☐ Smoking
- ☐ Unauthorized sale or distribution
- ☐ Other

**Describe circumstances of conduct:**

At 9:30 AM [redacted]. [redacted] [illegible] [illegible] Hall. [illegible] [illegible]. Then she started in with Anthony. Now [illegible] and she's still continuing the negative behaviors. This afternoon [redacted] [illegible] and refused to do [illegible] a lot of [illegible] was going on with her refusing to do the [illegible]. She kept ~~[illegible]~~ Anthony Anthony, I [illegible] her, she started [illegible] the class [illegible]. Asked her to stop [illegible] [illegible] be picked up [illegible]

## INDICATE PRIOR ACTION TAKEN BY TEACHER TO RESOLVE PUPIL'S PROBLEMS

☑ Conference with Pupil ☐ Conference with Parent ☐ Administrative Conference

~~☐ Other Disciplinary Action Taken~~

Teacher's Signature [signature]

## CHECK ACTION TAKEN BY ADMINISTRATOR BELOW

- ☐ Teacher-student conference
- ☐ Teacher-parent conference or contact
- ☐ Teacher-counselor conference
- ☐ Teacher-administrator conference
- ☐ Counselor-student conference
- ☐ Counselor-parent conference
- ☐ Administrator-student conference
- ☐ Administrator-parent conference
- ☐ Student Program adjustment
- ☐ Referral to Pupil Services
- ☐ Pupil Services-student/parent contact
- ☐ Detention Hall
- ☐ Behavioral Probation
- ☐ Temporary removal from class
- ☐ Short-term suspension
- ☐ Long-term suspension
- ☐ Referral to Security Counselor

**Other Disciplinary Action Taken:**

Student/Admin Conference
1 day Out-of-School Suspension 3/28/03
Parent conference set for 3/31/03 at ~~[illegible]~~ 8:30 a.m. with A.O. [illegible]

Administrator's Signature [signature]

Send all copies to office with student

WHITE COPY — Administrator CANARY COPY — Teacher PINK COPY — Cumulative Folder GOLDENROD COPY — Other

PRINCE GEORGE'S COUNTY PUBLIC SCHOOLS
Upper Marlboro, Maryland 20772
# PUPIL DISCIPLINE REFERRAL

SCHOOL _____ PUPIL _____ TEACHER _Edward_ SUBJECT _____

GRADE _6_    TIME REFERRED _3:40_    PERIOD _____    DATE _3/14/03_

## CHECK CONDUCT OF PUPIL BELOW

**Describe circumstances of conduct:**

- [ ] Alcoholic beverages
- [ ] Arson
- [ ] False alarms
- [ ] Possession of fireworks or explosives
- [ ] Inciting others to violence or disruption
- [ ] Physical attack and/or threat thereof
- [ ] Possession or use of weapons
- [ ] Shakedown and/or strong arm
- [ ] Possession, use or distribution of a controlled dangerous substance
- [ ] Vandalism and/or destruction of property
- [x] Fighting
- [ ] Theft
- [ ] Continued class disruption
- [ ] Disrespect
- [ ] Distribution of unauthorized printed materials
- [ ] False reports
- [ ] Forgery
- [ ] Gambling
- [ ] Insubordination
- [ ] Loitering
- [ ] Smoking
- [ ] Unauthorized sale or distribution
- [ ] Other

_3:30 Bus call time. _____ had a continued yelling match with ___. I asked them several times to stop and go back to their seats. They ignored me the entire time as if I had not given any direction. The yelling continued out into the hall. Mr. Hunt and Mr. Keiler witnessed the yelling that continued. She called him a name and it continued. After this disturbance when ___._

## INDICATE PRIOR ACTION TAKEN BY TEACHER TO RESOLVE PUPIL'S PROBLEMS

- [x] Conference with Pupil
- [ ] Conference with Parent
- [ ] Administrative Conference
- [ ] Other Disciplinary Action Taken

Teacher's Signature _____

## CHECK ACTION TAKEN BY ADMINISTRATOR BELOW

**Other Disciplinary Action Taken:**

- [ ] Teacher-student conference
- [ ] Teacher-parent conference or contact
- [ ] Teacher-counselor conference
- [ ] Teacher-administrator conference
- [ ] Counselor-student conference
- [ ] Counselor-parent conference
- [ ] Administrator-student conference
- [ ] Administrator-parent conference
- [ ] Student Program adjustment
- [ ] Referral to Pupil Services
- [ ] Pupil Services-student/parent contact
- [ ] Detention Hall
- [ ] Behavioral Probation
- [ ] Temporary removal from class
- [ ] Short-term suspension
- [ ] Long-term suspension
- [ ] Referral to Security Counselor

_Student/Admin conference. Continued problems will result in a suspension._

Administrator's Signature _____

WHITE COPY — Administrator    CANARY COPY — Teacher    PINK COPY — Cumulative Folder    GOLDENROD COPY — Other

Send all copies to office with student

PS-74 (Revised 5/86)

PRINCE GEORGE'S COUNTY PUBLIC SCHOOLS
Upper Marlboro, Maryland 20772
## PUPIL DISCIPLINE REFERRAL

SCHOOL _____ PUPIL _____ TEACHER _Miss Keene_ SUBJECT _____

GRADE __6__ TIME REFERRED _12:30 pm_ PERIOD _____ DATE _5/15/03_

### CHECK CONDUCT OF PUPIL BELOW
#### Describe circumstances of conduct:

- ☐ Alcoholic beverages
- ☐ Arson
- ☐ False alarms
- ☐ Possession of fireworks or explosives
- ☑ Inciting others to violence or disruption
- ☐ Physical attack and/or threat thereof
- ☐ Possession or use of weapons
- ☐ Shakedown and/or strong arm
- ☐ Possession, use or distribution of a controlled dangerous substance
- ☐ Vandalism and/or destruction of property
- ☐ Fighting
- ☐ Theft
- ☑ Continued class disruption
- ☑ Disrespect
- ☐ Distribution of unauthorized printed materials
- ☐ False reports
- ☐ Forgery
- ☐ Gambling
- ☑ Insubordination
- ☐ Loitering
- ☐ Smoking
- ☐ Unauthorized sale or distribution
- ☐ Other

D_____ has exhibited disruptive and disrespectful behavior the entire morning. I had counselled D_____ at the beginning of the day regarding her behavior, this was not effective. D_____ was disruptive at the special assembly she talked out loud and was singled out by the speaker for her behavior. Upon return to the classroom she continued to talk out loud and would not quiet down when asked.

### INDICATE PRIOR ACTION TAKEN BY TEACHER TO RESOLVE PUPIL'S PROBLEMS

☑ Conference with Pupil      ☐ Conference with Parent      ☐ Administrative Conference

☑ Other Disciplinary Action Taken _Sent to the office_

Teacher's Signature _Pauline D Keene_

### CHECK ACTION TAKEN BY ADMINISTRATOR BELOW
#### Other Disciplinary Action Taken:

- ☐ Teacher-student conference
- ☐ Teacher-parent conference or contact
- ☐ Teacher-counselor conference
- ☐ Teacher-administrator conference
- ☐ Counselor-student conference
- ☐ Counselor-parent conference
- ☐ Administrator-student conference
- ☐ Administrator-parent conference
- ☐ Student Program adjustment
- ☐ Referral to Pupil Services
- ☐ Pupil Services-student/parent contact
- ☐ Detention Hall
- ☐ Behavioral Probation
- ☐ Temporary removal from class
- ☐ Short-term suspension
- ☐ Long-term suspension
- ☐ Referral to Security Counselor

Student/Admin conference 2 day out of school suspension (May 16-19, 2003) Parent/Student/Teacher conference set for 5/20/03 at 8:15 am with Ms. _____

Administrator's Signature

Send all copies to office with student

513

WHITE COPY — Administrator      CANARY COPY — Teacher      PINK COPY — Cumulative Folder      GOLDENROD COPY — Other

PS-74 (Revised 5/86)

(See Reverse Side for Instructions)



PRINCE GEORGE'S COUNTY PUBLIC SCHOOLS
Upper Marlboro, Maryland 20772

# Notification of Pupil's Suspension
## *(Short Term)*

TO:  Mr. and Mrs. Carter (Respite Care)
_Parent or Guardian_

9017 Cheval Lane
_Address_

Upper Marlboro, MD  20772

301/952-1113
_Home Phone_                            _Work Phone_

RE: D███████ W███████
_Pupil's Name_

Catherine T. Reed Elementary
_School_

May 15, 2003
_Date_

Special Education: Yes _____ No _x_
Section 504:    Yes _____ No _____
Cumulative Days of Suspension
for Current School Year: _____ 3

███/03                    6th
_Birth Date_              _Grade_

This is to confirm the suspension of your (son) (daughter) as of  5/16/03    The reason(s) for this suspension (is) (are):

Suspended for two days (5/16-19/03) for Inciting others to violence or disruption/dis-

respect, insubordination and continued class disruption.

Guidance/Disciplinary Procedures utilized prior to this suspension:

**GUIDANCE PROCEDURES**

☑ Teacher-student conference
☑ Teacher-parent conference or contact
☑ Teacher-counselor conference
☑ Teacher-administrator conference
☑ Counselor-student conference
☑ Counselor-parent conference

☑ Administrator-student conference
☑ Administrator-parent conference
☐ Student program adjustment
☐ Referral to Pupil Services
☐ Pupil Services-student/parent contact

**DISCIPLINARY PROCEDURES**

☑ Detention Hall
☑ Behavioral Probation  FBA
☑ Temporary removal from class

Other:

To be noted if it applies:
☐ The above alternatives have been considered in this instance and are reasonably held inappropriate to resolving the problem.

It will be necessary for you to have a conference at school regarding the reason(s) for the suspension before your (son) (daughter) may be readmitted to school. Therefore, we are making a tentative appointment for you to come to school at *(Time)* 8:15 a.m. on *(Date)* 5/20/03 . If you cannot come at the time indicated above, please call *(Name)* Mrs. Gwendolyn C. Jefferson at *(Phone No.)* 301-918-8716 to arrange for another appointment. If we do not hear from you to the contrary, we will expect you at the time indicated above. Suspended students are not permitted on any school premises during the period of this suspension.

Following the conference that will be scheduled for you concerning this suspension, if you wish a review of the decision(s) that result from the conference, you may do so by writing to the Associate Superintendent for Pupil Services, Prince George's County Public Schools, Upper Marlboro, Maryland  20772, within ten days.

cc:   Ms. JoAnn Yates
_Pupil Personnel Worker_

_Principal's Signature_

White Copy: To be sent to parent          Green Copy: To be given to pupil for transmittal to parent          Canary Copy: To be sent to PPW
Pink Copy: Cumulative Folder             Goldenrod Copy: School Administrator

PS-31 (6/01)
PGIN 7540-3031                            **(See Reverse Side for Instructions)**

514

**PRINCE GEORGE'S COUNTY PUBLIC SCHOOLS**
**Department of Pupil Services**
Upper Marlboro, Maryland 20772

January 21, 2004

Ms. Areela Boadu
8001 Dellwood Avenue
Lanham, MD  20706

|  |  |
|---|---|
| RE: | Dayshawn D. Williams |
| BD: | 04/13/90 |
| School: | Thomas Johnson Middle |
| Date of Suspension: | 01/20/04 |
| Reason: | Inciting Others to Violence and Disruption |

Dear   Ms. Boadu:

A preliminary review of the principal's request for a suspension of your son/daughter,   D̶a̶y̶s̶h̶a̶w̶n̶ ̶
W̶i̶l̶l̶i̶a̶m̶s̶ _____   beyond ten school days has been conducted.

In accordance with Board of Education policy, the request has been:

   __X__   tentatively approved.  A suspension conference has been scheduled for   **you and your child**
at **2:30 p.m. on January 30, 2004, at Thomas Johnson Middle High School.**

   _____   denied.  Your son/daughter may be readmitted to school no later than   _____
Please contact the principal for a conference.

Thank you for your cooperation in this matter.

Sincerely,

*Ethel Levine*

Ethel Levine
Pupil Personnel Worker
Phone: 301-486-3712

**White Copy - Parent**
**Canary Copy - Principal**
**Pink copy – Region II Executive Director**
**Goldenrod copy - Pupil Personnel Worker**

PS-73 (11/95)

515

Board of Education of
Prince George's County



# Region II

## Office of the Regional Executive Director

66 Ridge Road, Greenbelt, MD 20770
Phone: 240-684-6235 • Fax: 240-684-6242

Bruce Katz, Ed.D.
Executive Director

### Prince George's County Public Schools

☐ Expulsion

■ Long-term Suspension

## LONG-TERM SUSPENSION/EXPULSION INVESTIGATION REPORT

<u>SECTION I</u> : Student Data                                      Student ID:  000462802

Pupil :    W██████      D██████       D.        D.O.B : ██/██/90
          Last          First          Middle

School :   Thomas Johnson Middle          Grade :   07

Parent(s) : _____ Guardian(s) : _____   Other(s) :   Foster Parent

Name(s) :   Areela Boadu

Address :   8001 Dellwood Avenue, Lanham, MD  20706

Telephone: Home :    301-322-2664

Work - Mother : _____       Work – Father : _____

SPECIAL EDUCATION     YES ()      NO  (x)     504 DISABILITY    YES ()     NO  (x)

MDT Meeting Date :     N/A                      *(If Applicable)*

MDT Decision :    *The student's disability did () / did not () significantly*
                      *contribute to the behavior resulting in this expulsion request.*

<u>SECTION II</u>:  Investigation

Date of Incident :    January 20, 2004     Date of Suspension Request :    January 30, 2004

Reason for Request :    Inciting Others to Violence and Disruption
*If applicable:*

Weapon/Explosive used or possessed:       N/A                MSDE Code:  N/A

Persons Contacted :    Student ___X___     Parents(s) ___X___     Principal _____

Administrator(s) ___x___    Counselor _____    Teacher(s) _____    Security _____

Other(s) _____

Student aware of Code of Student Conduct regarding incident?       Yes _____      No _____

Date Code of Student Conduct Statement Signed : _____

Revised 7/03

516

Long-Term Suspension Investigation for:  W_____, D_____ D.          Page 2

## Description of Incident :

**(Also include statements from the accused, victim, witness, and others having knowledge of the incident.)**

On January 10, 2004, D_____ and two other girls were getting ready to fight but staff quashed this. It was decided that she would spend the rest of the day in in-school suspension, as her foster mother could not attend for an impromptu proactive conference.  Enroute to lunch however, D_____ left the cafeteria and made her way to the second floor.  There, she briefly sat in a classroom for which she is not scheduled.  She then left to beat-up another girl in another classroom.  When apprehended, she loudly and repeatedly peppered her comments to staff with profanity.

In light of the degree of disruption, which this incident caused, and the concerns by staff for D_____ academic and emotional well-being, this worker is agreeing to the school's request for extended suspension.

Date Investigation Report was completed:      January 30, 2004

Signature of Person completing Investigation Report:     *Ethel Levine*

                                                          Ethel Levine
                                                          Pupil Personnel Worker

cc:      Dr. Katz, Regional II Executive Director
         Dr. Johnson, Principal
         Mr. Vaughn, Vice Principal
         Ms. Reed, Guidance
         Mrs. McCray, Peer Mediation Teacher
         File

517

_DW-14_

## Functional Behavioral Assessment

### A. Student Information

Name ~~Douglas Williams~~ Date of Birth ~~█~~/90 Student # _____

School Thomas Johnson MS  Grade 7  Date of Development 2/13/04

Teacher(s) _____

Is this a Special Education Student? Yes___ No ✓  |  If yes, what is the disability? _____

If no, is there a 504 Plan?  Yes___ No ✓  |  If yes, what is the disability? _____

### B. Methods Used to Conduct Assessment

- ✓ Comprehensive Record Review
- ✓ Parent Interview
- ✓ Teacher Interview
- ✓ Student Interview
- ○ Structured Observation _____
  (date and amount of time)

- ○ Chart techniques e.g. matrices, scatter plots
- ○ Behavior checklist(s) or rating scale
- ○ Antecedent Behavior Consequence Charts
- ✓ Review and modification of prior FBA
- ○ Other _____

### C. Identification of Behavior

1. Briefly, describe the student's behavior(s) of concern as specifically as possible. (Include frequency, duration, and intensity.) Ditching class, disrespectful tone in speaking to teachers, not doing homework or class assignments, talking too much, being disruptive in class, instigating fights, using curse words, anger outbursts.

2. In what situation(s) does / do the target behavior(s) occur? (Select all that apply.)

| Location | Time | Person(s) | Instructional Context |
|---|---|---|---|
| ✓ In class | ○ Arrival to School | ✓ Teacher(s) | ✓ Entire group |
| ✓ Hallways | ✓ Morning | ○ Specialist(s) | ○ Small Group |
| ○ Cafeteria | ○ Lunch | ○ Support Staff | ○ Individual |
| ○ Special Classes | ✓ Afternoon | ○ Bus driver | ○ Transition |
| ✓ Bus | ○ Recess / Break | ✓ Peer(s) | ○ Other _____ |
| ○ Other _____ | ○ Other _____ | ✓ Other Vice-Principal | ○ Other _____ |

Comments: _____

File:  Limited Access Folder (LAF) for Special Education Students.
Cumulative Folder (CUM) for Non-Special Education Students.
If materials contain sensitive information, an LAF must be created.

1

518

Student _____ DOB _____ Date of Meeting 2/13/04

## Background / Antecedents

1. From the list below indicate the triggers (antecedents), concurrent events, and consequences that seem to be supporting the current behavior. (Select all that apply.)

**Triggers**
- ☑ Lack of social attention
- ☑ Demand/Request
- ○ Difficult Task
- ○ Transition (task)
- ○ Transition (setting)
- ○ Interruption in routine
- ☑ Negative social interaction
- ☑ Consequences imposed for negative behavior
- ○ Other _____

**Concurrent Events**
- ○ Independent seatwork
- ☑ Group Instruction
- ○ Crowded setting
- ○ Unstructured activity
- ☑ Unstructured setting
- ☑ Peer attention
- ☑ Adult attention
- ○ Other _____

**Consequences**
- ○ Behavior ignored
- ☑ Reprimand-Warning
- ○ Time-out
- ☑ Loss of privileges
- ○ Loss of incentives
- ☑ Sent to office
- ☑ Communication with home
- ☑ Out of school suspension
- ☑ Other In-school suspension

Comments: _____

2. In what situations are the student's behaviors most appropriate? (Select all that apply.)

**Location**
- ○ In class
- ○ Hallways
- ○ Cafeteria
- ○ Special Classes
- ○ Bus
- ○ Other

**Time**
- ○ Arrival to School
- ○ Morning
- ○ Lunch
- ○ Afternoon
- ○ Recess / Break
- ○ Other

**Person(s)**
- ○ Teacher(s)
- ○ Specialist(s)
- ○ Support Staff
- ○ Bus driver
- ○ Peer(s)
- ○ Other

**Instructional Context**
- ○ Entire group
- ○ Small Group
- ○ Individual
- ○ Transition
- ○ Other _____

Comments: _____ none _____

3. Are there any other internal and external events that influence the target behavior(s)?

**Internal Events**
- ○ Medication _____
- ○ Physical Health _____
- ○ Academic skills _____
- ○ Other _____

**External Events**
- ☑ Conflicts at home _____
- ○ Conflicts in the community _____
- ☑ Peer influences _____
- ○ Other _____

Comments: _____

Note: Limited Access Folder (LAF) for Special Education Students.
Cumulative Folder (CUM) for Non-Special Education Students.
If materials contain sensitive information, an LAF must be created.

2

519

Student ~~D█████ W█████~~ DOB ~~██~~ 90   Date of Meeting 2/13/04

4. What function(s) does the identified behavior(s) seem to serve for the child?

- ☑ Avoid a demand or request .
- ☑ Avoid an activity / task (if known)
- ☑ Escape the classroom / setting
- ○ Escape the school
- ○ Other _____

- ○ Get desired item / activity
- ☑ Gain adult attention
- ☑ Gain peer attention
- ○ Get sent to preferred adult

- ○ Maintain internal control
- ○ Manage Emotional factors
- ○ Express thoughts/feelings
- ☑ Gain power

Comments: _____

5. Has this behavior occured before in this setting?  Yes ✓  No _____ (baseline data)
   If yes, when and how frequent? Since student transferred into school.

6. Describe how the behavior of concern impacts academic performance. @ Student is
   failing all classes but one.

## E. Hypothesis

1. Identify the settings, activities, and consequences that appear to be related to the occurrence and nonoccurrence
   of the student's behavior(s) of concern. ~~Student acts out in all situations~~
   Student's behaviors occur in all settings & activities.

2. Identify the events that occur prior to and after the behavior(s) of concern. Prior to - someone asks
   her to do something she doesn't want to do. After- sent to vice-principal

3. Are they consistent with other information collected?  Yes ✓  No _____
   Comments: _____

## F. Identification of Target Behaviors for Intervention (Excesses and Deficits)

1. Behavior(s) to increase: _____

2. Behavior(s) to decrease: Ditching, Angry Outbursts, Disrespectful tone in speaking
   to teachers, Not doing homework and classwork, cussing, instigating fights

3. Environmental changes: _____

4. Positive strategies / reinforcement (always needed): Give incentives, praise, give
   privileges back progressively.

File:   Limited Access Folder (LAF) for Special Education Students.
        Cumulative Folder (CUM) for Non-Special Education Students.
        If materials contain sensitive information, an LAF must be created.

3

520

Student _____████ W████_____ /DOB ___██___/90   Date of Meeting 2/13/04

5. Suggest any preferred items, activities, or people that could be used as incentives in an intervention for this student. What can be used to increase positive student behaviors?

Time w/ godmother or siblings, money, music, sleepovers, ability to attend school functions

6. What types of self-management strategies will be used to teach the student to monitor his / her own behavior?
- Organizational Skills
- Relaxation Techniques
- Proper Communication Skills
- Anger Management Skills
- Problem-Solving Skills
- Coping Skills

7. Is additional information needed prior to developing the Behavioral Intervention Plan?   Yes _____   No ✓

8. If yes, what information is needed? Explain below:

_____
_____
_____
_____
_____
_____
_____

G. Team Participants (Please print the names and titles of the participants below.)

| Name | Title |
|------|-------|
| MS Linda Y. Brown | Clinical Case Manager |
| Ms Reed | Guidance Counselor |
| | |
| | |
| | |
| | |

File:   Limited Access Folder (LAF) for Special Education Students.
Cumulative Folder (CUM) for Non-Special Education Students.
If materials contain sensitive information, an LAF must be created.

521

4

DW-15



*Making a Difference*

## INTERDYNAMICS, INC.
### *Evaluations and Therapy*
### PSYCHIATRIC EVALUATION

Name: D██████ W██████          D.O.B.        ███/1990
School: Choice Academy          Age:          15 years, 1 month
D.O.R: 5/12/05                  Phone:        202/498-8408
D.O.E. 4/21/05                  Examiner: Dwight Donesky, MD
                                           Psychiatrist

### PRESENTING PROBLEMS:

D██████ was referred for a psychiatric evaluation to determine an appropriate placement and the amount of services that would be deemed beneficial. D██████ has been previously diagnosed for Mood Disorder, NOS, Cannabis Abuse, ADHD, Oppositional Defiant Disorder, and learning Disorder, NOS in 2004.

### DEVELOPMENTAL AND MEDICAL HISTORY:

D██████ is currently 15 years old. No random urine toxic screens have been ordered, per the report of Suzanne McMichael, D██████ social worker and legal guardian. D██████ was prescribed Risperdal, 4 mg per day. According to records, there were no indications of drug use while D██████ was in utero.

### FAMILY HISTORY:

According to a Clinical evaluation dated April 21, 2005 by Dr. Jeanne Allegra of Interdynamics, Inc. D██████ is the first born of six siblings to a fourteen year old mother. About eight years ago D██████ was removed from their mother's home and placed in foster care due to neglect and lack of supervision. D██████ moved to eight different foster homes. While living at each foster home, she would run away to her mother's home. D██████ is currently a ward of the state, however, is living currently with her mother.

Included in a report at Keystone in June 2004, by Avtar Dhillon, M.D., D██████ reported that her mother had substance abuse problems, as well as emotional problems. At that time, her father had been incarcerated and had a history of substance abuse problems.

### SCHOOL HISTORY:

D██████ is a 15 year, 1 month old African American girl who was enrolled in the 9th grade at Woodson High School. She began at Woodson High on January 31, 2005 and was expelled on March 23, 2005 for assaulting a peer. She is currently at Choice

Academy since April 11, 2005. Da█████ states, "I don't like it there." She only attends approximately half the time.

## PREVIOUS EVALUATIONS:

D█████ was evaluated on April 21, 2005 by Dr. Jeanne Allegra of Interdynamics, Inc. D█████ was diagnosed as Oppositional Defiant Disorder and Cannabis Dependence. It was recommended that D█████ would benefit from a special educational program that employs therapeutic strategies to benefit her educational development. In addition, it was recommended that D█████ should receive group therapy to help deal with her incorrigible behaviors towards authorities. Furthermore, it was recommended that D█████ enroll in a Big Sister program to reinforce positive female role models. Dr. Allegra also emphasizes the importance of utilizing a Family Planning Program to help protect her against sexually transmitted diseases and pregnancies that could have a negative impact on her health.

D█████ was evaluated on April 8 and 9, 2004 by Marcia L. Gustafson, M.Ed of Washington Assessment and Therapy Services. According to the results of this Psychological evaluation, D█████ Cognitive scores ranged from borderline to average. Performance on the WISC-IV yielded a Full Scale IQ of 77, a Verbal Comprehension Index score of 77, a Perceptual Reasoning Index score of 79, a Working Memory Index score of 91, and a Processing Speed Index of 83. It was recommended that D█████ be assessed for special education. Recommendations were made for a Speech and Language evaluation to determine her need for therapy. Furthermore, D█████ would benefit from a classroom that employed preferential seating, modified assignments, a behavior modification plan, and an increased duration in which to complete her assignments. In addition, weekly therapy, regular psychiatric consultations and medication management, as well as residential placement if within a few months she is unable to adjust to her then current foster home.

D█████ was evaluated on June 17, 2004 by Avtar Dhillon, M.D., of Keystone. This Psychiatric evaluation offered treatment plans for Da█████. Such treatment plans were that D█████ be admitted to the Keystone residential facility, have various assessments, and lab work. It was deemed beneficial if she continued on Risperdal, as she has been doing well. It was listed that she would follow with individual therapy, group therapy, and recreational therapy. In addition, she would attend Keystone Academy. D█████ estimated length of stay was three to six months.

## HISTORY OF PRESENT ILLNESS/PSYCHIATRIC HISTORY:

According to D█████ Psychiatric report, aforementioned, she has been having problems the last couple of years. She has been treated in outpatient and inpatient facilities. She has been diagnosed with ADHD, Oppositional Defiant Disorder, and Bipolar Disorder. According to D█████ she was taken off Concerta and put on Risperdal due to mood swings, irritability, anger, and depression. However, she denies feelings of hopelessness, helplessness, and worthlessness and suicidal or homicidal

523

D██████ W██████  3

ideations. D██████ stated to Dr. Dhillon that she gets into fights at school, arguing, and cursing at others. She admits to smoking marijuana on a daily basis.

## MENTAL STATUS EXAMINATION:

D██████ appeared well groom with adequate hygiene. She expressed variable moods. Her speech and expressive language were normal. She appeared to be generally oriented to person, day of the week, month, and the current year. In addition, she was able to answer correctly the city and state she was currently in.

D██████ cognitive functioning was consistent with low average intellectual functioning. Her judgment was poor to fair. In addition, her insight and her ability to control her impulses were deemed poor. In addition, her insight and her ability to control her impulses were deemed poor. D██████ thought process and content appeared coherent and goal directed. Her memory appeared mostly intact; she was able to remember three unrelated words immediately and she was able to repeat sentences. D██████ concentration was fair. Due to her fair concentration, she was able to complete all serious of tasks repeating numbers and then saying them backwards or subtracting repeatedly except for one. D██████ was cooperative, however she was restless, but cooperative.

## BIOPSYCHOSOCIAL SUMMARY:

D██████ demonstrates clear "counter cultural" identifications and fascinations with thug behavior. She is episodically aggressive and disinterested in school. It is not clear whether she is ingesting the Risperdal as prescribed, @2 mg twice per day.

## DIAGNOSES:

| | |
|---|---|
| Axis I: | Mood Disorder, NOS      (262.90) |
| | Cannabis Abuse      (305.20) |
| | ADHD, Predominantly Hyperactive- Impulsive Type (314.01) |
| | Oppositional Defiant Disorder  (313.81) |
| | Learning Disorder, NOS      (315.9) |
| | Features of Conduct Disorder |
| Axis II: | Borderline Intellectual Functioning |
| Axis III: | Acne |
| | Genital Herpes |
| Axis IV: | Problems with family support system and social environment |
| Axis V: | GAF 40 |

524

**RECOMMENDATIONS:**

1) Commence individual psychotherapy
2) Commence random urine toxicology screens for street drugs
3) Continue routine psychiatric treatment, including Risperdal 2 mg bid
4) Placement in a residential facility could benefit D███████ academically, as well as help modify problem behaviors

**CERTIFIED BY:**     Dwight L. Donesky, MD

**TITLE:**     Psychiatrist

**DATE:**     5/19/05

525

DW-16



*Making a Difference*

## INTERDYNAMICS, INC.
### *Evaluations and Therapy*

### Psycho educational Evaluation
### Confidential

| | |
|---|---|
| **Name:** D██████ Wi██████ | **Date of Examination:** 5/12/2005 |
| **Date of Birth:** ████1990 | **Examiner:** James Moses Ballard, II, Ph.D |
| **Age:** 15 years, 1 month | Licensed Clinical Psychology |
| **School:** Choice Academy | MD 1160     DC 354 |
| **Grade:** 9th | |

**Reason for Referral:**
D██████ Wi██████ was referred by her attorney and educational advocate, Ms. Fatmata Barrie, for a Psycho educational Evaluation to assists in the development and implementation of an Individual Educational Plan.

**Tests and Techniques Administered:**

    Brief Mental Status Examination
    Clinical History
    Wechsler Intelligence Scale for Children – IV
    Wechsler Individual Achievement Test – II (WAIT – II)
    Beery – Buktencia Developmental Test of Visual – Motor Integration
    Attention – Deficit / Hyperactivity Disorder Test (ADHDT)
    Graphic Projective Pencil Drawings: House, Tree, Person(s)

**BACKGROUND INFORMATION**
D██████ presented as a 15 year old female of African American descent. She is one of five (5) children born to Ms. Tafounya Dorn. The father of D██████ is Mr. Idaho Leon Kelly.

Ms. Dorn was reportedly raised in a drug environment. She was pregnant at age 14 years. The mother has given birth to six (6) children, one of whom has died. The mother gave up the child because she could not control D██████. The mother was designated as an "unwilling care giver." D██████ was described as being sexually active at this time. She has contracted the genital herpes. Additionally, she is described as "gets in fights at

D█████ W██████                                          Psycho educational Evaluation
                                                                    Page 2 of 10

school, being a truant; and doing drugs.  Although she has a reported history of marijuana
usage, she denies any specific drug of choice.  She denies any drug use since January 2005.
She does, however, admit to using alcohol during this time.

She was a student at Woodson High School from January 30 to March 23, 2005.  At that
time, D██████ was expelled from Woodson for attacking another girl.  She attacked her
(and attacks people) when "they look at me funny."  The status was changed to "long term
suspension.  She also has a history of absenteeism.  When she did attend school, she was
often found wandering the halls.  Presently, D██████ is enrolled at Choice Academy in
Washington, D.C., where her attendance has not improved.

Ms. Suzanne Mc Michael, Social Worker in Attendance, reported that D██████ has been
in the Foster Care under Child and Family Services Administration (CFSA) for the past 8
years.  According to a Clinical Evaluation, by Dr. Allegra, dated 4/25/2005, CFSA got
involved because of "her mother's inability to parent and her difficulty in controlling
D██████ behavior."  D██████ has been in eight different foster homes.  She has a
history of absconding and returning to her mother's home.

D██████ was an inpatient at Keystone Newport News, a residential facility, from June
17, 2004 to January 17, 2005 due to her "continued struggles," including very disruptive
behaviors and fighting with other students.  Following this residential placement,
D██████ was placed with her godmother.  She reported being very happy with this
placement, where she remained from January 17, 2005 until March 19, 2005.  D██████
ran away from her godmother's home on March 19, 2005 and was not found until March
22, 2005.  Her subsequent explanation for running away was because her godmother had
hit her.  The incident was investigated; and the claims have not been substantiated.

Presently, D██████ is living with her mother.  She has been court-ordered there for an
"extended visit".  Ms. Dorn has not relinquished her legal rights of D██████ but has
indicated that she would like to continue "getting help" from CFSA, and indicating that she
is unable to control D██████ behavior.  D██████ and one sibling remain with Ms.
Dorn at this time.  The others have been removed due to neglect.

## BEHAVIORAL OBSERVATION/INTERVIEW

D██████ presented as a 15 year old female of African American descent.  She presented
as large for her age.  She is mature acting; and she seems to be "acting older and more
mature than she is chronologically.  Her body is well developed and well nourished.  She is
well coordinated.  She walked without apparent difficulty.  She is essentially right handed.

During the evaluation, D██████ slouched and placed her arms and head on the testing
table.  She was fairly cooperative during the WISC – IV administration.  She refused to
begin a second test that was necessary.  What might have been an impasse was resolved
when a female Psychology Associate, Ms. Joan Branch, came to help out.  After a short
break and a conversation with Ms. Branch, D██████ agreed to cooperate.  Ms. Branch
administered the Wechsler Individual Achievement Test – III without further incident.

527

D███████ W████████                                    Psycho educational Evaluation
                                                                    Page 3 of 10

The interview with D██████ was pleasant. She answered questions and seemed
comfortable. She seemed to enjoy being the center of attention. She freely admitted to a
history of street drug usage. She discussed some of the problems she was having at school.
Ms. Mc Michael served an informant for this case. It is my opinion that the results of the
evaluation represent D██████ cognitive and achievement abilities at this time.

**Test Results and Discussion:**

**WISC-IV Results**
D██████ was administered ten subtests of the Wechsler Intelligence Scale for Children –
Fourth Edition (WISC-IV) from which her composite scores are derived. The Full Scale
IQ (FSIQ) is derived from a combination of ten subtest scores and is considered the most
representative estimate of global intellectual functioning.

**Table 1: Composite Scores Summary**

| Scale | Sum of Scaled Scores | Composite Score | Percentile Rank | Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|
| Verbal Comprehension (VCI) | 15 | 71 | 3 | 66-80 | Borderline |
| Perceptual Reasoning (PRI) | 14 | 67 | 1 | 62-77 | Extremely Low |
| Working Memory (WMI) | 9 | 68 | 2 | 63-78 | Extremely Low |
| Processing Speed (PSI) | 7 | 65 | 1 | 60-78 | Extremely Low |
| Full Scale (FSIQ) | 45 | 80 | 0.4 | 56-66 | Extremely Low |

D██████ general cognitive ability is within the Extremely Low range of intellectual
functioning, as measured by the FSIQ. D██████ may experience great difficulty in
keeping up with her peers in a wide variety of situations that require age-appropriate
thinking and reasoning abilities. Her verbal reasoning abilities as measured by the Verbal
Comprehension Index are in the Borderline range and above those of only 3% of her peers
(VCI = 71; 95% confidence interval = 66-80). The Verbal Comprehension Index is
designed to measure verbal reasoning and concept formation. D██████ performed
comparably on the verbal subtests contributing to the VCI, suggesting that these verbal
cognitive abilities are similarly developed.

**Table 2: Verbal Comprehension Subtest Scores Summary**

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Similarities | 15 | 5 | 8:6 | 5 |
| Vocabulary | 27 | 4 | 8:6 | 2 |
| Comprehension | 23 | 6 | 10:10 | 9 |

D██████ nonverbal reasoning abilities as measured by the Perceptual Reasoning Index
are in the Extremely Low range and above those of only 1% of her peers (PRI = 67; 95%
confidence interval = 62-77). The Perceptual Reasoning Index is designed to measure fluid
reasoning in the perceptual domain with tasks that primarily assess nonverbal fluid
reasoning and perceptual organization abilities. D██████ performance on the
perceptual reasoning subtests contributing to the PRI is somewhat variable, although the
magnitude of this difference in performance is not unusual among children her age.

528

Da█████ W██████

Psycho educational Evaluation
Page 4 of 10

Examination of Da█████ performance on individual subtests provides additional information regarding her specific nonverbal abilities.

**Table 3: Perceptual Reasoning Subtest Scores Summary**

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Block Design | 22 | 4 | 8:2 | 2 |
| Picture Concepts | 12 | 3 | 7:2 | 1 |
| Matrix Reasoning | 21 | 7 | 10:2 | 16 |

Da█████ ability to sustain attention, concentrate, and exert mental control is in the Extremely Low range. She performed better than approximately 2% of her age-mates in this area (Working Memory Index = 68; 95% confidence interval 63-78).

**Table 4: Working Memory Subtest Scores Summary**

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Digit Span | 14 | 6 | 8:10 | 9 |
| Letter-Number Sequencing | 12 | 3 | 7:6 | 1 |

Da█████ ability in processing simple or routine visual material without making errors is in the Extremely Low range when compared to her peers. She performed better than approximately 1% of her peers on the processing speed tasks (Processing Speed Index = 65; 95% confidence interval 60-78).

**Table 5: Processing Speed Subtest Scores Summary**

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Coding | 37 | 3 | 8:10 | 1 |
| Symbol Search | 20 | 4 | 9:6 | 2 |

Da█████ achieved her best performance among the nonverbal reasoning tasks on the Matrix Reasoning subtest. Although better developed than her other nonverbal reasoning abilities, Da█████ ability on the Matrix Reasoning subtest was still below that of most children her age. The Matrix Reasoning subtest required Da█████ to look at an incomplete matrix and select the missing portion from five response options. This subtest assesses fluid visual information processing and abstract reasoning skills; (Matrix Reasoning scaled score = 7).

Her lowest score was on the Picture Concepts subtest. Her weak performance on the Picture Concepts subtest was far below that of most children her age. On the Picture Concepts subtest, Da█████ was presented with two or three rows of easily identifiable pictures and asked to choose one picture from each row to form a group with a common characteristic. This subtest is designed to measure fluid reasoning and abstract categorical reasoning ability. The task invokes verbal concepts, but does not require verbal responses; (Picture Concepts scaled score = 3).

D███████ W███████                                          Psycho educational Evaluation
                                                                            Page 5 of 10

Her performance across these two areas differs significantly, suggesting that these are the areas of most pronounced strength and weakness, respectively, in D███████ profile of nonverbal reasoning abilities.

## Achievement
## WIAT-II Results

### Reading

D███████ presents a diverse set of skills on different aspects of reading. She performed much better on tasks that assessed her capability to correctly apply phonetic decoding rules when reading a series of nonsense words (Pseudoword Decoding standard score = 105), than on tasks that required her to correctly read a series of printed words (Word Reading standard score = 80) and read sentences and paragraphs and answer questions about what was read (Reading Comprehension standard score = 80). For this reason, the Reading Composite standard score (86) may not be the most accurate manner in which to summarize her reading skills. Her Pseudoword Decoding subtest score is higher than approximately 63% of her peers, placing these skills in the Average range. D███████ performance in Reading Comprehension and Word Reading are within the Low Average range.

### Mathematics

In overall mathematics skills D███████ performed in the Borderline range, as indicated by her Mathematics Composite standard score (74). Her skills in this area exceed that of only approximately 4% of students her age. D███████ performance on tasks that required her to add, subtract, multiply, and divide one- to three-digit numbers, fractions, and decimals; and solve simple linear equations (Numerical Operations standard score = 73) is comparable to her performance on tasks that requires her to understand number, consumer math concepts, geometric measurement, basic graphs, and solve single-step and multi-step word problems (Math Reasoning standard score = 79).

**Table 7: Summary of WIAT-II Subtest Scores**

| SUBTESTS* | RAW | STD | 95% INTERVAL | PR | NCE | S9 | AGE EQU | GRADE EQU |
|---|---|---|---|---|---|---|---|---|
| Word Reading | 107 | 80 | 73- 87 | 9 | 22 | 2 | 11:4 | 6:1 |
| Reading Comprehension | 124** | 80 | 71- 89 | 9 | 22 | 2 | 10:4 | 5:0 |
| Pseudoword Decoding | 48 | 105 | 99- 111 | 63 | 57 | 6 | 17:0– 19:11 | 10:4 |
| Numerical Operations | 25 | 73 | 64- 82 | 4 | 12 | 2 | 10:4 | 5:2 |
| Math Reasoning | 47 | 79 | 69- 89 | 8 | 21 | 2 | 11:8 | 6:5 |
| Spelling | 30 | 77 | 67- 87 | 6 | 18 | 2 | 10:0 | 4:8 |
| Written Expression | 15 | 71 | 60- 82 | 3 | 9 | 1 | 8:8 | 3:1 |
| Listening Comprehension | 27 | 81 | 68- 94 | 10 | 23 | 2 | 11:0 | 5:5 |
| Oral Expression | 20 | 77 | 66- 88 | 6 | 18 | 2 | 7:8 | 3:0 |

* WIAT-II age-based normative information was used in the calculation of subtest and composite scores.
** Represents Reading Comprehension weighted raw score.

### Oral Language

D███████ performed in the Borderline range in overall language skills, as indicated by her standard score on the Oral Language Composite (76). Her skills in this area exceed those

D███████ W███████                              Psycho educational Evaluation
                                                         Page 6 of 10

of only approximately 5% of students her age. D███████ performed comparably on tasks
that required her to identify the picture that best represents an orally presented descriptor or
generate a word that matches the picture (Listening Comprehension standard score = 81)
and generate words within a category, describe scenes, and give directions (Oral
Expression standard score = 77).

### Written Language
In overall written language skills, D███████ performed in the Borderline range, as
indicated by her Written Language Composite standard score (72). Her achievement in
this area is better than of only approximately 3% of students her age. D███████
performance on tasks that required her to generate words within a category, generate
sentences to describe visual cues, combine sentences, and compose an organized,
persuasive essay on a named topic (Written Expression standard score = 71) is comparable
to her performance on tasks that required her to correctly spell verbally presented words
(Spelling standard score = 77).

### Strengths And Weaknesses
Compared to D███████ mean score for all WIAT-II subtests, her performance is
significantly better in Pseudoword Decoding, indicating that this is an area of relative
strength for her. She obtained her lowest score on Written Expression; this was not
significantly less than her mean subtest score.

### Ability-Achievement Discrepancy Analysis Predicted Method
D███████ scores on the WIAT-II were compared to the levels of achievement predicted
for a student with her general cognitive ability, as indicated by her Full Scale IQ score of
60 on the WISC-IV administered 4/26/2005. Significant differences between actual and
predicted achievement scores are reported in this section.

D███████ achieved better than anticipated in reading. Her Reading Composite score (86)
is much higher than anticipated for a young woman with her general cognitive ability
(predicted score = 69). The difference is significant, suggesting that this is an area of
considerable strength for D███████. Although higher than expected, D███████
performance in this area is still in the Low Average range. She performed particularly well
on tasks that required her to correctly apply phonetic decoding rules when reading a series
of nonsense words as well as on tasks that assessed her ability to read sentences and
paragraphs and answer questions about what was read.

D███████ achieved a much higher score on the Pseudoword Decoding subtest (actual
score = 105) than expected, based on her overall cognitive ability (predicted score = 75).
Similarly, she obtained a higher score on Reading Comprehension subtest (actual score =
80) than anticipated (predicted score = 70). These significant differences indicate specific
strengths in these skill areas relative to her general cognitive ability. D███████
performance in Word Reading is only in the Low Average range, however, compared to
that of her peers.

531

Da▮▮▮▮ Wi▮▮▮▮                                    Psycho educational Evaluation
                                                                Page 7 of 10

**Table 8: Scores Summary**

| WISC-IV COMPOSITE | SCORE | WIAT-II COMPOSITE | SCORE |
|---|---|---|---|
| Verbal Comprehension Index (VCI) | 71 | Reading | 86 |
| Perceptual Reasoning Index (PRI) | 67 | Mathematics | 74 |
| Working Memory Index (WMI) | 68 | Written Language | 72 |
| Processing Speed Index (PSI) | 65 | Oral Language | 76 |
| Full Scale IQ (FSIQ) | 60 | | |

## Perceptual – Motor Integration:

### BVMI

In order to assess D▮▮▮▮ visual-motor integration ability, the Berry-Buktenica Visual Motor Integration Test was administered. The Berry-Buktenica VMI is designed to assess visual-motor functioning. This instrument consists of developmental sequences of geometric forms to be copied with paper and pencil. These tasks required D▮▮▮▮ to copy increasingly complex designs without erasing, thus, evaluating both fine-motor control and motor planning skills. D▮▮▮▮ earned a Standard Score of 69 on the Beery VMI, with a corresponding Scaled Score of 4. The Age Equivalent is 7 years. This is a "very low" BVMI score. The score is commensurate with the present measured level of cognitive functioning.

### Attention – Deficit / Hyperactivity Disorder Test (ADHDT):

The ADHDT is a report rating scale typically completed by someone familiar with the subject. Often one of the parents is chosen. There are three (3) subtest categories rated by the person completing the "report scale." The three categories are 1. Hyperactivity, 2. Impulsivity and 3. Inattention. The rater, in this instance, was Ms. Mc Michael, the Social Worker. The mean for the Standard Scores is 10, with a Standard Deviation of 3. The scores obtained are the following:

| **Subtests** | **\*SS** | **Probability of ADHD** |
|---|---|---|
| Hyperactivity | 11 | Average Probability |
| Impulsivity | 7 | Below Average Probability |
| Inattention | 7 | Below Average Probability |

\*Standard Score

The results of the ADHDT for D▮▮▮▮ suggest that the three categories rated are negative for ADHD.

### Graphic Projective Drawings (HTP)

On the projective drawings, D▮▮▮▮ representations are consistent with an adolescent person who would have a low self – concept and low self – esteem. Her representations suggest that she has a psychological identification with more mature and adult age females. In this case, the likely model would be her mother. On the drawing of a female person, D▮▮▮▮ wrote, "12 year old likes to be grown cause she sees things her mother be doing

532

Da█████ Wi██████                                    Psycho educational Evaluation
                                                              Page 8 of 10

so she do it – she want to follow in her mother's footsteps." The attempt was to draw a
glamorous person. There is a lot of need to control even though the words written suggest
a more free and available person. This reflects the ambivalence that seems to permeate
Da████████ life. She breaks rules and shows impulse control issues. At the same time,
she demonstrates from the drawings a need to be in control. Her main methods for trying
to control are the intellectual defenses including rationalization, projection and denial.


**Summary**

Da████ Wi████ is a 15 year old female of African American descent. She has a
history of maladaptive behavior connected with school and with home. She was
suspended from Woodson High School in Washington, D.C. for fighting, truancy and
failure to attend classes when at school. She was accompanied to this testing by her social
worker, Ms. Suzanne Mc Michael, who provided background information. Da██████ has
been attending the Choice Academy since the end of March, where her attendance has
been inconsistent.

Ms. Mc Michael provided the following history. Da██████ was born 15 years ago. Her
mother was 14 years old at the time. Her mother had five children subsequent to
Da██████ birth. Eight years ago, Da██████ was placed in the care of Child and Family
Services Association. Da██████ mother petitioned the court to assist her in Da██████
care because she (mother) was unable to control her behavior, Since that time, Da██████
has been in 8 foster homes and one residential treatment facility, Keystone Newport News.
Most recently when released from the residential facility, Da██████ began to live with her
godmother. Initially, Da██████ seemed happy with this placement, however, after about 3
months she ran away. Once returned, she was placed with her biological mother. Her
mother has one other child in her care; the other children were removed due to neglect.
Her mother has not relinquished her parental rights. CFSA is currently looking for a viable
placement for Da██████.

**Table 8: Scores Summary**

| WISC-IV COMPOSITE | SCORE | WIAT-II COMPOSITE | SCORE |
|---|---|---|---|
| Verbal Comprehension Index (VCI) | 71 | Reading | 86 |
| Perceptual Reasoning Index (PRI) | 67 | Mathematics | 74 |
| Working Memory Index (WMI) | 68 | Written Language | 72 |
| Processing Speed Index (PSI) | 65 | Oral Language | 76 |
| Full Scale IQ (FSIQ) | 60 | | |

Da██████ obtained a Full Scale IQ of 60. The Verbal Comprehension Index is slight in
the "Borderline" range. Da██████ general verbal comprehension abilities were in the
Borderline range (VCI = 71), and general perceptual reasoning abilities were in the
Extremely Low range (PRI = 67). These are low scores and suggest that she would have
difficulty keeping up with her peer in a classroom setting.

The WIAT – II score results corroborate from the achievement side that she is
experiencing difficulty in mastery of appropriate, age – level academic information and
performing necessary academic operations as in math for example. Da██████

533

D██████ W██████                                    Psycho educational Evaluation
                                                          Page 9 of 10

demonstrated personal strengths in Pseudoword Decoding and Word Reading on the
WIAT-II. However, her skills in Word Reading are still less than expected for her age.

## RECOMMENDATIONS

1. D██████ would benefit academically by participation in a supportive academic
   program. It is my opinion that she would do best in a one on one situation.
   Females who are able to deal therapeutically with how she presents, would be more
   successful in working with D██████

2. It is important to design an educational program that meets D██████ needs and
   capabilities. She would benefit from smaller classroom participation. Also, it
   would be important to use a one to one ratio as a teaching approach when
   introducing new material.

3. D██████ would benefit from individual psychotherapy as soon as is possible. It
   would be important to focus on subjective factors such as anger and interpersonal
   relationships. At some point in the near future, efforts to have her participate in
   small group discussion to learn social skills would help.

4. A neuropsychological evaluation would be helpful to rule out effects of Cannabis
   on conation and cognition, and the long term effects of maternal neglect during the
   early years.

5. D██████ should be encouraged to participate in sex education classes. She
   admits to being sexually active and not using any birth control or "protection." She
   has genital herpes. Her sexual behavior along with this medical history puts her at
   risk for a pregnancy which will have multiple health problems.

6. Refer for a Clinical Evaluation to assist with the Multidisciplinary Team Meeting
   process and in determining eligibility for special education services.

James Moses Ballard, II, Ph.D
Licensed Clinical Psychologist
MD 1160        DC 354

534

Dw-17



*Making a Difference*

## INTERDYNAMICS, INC.
*Evaluations and Therapy*

## CLINICAL PSYCHOLOGICAL EVALUATION
### Confidential Report

Student: D██████ W██████                    Date of Birth: ████/90
Current School: Choice Academy              Age: 15
Primary Language: English                   Grade: Freshman
Date of Evaluation: 4/21/05                 Date of Report: 04/25/05

## REASON FOR REFERRAL

D██████ W██████ was referred by her attorney and educational advocate, Ms. Fatmata Barrie, to assess her current psychological functioning and to provide insight into the ways in which this functioning may be interacting with her needs for special education. Results from this evaluation will be used to assist the multidisciplinary team in determining the most appropriate program to meet those needs.

## BACKGROUND INFORMATION

Ms. McMichael, D██████ social worker from Child and Family Services of Washington, D.C. accompanied her to the test administration. Ms. McMichael shared that D██████ was in the 9th Grade at Wilson High School from January 30 to March 23, 2005, when she was suspended. She was suspended because she was often absent. When she did attend school, she was often found wandering the halls often was responsible for starting fights. Following her long-term suspension in March, D██████ was enrolled at Choice Academy in Washington, D.C., where her attendance has been spotty and the principal has revealed to Ms. McMichael that she had not appeared at all during this past week.

Ms. McMichae reported that D██████ has been in foster care under the auspices of Child and Family Services Association (CFSA) for the past 8 years. She cited the reason for D██████ foster care as being "her mother's inability to parent and her difficulty in controlling D██████ behavior." There was no indication of drug use while D██████ was in utero. D██████ is the first born of her family. D██████ mother is currently 29 years old and has five other children; she was 14 years old when D██████ was born. In addition to D██████ incorrigible behavior, she has admitted using Marijuana and has contracted genital herpes. Ms. McMichael added that since D██████ has been in

foster care, she has been in eight foster homes, from which she generally ran away. On almost all those occasions, she ran back to her mother's home.

D███████was placed in a residential facility from June 17, 2004 to January 17, 2005 due to her very disruptive behaviors, and her fighting with other students. Following this residential placement, D███████ was placed with her godmother. She reported being very happy with this placement, where she remained from January 17, 2005 until March 19, 2005. D███████ ran away from her godmother's home on March 19 and was not found until March 22. When found, she stated that she ran away because her godmother had hit her. Subsequent investigations of these claims have not been substantiated.

D███████ is now temporarily living with her mother. She has been court-ordered there for an "extended visit". Her mother has not relinquished her legal rights of D███████ but has indicated that she would like to continue getting help from CFSA, indicating that she is unable to control her behavior. Only one of D███████ mother's children remain with her at this time. All of the others have been removed because of neglect.

## BEHAVIORAL OBSERVATION/INTERVIEW

D███████ is a large-boned heavy-set adolescent, with a noticeable case of facial acne. A diffferent evaluator, who had seen D███████ waiting for this test administration, saw her as "rather masculine" in her appearance. D███████ expressed to this examiner that she was not happy about having to be here, and hoped that the testing would go fast. When asked her understanding of the need for this testing session, she stated that she knew that she is in special education because she has a behavior problem and that she disrepects other people, like her godmother. When asked about her behavior in school, she indicated that she has difficulty because she gets into fights. She indicated that she did not like her new placement at the Choice Academy because she said, "I don't like it 'cause I can't skip." She said that English and Math were her best subjects. She volunteered, "Drugs get me in most trouble. I have done Marijuana and cigarettes dipped in embalming fluid." She said that she had been in trouble with the law when she was caught in a stolen car with some of her friends. While sexually active, she admits that she does not use any birth control. She has "one special boyfriend". She states that she does not have sex with him but has sex with another boy.

The first test to which she was introduced was the Millon Adolescent Clinical Inventory (MACI), despite asking "how long is this test going to take?" and "how many questions do I have to answer?", D███████ was compliant with the administration. D███████ looked bored and checked the clock repeatedly while taking the test, she continued with the task from beginning to end. Her first attempt at the test yielded a valid profile, indicating that she had completed all the items, leaving none of them blank . Her behavior was similarly compliant as she approached the second test, the House-Tree-Person Projective Drawings. The only question she asked about these drawings was, "Can I draw a stick person?" When this examiner responded that she should draw a person, which was not a stick person, she again followed directions as presented. However, when confronted by the projective inventories, Thematic Apperception Test

2

and the Rorschach, she seemed to lose her composure and her ability to be compliant, refusing to take either inventory. She was compliant with the Sentence Completion Series-Adolescent Form, and the Conners-Wells Scale however it was evident that she was attempting to rush through these assessments so that she could finish the evaluation and go home.

## TESTS & TECHNIQUES ADMINISTERED

Clinical Interview with Ms. McMichael, social worker
Clinical Interview with D██████
Millon Adolescent Clinical Inventory (MACI)
House-Tree-Person (H-T-P)
Sentence Completion Series, Adolescent Form
Thematic Apperception Test (TAT)
Rorschach

## TEST RESULTS

### Millon Adolescent Clinical Inventory (MACI):

D██████ produced a valid report on the MACI on her first attempt, indicating that she had completed all items as instructed. This is noteworthy as it indicates her compliance with the task. The MACI instrument allows the comparison of D██████ scores to other adolescent patients, seen in professional treatment settings. The MACI provides information in several categories including: "personality patterns", "expressed concerns" and "clinical syndromes".

"Personality patterns" are the relatively enduring traits of D██████ methods of relating, behaving, thinking and feeling. In general, D██████ responses to the MACI indicate that she is "troubled". She tends to be irritable and uncooperative and tends to act-out. She often reacts impulsively and can be provoked by others to react to a situation in a moment's notice. Her reactions to situations may be considered to be "immature" for her age. She seems to be locked in conflict between her dependency needs, i.e. the need to rely on other more mature adults in her environment, and her intense need to be independent.. D██████ fears being disappointed in peer and family relationships, however her complaining, passive-aggressive attitude and unruly and anti-social behavior actually create the anticipated disappointment. She has created a self-fulfilling prophecy in which she predicts that she will lose important relationships. Her acting-out behaviors guarantee this loss.

The area of "expressed concerns" relate to the adolescent's perceptions of personal, social and familial matters. D██████ seems to be somewhat distant and insensitive to the troubles experienced by others. She shows little willingness to be helpful to them. In addition, although difficulties with the family are common among adolescents, D██████

3

describes a greater degree of conflict than is typical. Significant conflicts in this area will make her experience of other issues in her environment greater.

The clinical syndromes suggested by D████████ profile indicate the enduring aspects of her basic personality make-up. D████████ is highly negative, erratic and impulsive. Her drug/alcohol use and her sexual promiscuity is often prompted by her resentment towards others in authority in her environment. Unfortunately, her ways of expressing her defiance toward authority have self-destructive undertones.

*Sentence Completion Series, Adolescent Form:*
In this test the individual is asked to turn sentence stems into complete sentences. This test presents the test taker with the opportunity to make relatively straightforward responses, giving insight into issues that are in the forefront of an individual's thoughts. D████████ responses indicate that she is a teenager in conflict. Although she is only 15, she is already involved in very adult activities, which have the potential to cause her great harm and to shorten the independence and carefree lifestyle of her adolescent years. She is unaware of the dangers that exist for her in her life and in the ways she is choosing to live it.

D████████ seems unaware of the major conflict in lifestyle when she says, "*My goals...is to have babies and go to school.*" She seems to think that having babies and going to school can happen simultaneously, without any concern that one might be inconsistent with the other, at the age of 15. This response demonstrates an immaturity of understanding of the tremendous amount of commitment it takes to raise a healthy baby. She further demonstrates her conflict as well as a lack of appropriate and information-based goal-setting when she states that she sees herself "as a lawyer"and indicates that her career plans are going to "turn out great" and yet, in actuality, D████████ is unwilling to attend school. She seems to be unaware of the steps necessary to become a lawyer. She demonstrates poor reality testing in this instance.

More than 10% of D████████ responses indicate her involvement in sexual activity. One might deduce from this observation that a great deal of her energy is spent in thinking about sexual activity. Interview data suggests that this teenager has gone beyond thinking about the activity to being very active in engaging in it and has even suffered from a sexually transmitted disease at an earlier age. While she admits that she doesn't like to date, she adds that she "just likes sex." When she feels grown-up and confident, she sees herself as having sex. Sexual activity is clearly tied up with D████████ self-esteem. It is troubling to read that when D████████ wants something, she "has sex for money." Her sexual energy seems to have brought her to a form of prostitution. D████████ lack of a significant father-figure is likely tied to her sexual acting out.

The observations made from D████████ responses to the Incomplete Sentences clearly support the inferences drawn from her responses to the MACI. Her admitted use of sex, drugs and alcohol, demonstrates D████████ propensity to anti-establishment acting out. Her behaviors are potentially self-destructive and carry the potential to bring her into

538

conflict with the law.

*House-Tree-Person:*

D█████ was asked to draw a House, a Tree, and a Person. She chose to begin with a drawing of a house, followed by a tree and then a person. She approached the task without comment, seemingly willing to comply. She was likewise willing to share some of her thoughts about her drawings with this evaluator.

D█████ drawing of a house was triangular in shape. Her house has a door, drawn against one of the exterior walls. There is one window on the first floor, and another that appears to be in the attic, drawn as the peak of the home. D█████ rendering of the house is unusual. A triangular-shaped home may be indicative of some type of organic brain damage. However, on further questioning, D█████ indicated that she lived with a family in Upper Marlboro, who had a similarly shaped house. She further explained that she had to leave that home because the family moved to Atlanta. In this case, the shape of the home is probably more indicative of D█████ tendency to see the world in anti-social ways. It is important to note that despite the house's shape, it is drawn on the edge of the paper, no real foundation is present and entrance into this house is nearly impossible. This lack of foundation may be suggestive of D█████ experience in life. She has faced her world with almost no strong family foundation, has been relinquished by her mother to a social service agency because she is unable to control her, has been bounced around to eight foster homes and must keep her feelings about all of this to herself and inaccessible to others.

D█████ drawing of the tree is very simplistic. As is true of her house, the tree rests on the bottom edge of the paper on which it is drawn and covers most of the page. She draws "leaves", using concentric circles, the same technique used to draw hair on the following person. The trunk of the tree is simply made from two curved lines, curves suggestive of the female form. But perhaps most interesting in D█████ conception of the "tree" is the hole that she draws in the center of the tree for an owl. Since her tree is suggestive of the female form, it seems very important that the center of her tree contains a hole. It seems as if D█████ is suggesting that she has a whole in her heart, caused by the many rejections and hurts that she has experienced in her life. When asked where the tree grows, D█████ says that it is found above her brother's grave. She goes on to describe that her brother died of kidney failure at the age of 2 months. She adds that the incident was very sad for her because she did not have the opportunity to hold him. Perhaps this tree's hole depicts the sadness and emptiness that D█████ felt at the loss of her baby brother.

D█████ picture of a person was very hurriedly and somewhat carelessly drawn. The head is round and almost half the size of the entire person. The hair is drawn around the face, using the concentric circle approach. The eyes are blank circles. Missing are ears. There is a lip ring and tongue ring in this person's mouth. There is an elongated neck which joins a boxy-like body to the head. This body resembles the body of the cartoon character Sponge Bob Square Pants. There is a definite midline emphasis, separating the upper body from the lower body. The arms are drawn resembling two wings coming out

5

from the top of the square torso. There are only 3 fingers on each hand. Legs are drawn as sticks, seen through the skirt worn by this woman. The arms are the length of the entire torso and the feet are barely perceptible at the bottom of the page. D██████ calls this woman her imaginary friend, "Lucky". She is 21 and the two go to clubs together. She has her pearls on and is wearing a shirt that has the word LOVE on it.

The psychological interpretation of D██████ person lends insight into the functioning of her psyche. As in D██████ other projective drawings there is no groundline, which is generally indicative of her need for support. The very large head of "Lucky" seems to indicate D██████ aggressive tendencies, as does the rather large mouth on Lucky's face, which suggests D██████ verbal aggressiveness. Several aspects of the drawing, specifically the figure's empty eyes, long neck, its weak, powerless arms, and its petal-like fingers, suggest D██████ general pattern of detachment from social relationships and a restricted range of expression of emotions in interpersonal settings. It is not surprising that a young person of 15, who has already been rejected by her mother and has been in eight foster homes would show distress in the formation of interpersonal relationships. Perhaps most interesting is the angular, squared off body shape D██████ gives to Lucky. This is a body shape more appropriate to the male form. This self representation may suggest D██████ confusion about her sexuality or may be her way of expressing the envy she feels about masculine sexual power in her world.

*Thematic Apperception Test (TAT) and the Rorschach:*
The Thematic Apperception Test required D██████ to orally create stories in response to pictures of individuals, presumably in some type of relationship. Responses on this task can help the evaluator identify themes which are indicative of the emotional conflicts and needs of the respondent. The way in which the stories produced are resolved can give the evaluator insight into the respondent's feelings about their future. There are fifteen cards. In general, D██████ gave only two responses to the cards presented. She responded to Card I in a traditional way, relating that the boy's guitar had been broken when he let someone else use it. His mother helps him get it fixed. The only other card to which she offered a response was Card IV, in which she sees that the couple pictured is having difficulties and the woman finally leaves. For all of the remaining cards, D██████ rejected them saying, " I don't have a story for that one." It might simply be interpreted that D██████ was refusing to follow the protocol of the tasks with which she was confronted, similar to the way she "acts out" in school or at home. However, it is noteworthy that she did not reject any of the other more structured psychological tasks. One might hypothesize that the projective and unstructured nature of the tasks associated with the TAT cards, produced uncomfortable and conflicted feelings for D██████, which she opted to ignore.

D██████ was similarly asked to respond to ambiguous inkblots, known as the Rorschach cards. There are 10 cards. Similar to her response on the TAT cards, D██████ looked at several of the Rorschach cards, turned them around and said, "I have no idea what is here. I don't want to do these." She refused to continue with the test, which was ended at Card III. Once again, D██████ seemed to be responding to the ambiguous, unstructured nature of the cards. As in the TAT, she refused to continue.

6

540

destructive in nature. Her projective drawings suggest an aggressive individual, whose acting out functions as a successful way of preventing her from forming meaningful and intense long term relationships. Her rejection of the projective tests, TAT and Rorschach indicate her uneasiness in unstructured heavily emotionally ladened situations. It also shows her uneasiness in revealing these intense emotions to others.

## DSM IV DIAGNOSIS

| | |
|---|---|
| Axis I: | 312.81  Conduct Disorder, Childhood Onset Type |
| | 304.30   Cannabis Dependence |
| Axis II : | Deferred |
| Axis III: | Deferred |
| Axis IV: | Genital herpes |
| | Unprotected sexual relations |
| | Lack of female role models |
| | Behavior problems in school leading to expulsion |
| Axis V: | GAF  50 |

## RECOMMENDATIONS

1. D████ needs a special education program, which will employ therapeutic strategies to encourage her to address her tendency to act out inappropriately, which is hampering her educational development. The only avenue open to her at present is an acting-out expression, which of course is unacceptable in a large classroom setting where other students are disrupted. D████ is not being helped when she is expelled from the classroom. This is a type of reinforcement of her behavior which instead needs to be extinguished. A smaller classroom environment, where therapeutic attention is available, will afford her the opportunity to deal with the overwhelming feelings motivating this acting-out, while still allowing her to stay in the classroom and learn. ways in which she can deal with situations in more productive ways.

2. D████ should receive therapy as soon as is possible. Given her tendency towards acting out and rebelliousness towards authority and authority figures, group therapy would be preferred over individual therapy.

3. D████ should be enrolled in a Big sister Program. D████ needs to be exposed to positive female role models in her life.

$Dw-18$



*Making a Difference*

## INTERDYNAMICS, INC.
### *Evaluations and Therapy*

### Social Work Evaluation Report

**Student Name:** D████ W████    **DOB:** ██/90    **Age:** 15
**Primary Language:** English    **Grade:** 9th
**Parent/Guardian:** Tafounya Dorn
**Address:** 4134 4th St. SE   Apt. # 102   Washington, DC
**Telephone#** (202) 561-09██
**Referral Source:** Parent
**Reason for referral:** D████ W████ was referred for evaluation due to increasing concerns regarding her educational placement.

### Developmental/Medical History

D████ was born at Greater Southeast Hospital, of natural delivery, following her mother's full term pregnancy. Ms. Dorn reports to have had an unremarkable pregnancy. Additionally, she reports to have had no involvement with alcohol, drugs or tobacco products while pregnant. D████ is reported to have had no illnesses or injuries, including head trauma, resulting in overnight hospitalization. She is reportedly up to date with immunizations and has had a negative lead screening. Ms. Dorn reports that D████ has had one childhood illness, chicken pox, which occurred when she was three years old. Developmental milestones are reported to have occurred within normal limits including walking at eleven months, talking at age one and potty trained at two years old.

### Family History

### Household Composition

| Name | Age | Relationship | Occupation |
|------|-----|--------------|------------|
| Tafounya Dorn | 29 | mother | unemployed |
| D████ W████ | 15 | self | 9th grade |
| Tayshawn Williams | 12 | brother | 6th grade |
| Trayquan Dorn | 3 | brother | N/A |

D██████ lives in a two bedroom apartment with her family where they've been for approximately five years. Ms. Dorn reports that D████████ generally gets along well with everyone in the home although she is often verbally abusive toward her brother, Tayshawn. Additionally, Ms. Dorn reports that D████████ has a history of ungovernable behavior, intensifying at twelve years old, leading to involvement with the District of Columbia Child and Family Service Agency. Ms. Dorn further reports that she contacted the agency for assistance because of D████████ frequent curfew violations, school suspensions and promiscuous behavior. On the day of her evaluations, D████████ was escorted to Interdynamics by her Child and Family Services casemanger, Suzanne McMichael, who also provided background information regarding D████████. According to Ms. McMichael, D████████ was removed from the home at twelve years old due to her mother's unwillingness/inability to provide care for her. D████████ would subsequently have approximately eight placement changes due primarily to her frequent habit of running away. Ms. McMichael further reports that D████████ was evaluated at twelve years old to determine the appropriateness of residential care because of reports of ongoing fights with peers, illicit drug use, lack of school progress and disrespect toward authority figures. Ms. McMichael also stated that D████████ was placed temporarily with her godmother, Glenneta Pelham, beginning in March 2004. She remained with Ms. Pelham until her acceptance into the Pines Residential Center in Newport News, Virginia in June 2004. Ms. McMichael reports that D████████ had a difficult transition into the Pines as evidenced by frequent reports of lack of progress related to fighting peers and disrespect toward authority figures. D████████ was discharged "successfully" from the Pines Center in January 2005. Ms. McMichael further reported that her discharge plan consisted of a recommendation for individual/family therapy and medication management because of her current prescription of Ritalin. D████████ is reported to have returned to Ms. Pelham's home where she remained from January 17, 2005 until March 19, 2005 when she left after accusing Ms. Pelham of hitting her. D████████ eventually surfaced at her mother's house on March 22, 2005 where she remains as of the date of this report.

Ms.Dorn, D████████ mother, reports that she completed the tenth grade and has no additional education or vocational training. The family receives TANF (Temporaray Assistance for Needy Families) and section eight vouchers to assist with financial needs. Additionally, Ms. Dorn reports that D████████s father, Leon Kelly, age 30, also lives in the metropolitan area and has sporadic contact with D████████, primarily by telephone.

## Social/Behavior Characteristics

Ms. Dorn describes D████████ as someone who lacks self control, has frequent mood changes has difficulty with rules and organization, and is aggressive toward other people. Ms. Dorn is unaware of any interests D████████ has aside from listening to music.

543

## School History

D███████ attended the first through the third grade at Stanton Elementary School where Ms. Dorn reports that she performed on grade level and had good behavior. She transferred to Wilkerson Elementary School in the middle of the third grade due to the family moving where she remained through the fourth grade. Ms. Dorn reports that D███████ continued to perform on grade level and did not have problems with behavior. She attended fifth grade at Hinley Elementary School where Ms. Dorn reports that D███████ had frequent reports of running and screaming in the halls, disrespect toward teachers and failure to complete assigned work. Ms. Dorn further reported to be unsure of a good portion of D███████ educational history due to her involvement in the foster care system. D███████ was enrolled into H.D. Wilson High School in the ninth grade after her discharge from the Pines Center. D███████ casemanager, Ms. McMichael, reports that she was expelled in March because of an "unprovoked assault" of a peer at school. There had also been reports of frequent walking in the halls and disrespect toward school personnel. D███████ is currently attending classes at the Choice Academy for the remainder of the school year.

## Summary

D███████ W██████ is a fifteen year old African-American female with a history of poor academic performance related to, but not necessarily limited to; behavior problems, unstable family life and possible deficits in cognition.

D███████ was born to a fourteen year old mother who did not have the parenting skills required to respond to her social, emotional and educational needs. As a result, D███████ growth and development was compromised at an early age causing her to have challenges in many areas including effective communication, interpersonal relationships and coping skills. Additionally, D███████ has experienced multiple childhood trauma related to her involvement in the child welfare system. Although much of her instability, in terms of placements, have reportedly been self induced, there would likely be a desire to return to her home environment, even if she realizes its not the most appropriate place for her to be.

This is a critical period for D███████ as she attempts to negotiate typical adolescent demands such as identity formation, self-esteem and academic achievement. She is at risk of emotionally withdrawing from school, thereby using it only as a social activity, if she doesn't see any tangible results soon.



544


Pg. 4

It is imperative that the multidisciplinary team review the most recent evaluations including health records to determine the most appropriate socioemotional and academic program for D██████.

**Reccomendations:**

1) D██████ could benefit from a small structured therapeutic environment with a vocational component.

2) D██████ should be considered for a residential program that would meet her academic need and provide placement stability.

3) D██████ could benefit from a vocational assessment to assist with future planning post high school.

4) D██████ could benefit from a behavior modification program that has rewards and persistent encouragement attached to assist with development of self control and help with self esteem issues.

5) D██████ is in need of individual therapy to address issues related to anger management and to develop appropriate coping skills.


James Thomas, MSW, LGSW

5/16/05
Date

545

DW-19

# LAW OFFICES,
# CHRISTOPHER N. ANWAH, LLC



Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
(DC, MD, NJ)
Fatmata Barrie, Esq.
(DC, FL)
Panya Monford, Esq.
(MD**)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

May 20, 2005

Tim Fitzgerald
Placement Specialist/Monitor for Surrounding Counties
District of Columbia Public Schools
825 North Capitol Street, NE
6th Floor
Washington, DC 20002

**Via Facsimile: 202-442-5517/5518**
**Via First Class Mail**

**RE:** D███████ W███████
**DOB:** ██████/90

Dear Mr. Fitzgerald:

Please find attached the psychiatric, psycho-educational, clinical and social history evaluations for D██████ W██████. According to the 05/20/04 HOD, DCPS has 15 school days to convene the meeting to review the evaluations and determine eligibility. Please forward a meeting notice with three dates and times because this is a student in need of immediate services. Should you have any questions or need additional information, please do not hesitate to contact me.

Sincerely,

Annie R. Pressley, JD
Law Clerk/Advocate

546

TRANSMISSION VERIFICATION REPORT

```
                                    TIME  : 05/20/2005 14:12
                                    NAME  :
                                    FAX   :
                                    TEL   :
                                    SER.# : BROK3J760429
```

```
DATE,TIME             05/20  14:02
FAX NO./NAME          4425517
DURATION              00:09:56
PAGE(S)               29
RESULT                OK
MODE                  STANDARD
                      ECM
```

547

# LAW OFFICES,
## CHRISTOPHER N. A NWAH, PLLC

**Attorneys and Counselors at Law**

Christopher N. Anwah, Esq.
(DC, MD, NJ)
Fatmata Barrie, Esq.
(DC, FL)
Panya Monford, Esq.
(MD)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

## FACSIMILE COVER LETTER

DATE: 05/20/05

TO: Tim Fitzgerald

COMPANY: SHO

FAX NUMBER: 202-442-5517/5518

FROM: Annie R. Pressley

RE: Evaluations for Da███████ W██████

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET        29

MESSAGE:

If there is any problem with this transmission, please call as soon as possible at (202) 626-0040

### ***CONFIDENTIALITY NOTICE***

The pages accompanying this facsimile transmission contain information from the Law Office of Christopher Anwah, PLLC, which is confidential or privileged, or both. The information is intended to be for the use of the individual or entity named on this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately at (202) 626-0040 so that we can arrange for the retrieval of the original documents at no cost to you.

548



# First Home Care Corporation

## We Build Futures

April 27, 2004

## TO WHOM IT MAY CONCERN:

Re: D███████ W██████

Dear Sir/Madam:

I am writing this letter on behalf of D███████ W██████. I have been D███████ psychiatrist since early March 2004, and have met with her twice. D███████ is being treated for Bipolar Disorder, not otherwise specified. She is currently taking Risperdal, an antipsychotic and mood stabilizing medication. However, there have been problems with her not taking the medication, as prescribed.

D███████ behavior continues to be worrisome. She is engaging in high-risk activities and is extremely oppositional. These behaviors continue despite intense outpatient psychiatric services. At the current time, I feel it is in D███████ best interest to be referred to a residential facility. This will ensure her safety and provide the more extensive treatment she requires.

Please feel free to contact me at (202) 654-0881, should you have any questions.

Sincerely,

Joshua Weiner, M.D.

JW/dmr

1012 14th Street, NW, 14th Floor, Washington, DC 20005 • (202) 737-2554 • Fax: (202) 737-3557
A Subsidiary Of Alternative Behavioral Services
www.absfirst.com

549

**Complaint Intake Unit**
825 North Capitol Street, NE – 8th Floor
Washington, D.C. 20002



**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
State Enforcement & Investigation Division
for Special Education Programs

# Fax

| Name: | Fatmata Barrie, Esq. | Pages: | 3 |
|---|---|---|---|
| Fax Number: | 626 0048 | Date: | August 26, 2005 |
| Telephone No: | 626 0040 | | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

• Comments: Scheduling Memorandum

For: D██████ Wi██████

The document(s) accompanying this telecopy transmission contains confidential information that is legally privileged. The information is intended only for use of the individual or entity named Above. If you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is strictly prohibited. If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

550

# STATE EDUCATION AGENCY
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | |
|---|---|
| In the Matter of: | BEFORE A SPECIAL EDUCATION |
| ~~D⟋⟍⟍⟍⟍⟍ W.~~ ) | |
| **Petitioner** ) | |
| ) | **HEARING OFFICER** |
| _DCPS-Choice Academy_ v/s. ) | |
| ) | **DISTRICT OF COLUMBIA** |
| **Respondent** ) | **PUBLIC SCHOOLS** |

## SCHEDULING MEMORANDUM

1.  A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **The Student Hearing Office does not schedule or participate in resolution meetings.**

2.  The complaint notice was filed on _August 25, 2005_.

3.  The deadline for the resolution meeting is _September 9 2005_ unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A.  ___Prior Written Notice Not Issued by the Local Educational Agency___. If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

    1.  An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;
    2.  A description of other options that the IEP Team considered and the reasons why those options were rejected;
    3.  A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and
    4.  A description of the factors that are relevant to the agency's proposal or refusal.

Rev'd. 7/6/05

551

B.    Prior written notice, if not already provided to the parent, must be sent by the Local

Educational Agency to the complaining party no later than *September 4, 05*

C.    *Deficiency Notice*.  A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, within 15 days of receiving the notice of the complaint, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.    The deadline for filing a deficiency notice is *September 9, 2005*

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence.  A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice.  The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law.  Information about the time, date, and location of the resolution meeting will be provided by the school or the Local Education Agency responsible for scheduling the meeting.

552

Rev'd. 7/6/05

JW-22 FB
4/8/05

D██████ W█████

Suspension Meeting

SEC - D█████████ cannot be in sp. ed
with the 2004 psychological
eval. Will need

Principal - Cannot place her @ CHOICE
Re: expulsion. Suspended Re: attacked a peer
without provocation

Advocate - Requesting that all information
Re: education be through the advocate.

SEC - Ask that we complete as many
      evaluations as necessary.
      Cannot do evaluations this school
      year. Cannot hold an IEP meeting
      without up to date psycho - educational,
      psychiatric evaluation, clinical
      psychological and social history.

Ms. K. Phillips
Sp. Ed. Coord.
4/11/05

553



# *CONFIDENTIAL*
This Document ONLY For Use by Authorized Individuals as Designated on this Cover Sheet

## COVER

## SHEET

# FAX

**To:** Ms. Shannon Campbell
**Fax:** 202.727-7706
**Subject:** Referral Response
**Date:** August 12, 2005
**Pages:** 3, including this cover sheet.

Re: D████████W███████
DOB: ██████-90

Dear Ms. Campbell:

Thank you for your interest in the Devereux Florida, Viera Campus, a licensed specialty hospital treating children ages 5 through 17. Our screening committee has completed its review of available documentation and determined that the above referenced youngster is appropriate for admission to our intensive residential treatment program at the contract rate pending confirmation through a psychiatric examination of the child on the scheduled date of admission. With few exceptions, our screening process accurately predicts suitability for admission.

This is confidential and privileged information. For Professional use only. This information has been disclosed to you from records whose confidentiality is protected by federal law. Federal regulation (42 CFR, Part 2) prohibits you from making any further disclosure of it without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations.

## DEVEREUX FLORIDA Central Referral Unit - Viera

| | |
|---|---|
| Central Referral Unit | ☒ Linda Brooks, ACSW, LCSW - Director of CRU; ext. 130 |
| 8000 Devereux Drive | ☐ Kelianne Bayless, B.S. – Admissions Coordinator; ext. 129 |
| Viera, Fl 32940 | ☐ Keri Robison, CABA – Assistant Director of CRU, ext. 131 |

Telephone: 321-242-9100 or 800-338-3738    **Fax: 321-242-1573**

554

*State Education Agency for the District of Columbia*
*State Enforcement and Investigation Division (SEID)*
*Special Education Programs*

DW-24



# Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting **(called a "Resolution Session")** with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A. INFORMATION ABOUT THE STUDENT:

Student Name: D██████ W███████          Birth Date: ████/90

Address: Girls and Boys Town of Washington, DC 4801 Sergeant Rd. NE , Washington, DC 20017

Home School: _____

Present School of Attendance: CHOICE Academy

Is this a charter school? _____  (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student: Ward

Address (if different from the student's above): _____

1

Phone/Contact Number: _____    Fax Number (if applicable): _____

**B.    <u>Individual Making the Complaint/Request for Due Process Hearing</u>:**

Name:    Fatmata Barrie, Esq.

Complete Address:    1003 K St. NW #565 Washington, DC  20020

_____

Phone: (h)  202-626-0040    (W)  202-626-0040    (Fax)  202-626-0048    (e-mail) _____

Relationship to the Student:

☐    Parent                      ☐    Legal Guardian              ☐    Parent Surrogate

☐    Self/Student                ☐    Local Education Agency (LEA)    ☐    Parent Advocate

X    Court Appointed Educational Advocate

**C.    <u>Legal Representative/Attorney (if applicable)</u>:**

Name:    Fatmata Barrie, Esq.  (Law Offices, Christopher N. Anwah, PLLC)

Address:    1003 K St. NW #565 Washington, DC  20020

_____

Phone: (w)  202-626-0040         (Fax) 202-626-0048       (e-mail)_____

Will attorney / legal representative attend the resolution session?    X Yes         ☐ No

**D.    <u>Complaint Made Against (check all that apply)</u>:**

☐ DCPS school (name of the school if different from page one)    DCPS _____
☐ Charter school (name of the charter school if different from page one)    _____
☐ Non-public school or residential treatment facility (name)    _____
☐ Parent

**E.    <u>Resolution Session Meeting Between Parent and LEA</u>:**

I understand that it is my right to have a resolution meeting to resolve this complaint.  I also understand that I may voluntarily waive this right if I choose.  (Note:  All parties must agree to waive the resolution meeting to avoid having this meeting.)

☐ I wish to waive the Resolution Session Meeting

556

**F.** **Mediation Process:**

IDEIA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session Meeting or as an alternative to a Due Process Hearing. Please check all that apply:

☐    I am requesting mediation as an alternative to the resolution session meeting.

☐    I am requesting mediation and a due process hearing.

☐    I am requesting mediation **only** at this time.

**G.** **Facts and Reasons for the Complaint:**

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.     What is the nature of the problem, including the facts relating to the problem that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

A.     DCPS failed to adhere to the "child find" statute because DCPS has yet to determine D████████ eligible for special education services. Since Elementary and middle school, D████████ has indicated behavioral problems that have impacted on her academics. However, DCPS did nothing to provide her with the appropriate services. In fact as early as 1996 and in 2003, it is documented that D████████ had behavior problems which were disruptive to her and the class and that she needed services like OT. However, to date, no IEP meeting has been held and no IEP has been provided for D████████. Therefore, violating the "child find" statute.

B.     DCPS has failed to adhere to the 05/20/04 HOD because DCPS has yet to convene a meeting to determine D████████ eligibility even though the evaluations were provided to DCPS on 05/20/05. For the entire summer of 2004 and half of the 2004/2005 school year, D████████ was in a residential treatment center. Upon her return, she attended HD Woodson and her behaviors continued. In fact, her behavior was so out of control that Woodson expelled her and placed her at CHOICE Academy. However, D████████ complained that books were not offered. During a meeting at Woodson in April 2005 to address her behaviors, the principal and SEC indicated that although they had the psychological evaluation and other documents, it was not enough to determine if she qualifies for special education services. Additionally, the independent evaluations were completed and forwarded to DCPS per the 05/20/04 HOD but DCPS made no contact with the office to convene a meeting so as to review the evaluations, determine eligibility, discuss and determine placement, issue a PNOP and discuss and determine compensatory education. Therefore, violating the 05/20/04 HOD.

C.     DCPS has failed to provide D████████ with an appropriate IEP because she does not yet have an IEP even though all the evaluations indicate such. Her clinical and psychiatric evaluations both indicate the need for intensive services. In fact her psychiatric indicated that she is need of a residential program and her clinical diagnosed her with conduct disorder and recommended a therapeutic program that can address her inappropriately acting out behaviors. Her psychiatric diagnosed her with ADHD, Mood disorder, ODD, conduct disorder and LD. However, she remains without an IEP or an appropriate placement. Therefore, exacerbating the problems she has to deal with.

D.     DCPS has failed to provide D████████ with appropriate special education and related services because she does not have an IEP that is geared towards addressing her ADHD, Mood disorder, ODD, conduct disorder and LD and as a result, continues to be instructed within the regular

3

D████████ W████████ – ████/90

557

education setting in which she continues to fail both academically and emotionally. Therefore, DCPS has not provided her with all her needed special education and related services. DCPS has also not provided the opportunity to participate in a placement meeting to determine the appropriate placement for D█████.

E.  DCPS has failed to provide D██████ with an appropriate placement even though she has not progressed academically or emotionally. As stated above, her evaluations diagnosed her with ADHD, Mood disorder, ODD, conduct disorder and LD. However, she has yet to be placed in a placement that ca n address such disabilities. As a result, her emotional and academic issues have become worse.

F.  DCPS has failed to provide or determine any transition services for D██████ even though she is now 15.

G.  DCPS has failed to provide her with the needed compensatory education for not identifying her within the appropriate time frame even though her academics have always been below level, for not providing her with appropriate services and placement because she continued to not progress academically or social emotionally and for not providing her with an IEP for the reasons listed above.

2.  To the extent known to you at this time, how can this problem be resolved?

A.  DCPS to provide her with an appropriate residential placement of the court's choice.

B.  DCPS to convene a meeting to complete an appropriate IEP and transition services for the student.

C.  DCPS to provide compensatory education for 2 to 3 years of denial of FAPE.

D.  DCPS to pay attorney's fee.

3.  Issues presented:

A.  Whether DCPS denied D██████ a Free Appropriate Public Education (FAPE) when it failed to adhere to the "child find" statute, failed to evaluate her in all areas of suspected disability and failed to adhere 05/20/04 HOD?

B.  Whether DCPS denied D██████ FAPE when it failed to provide her with an appropriate IEP?

C.  Whether DCPS denied D██████ FAPE when it failed to provide her with appropriate special education and related services?

D.  Whether DCPS denied D██████ FAPE when it failed to provide her with an appropriate placement?

E.  Whether DCPS denied D██████ FAPE when it failed provide the opportunity for participation in a placement meeting to determine an appropriate placement for D██████?

F.  Whether DCPS denied D██████ FAPE when it failed to provide her with the needed compensatory education for the past and present denial of FAPE ie for 2 to 3 years?

# H.  Accommodations and Assistance Needed:

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type) _____
- Special Communication (please describe the type)

4

- Special Accommodations for Disability (please be specific) _____

- Other _____

**I.**   <u>**Waiver of Procedural Safeguards:**</u>

☐ I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**J.**   <u>**Parent Signature and Affirmation:**</u>

I affirm that the information provided on this form is true and correct.

_____
Signature of Parent or Guardian                     Date

**K.**   <u>**Signature of Attorney/ Legal Representative:**</u>

_____   08/25/05
Legal Representative / Advocate               Date

**L.**   <u>**Signature of LEA Representative (if hearing requested by LEA):**</u>

_____
Representative of LEA                              Date

**Mail, fax or deliver this complaint notice to:**
**State Enforcement and Investigation Division**
**For Special Education Programs  (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC  20002**
**Fax number: 202/442-5556**

559

SEID DPCN Rev'd. 7/12/05

# LAW OFFICES,
# CHRISTOPHER N. ANWAH, PLLC

**Attorneys and Counselors at Law**

Christopher N. Anwah, Esq.
(DC, MD, NJ)
Fatmata Barrie, Esq.
(DC, FL)
Georgina A. Oladokun, Esq.
(MD)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

## FACSIMILE COVER LETTER

DATE: 08/25/05

TO: SHO

COMPANY: SHO

FAX NUMBER: 202-442-5556

FROM: Fatmata Barrie, Esq.

RE: Hearing Request for Da███████, W██████

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET        06

MESSAGE:

If there is any problem with this transmission, please call as soon as possible at (202) 626-0040

### ***CONFIDENTIALITY NOTICE***

The pages accompanying this facsimile transmission contain information from the Law Office of Christopher Anwah, PLLC, which is confidential or privileged, or both. The information is intended to be for the use of the individual or entity named on this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately at (202) 626-0040 so that we can arrange for the retrieval of the original documents at no cost to you.

TRANSMISSION VERIFICATION REPORT

TIME : 08/25/2005 15:11
NAME :
FAX  :
TEL  :
SER.# : BROK3J760429

| | |
|---|---|
| DATE,TIME | 08/25  15:10 |
| FAX NO./NAME | 4425556 |
| DURATION | 00:01:52 |
| PAGE(S) | 06 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

561



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

**Office of the Superintendent**
Office of the General Counsel
825 North Capitol Street, N.E., 9ᵗʰ Floor
Washington, D.C. 20002-4232
202-442-5000        Fax: 202-442-5098
www.k12.dc.us

October 13, 2005

Fatmata Barrie, Esq.
1003 K Street, NW, Suite 565
Washington, DC 20020

## DISCLOSURE STATEMENT

## VIA FACSIMILE 202/626-0048

| | |
|---|---|
| **Subject:** | **Due Process Hearing for D▓▓▓▓▓ W▓▓▓▓** |
| **DOB:** | ▓▓▓▓/1990 |
| **Attending School:** | **CHOICE Academy** |
| **Former School:** | **Woodson Senior High School (SHS)** |

Dear Ms. Barrie:

In accordance with your agreement to waive the timeline for disclosures in this matter, at the upcoming due process hearing in the above-referenced matter scheduled for Tuesday, October 19, 2005 at 11:00 a.m. or any subsequent hearing, and pursuant to the Individuals with Disabilities Education Improvement Act, Pub. L. No. 108-446 and 34 C.F.R. 300.509(a) (3), in addition to any documents and witnesses disclosed by the parent, DCPS may rely upon any of the following witnesses/documents[1], in addition to any documents and/or witnesses previously disclosed by any party for any earlier hearing for this student and/or compelled below:

### Witnesses

Mary Lee Phelps or successor, Interim Associate Superintendent for Special Education Reform & Student Services, DCPS and/or designee(s);
Ruth Blake, Director, Non-Public Day, DCPS and/or designee(s);
Tammye Martin, Acting Supervisor, School Support, DCPS and/or designee(s);
Gary Washington or successor, Principal, CHOICE Academy and/or designee(s);
Aona Jefferson or successor, Principal, Woodson SHS and/or designee(s);
Katie Phillips, Special Education Coordinator, Woodson SHS and/or designee(s);
Deirdre Council, Residential Coordinator, DCPS and/or designee(s);
Breona T. Harrison, Complaint Resolution Specialist, DCPS and/or designee(s);
Gina Scales-Johnson, Resolution Meeting Scheduler and/or designee(s);
Lillian Staten or successor, Special Education Teacher/Coordinator, CHOICE Academy and/or designee(s);
Kymberly Grafton or successor, Placement Specialist/Monitor, DCPS and/or designee(s);

---

[1] Witnesses may testify by telephone.

562

Page Two
October 13, 2005
RE:   Due Process Hearing for D████████ Wi███████

D████████ Case Manager, CHOICE Academy and/or Woodson SHS and/or designee(s);
D████████ Special Education Teacher(s), CHOICE Academy and/or Woodson SHS and/or designee(s);
D████████ Regular Education Teacher(s), CHOICE Academy and/or Woodson SHS and/or designee(s);
Registrar(s) and/or Attendance Counselor(s) or equivalent(s), CHOICE Academy and/or designee(s).

**Documents**

| | |
|---|---|
| DCPS-01 | Student Master Records (4/04/05) |
| DCPS-02 | Student's Attendance Records (4/4/05) |
| DCPS-03 | Disciplinary Records (4/5/05) |
| DCPS-04 | Keystone Academy Records (2004/2005 SY) |

DCPS reserves the right to object to expert testimony by any witness whose curriculum vitae has not been disclosed to the Office of the General Counsel for DCPS at least five (5) business days prior to the hearing. DCPS also reserves the right to examine any witnesses called or identified as a potential witness by the representative of the student as though the witness was called by DCPS.

DCPS furthermore reserves the right to rely upon and /or use any documents/witnesses presented and/or disclosed by the parent that DCPS deems relevant in this case. Also, DCPS reserves the right to call rebuttal witnesses in its case.

If you wish to discuss any aspect of this case further, or have questions, please contact me at (202) 442-5157.

Sincerely,

Michael D. Levy
Attorney Advisor

cc: Student Hearing Office

563

Case 1:07-cv-01427-JMF    Document 13-3    Filed 02/21/2008    Page 15 of 30

Student ID:        9003083                    Status:              A
                                              Grade/School Yr:  09 04/05
Last Name:         WI█████                    Homeroom:         5089 New:
Given Names:       D█████                     Program:
Called Name:                                  Locker/Comb:          0
Address Line 1:    326 63RD ST. NE            Previous School:    958  File: N
Address Line 2:                               Admission Date:   01/24/05
City:              WASHINGTON                 Admission Code:   A5 Calendr: 0
State:             DC                          Withdrawal Date:
Zip Code:          20019                       Withdrawal Code:
Tel No/Area/Code:  397-5544  (202)            Transf To School:        File: N
Parent/Guardian:   GLENNETTA PELHAM           Date Transferred:
P/G Relationship:  2  FATHER                  Graduation Rule:
Sex/Ethnic Code:   F  B  BLACK                Graduation Date:
Birthdate:         █████/90                   Schedule Changed: 03/31/05
Verified With:     B  BIRTH CERT.                               1 2 3 4 5
Soc Sec No:        ██████████                 Data Flags:       1 Y Y
Counselor Name:                               Report Flags:     N N N N N
Scheduling Priority:                          Res/Sped/Att:     R       0
Command: DISPLAY
Message:
   1(023,011)

**SECTION I   WITHDRAWAL INFORMATION**

REPORTING SCHOOL WILL: (1) COMPLETE SECTION 1; (2) FORWARD THE ORIGINAL TO THE DIVISION OF STUDENT SERVICES, SCHOOL ATTENDANCE BRANCH; (3) FORWARD COPIES 1 AND 2 TO THE RECEIVING SCHOOL ON THE DAY OF WITHDRAWAL; (4) GIVE COPY 3 TO THE STUDENT; AND, (5) RETAIN COPY 4 FOR YOUR FILES.

REPORTING SCHOOL:

STUDENT ALSO ATTENDS: SECOND SCHOOL

STUDENT ALSO ATTENDS: THIRD SCHOOL

STUDENT'S NEW ADDRESS: (IF ANY)

SPECIAL SERVICES: (CHECK ALL THAT APPLY)

RACIAL PLACEMENT:

REASONS FOR WITHDRAWAL CODES:
- W-1 DISCHARGED TO ENROLL IN A D.C. PUBLIC SCHOOL
- W-2 DISCHARGED TO ENROLL IN A D.C. NONPUBLIC SCHOOL
- W-3 DISCHARGED TO ENROLL IN A SCHOOL OUTSIDE THE DISTRICT OF COLUMBIA (EVIDENCE SUBMITTED)
- W-4 DISCHARGED TO WORK (UNDER 16; EMPLOYER EVIDENCE SUBMITTED)
- W-5 DISCHARGED FOR NONPAYMENT OF TUITION
- W-6 DISCHARGED BY COURT ORDER FOR ☐ INCARCERATION ☐ OTHER (SPECIFY)

CHAPTER I ☐

2. INSTRUCTIONAL LEVEL:   READING

FREE LUNCH ☐   REDUCED COST LUNCH ☐

2. STUDENT I.D. NO.:   9 0 0

3. DATE OF BIRTH:   MONTH - DAY - YEAR

VISITING INSTRUCTION ☐   OTHER ☐   SPECIFY

7. IMMUNIZATION:   COMPLETE ☐   INCOMPLETE ☐

MATHEMATICS

VOLUNTARY WITHDRAWAL
- W-7 UNDER 7 YEARS OF AGE
- W-8 AGE 16 AND OVER
- W-9 STUDENT DECEASED
- W-10 GRADUATION FROM HIGH SCHOOL

REASONS:
- ☐ TO WORK   ☐ FOR ECONOMIC REASONS
- ☐ LACK OF INTEREST   ☐ MILITARY SERVICE
- ☐ OTHER

W WITHDRAWAL DUE TO SERIOUS ILLNESS OR DISABILITY (APPROVED M.D. CERTIFICATE)

STUDENT LAST ATTENDANCE:   MONTH - DAY - YEAR

EFFECTIVE DATE OF WITHDRAWAL:   MONTH - DAY - YEAR   DATE:

**CONFIRMATION OF ENROLLMENT**

THE INFORMATION BELOW AND FORWARD COPY 1 TO THE DIVISION OF STUDENT SERVICES, SCHOOL ATTENDANCE BRANCH, 415 12TH STREET, NW, ROOM 813, WASHINGTON, DC 20004 WITHIN ONE COPY 2 OF ENROLLMENT OR WITHIN 15 DAYS FROM DATE OF RECEIPT OF THIS FORM, IF STUDENT HAS NOT ENROLLED.

RECEIVING SCHOOL:   CODE

RECEIVING SCHOOL NAME:

RECEIVING SCHOOL ADDRESS
STREET   CITY   STATE   ZIP CODE

INSTRUCTIONAL PROGRAMS (CHECK ALL THAT APPLY):
REGULAR ED.   CAREER DEV.   SPECIAL ED.   ADULT ED.

RECEIVING SCHOOL ADMINISTRATOR:

PUPIL'S SCHOOL CODE:

☐ STUDENT ENROLLED (DATE OF ENTRY)
MONTH   DAY   YEAR

☐ STUDENT NOT ENROLLED (AS OF THIS DATE)
MONTH   DAY   YEAR

CURRENT STATUS:

IDENT. ADDRESS:

16. ADDRESS:
HOUSE NO.   STREET   APT   SECTION

17. GRADE PLACEMENT:

ADDRESS:
STREET   CITY   STATE   ZIP CODE

NATURE OF RECEIVING SCHOOL ADMINISTRATOR:

NATURE OF RECEIVING SCHOOL CLASSROOM TEACHER NAME:
LAST   FIRST   MI

18. HOMEROOM NO.:

20. TEACHER SOCIAL SECURITY NO.:

DATE:

565

# PUPIL'S PERMANENT RECORD

## DISTRICT OF COLUMBIA
### PUBLIC SCHOOLS

D Woodson Senior High School

**LAST NAME OF PUPIL** W

**FIRST NAME** D

**MIDDLE NAME**

**PARENT OR GUARDIAN** Ms. Glennetta Pelham

**OCCUPATION**

**RESIDENCE** 326 63rd Street, NE

**TEL.**

**RESIDENCE** Washington, DC 20019

**TEL.**

**PLACE OF BIRTH:**

**DATE OF BIRTH:** /90

**SEX:** M F — F

**DATE OF ENTRY**

**DATE OF WITHDRAWAL**

**DATE OF REENTRY**

**FROM**

**TO**

**FROM**

| NINTH GRADE | | | | |
|---|---|---|---|---|
| SUBJECT | GRADE | UNIT | | |
| ENGLISH | | | | |

| YEAR BEG. | | | | | | | |
|---|---|---|---|---|---|---|---|
| SUBJECT | SECTION | SEM. I | SEM. II | TCHR. | SEM. | FINAL | UNIT |
| ENGLISH | | | | | | | |
| MILITARY SCIENCE | | | | | | | |
| PHYSICAL EDUCATION | | | | | | | |

| YEAR BEG. | | | | | | | |
|---|---|---|---|---|---|---|---|
| SUBJECT | SECTION | SEM. I | SEM. II | TCHR. | SEM. | FINAL | UNIT |
| ENGLISH | | | | | | | |
| MILITARY SCIENCE | | | | | | | |
| PHYSICAL EDUCATION | | | | | | | |

| YEAR BEG. | | | | | | | |
|---|---|---|---|---|---|---|---|
| SUBJECT | SECTION | SEM. I | SEM. II | TCHR. | SEM. | FINAL | UNIT |
| ENGLISH | | | | | | | |
| MILITARY SCIENCE | | | | | | | |
| PHYSICAL EDUCATION | | | | | | | |

| YEAR BEG. | | | | | | | |
|---|---|---|---|---|---|---|---|
| SUBJECT | SECTION | SEM. I | SEM. II | TCHR. | SEM. | FINAL | UNIT |
| ENGLISH | | | | | | | |
| MILITARY SCIENCE | | | | | | | |
| PHYSICAL EDUCATION | | | | | | | |
| DEPORTMENT | | | | | | | |
| DAYS PRESENT | | | | | | | |
| DAYS ABS. EX. | | | | | | | |
| DAYS ABS. UNEX. | | | | | | | |
| TIMES TARDY | | | | | | | |

**TEST RECORD**

**SUMMER SCHOOL**

**UNITS**

**ENROLLED IN THE FOLLOWING COURSE:**
- HONORS COLLEGE PREP
- REGULAR COLLEGE PREP
- GENERAL
- BASIC

COPY CERTIFIED BY _____

PRINCIPAL

DATE

566

Case 1:07-cv-01427-JMF     Document 13-3     Filed 02/21/2008     Page 18 of 30

                                                            F-09-A-04/05-5089
Student ID:9003083    Grd: 09   Home:  GLENNETTA PELHAM        (202)397-5544
                                Cont:EC JONNY ROBINSON         (202)889-0449
W▓▓▓▓▓▓ D▓▓▓▓▓▓▓     Cont:ON MONCIA BROADIE       (202)262-1237

      Date:           Abs Type:    Am/Pm:  Prds:  Time:  Abs Reason:   Abs Note:
 1   02/15/05         A Absent
 2   02/18/05         A Absent
 3   02/25/05         A Absent
 4   03/07/05         A Absent
 5   03/10/05         A Absent
 6   03/14/05         S Suspended
 7   03/15/05         S Suspended
 8   03/16/05         S Suspended
 9   03/17/05         S Suspended
10   03/18/05         S Suspended
11   03/23/05         T Tardy
12
13

    Command: DISPLAY
    Message:
       1(023,011)



# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## FINDINGS AND RECOMMENDATIONS FROM
## STUDENT/PARENT CONFERENCE

H.D. Woodson SHS
**School**

724-4500
**Telephone**

Aona H. Jefferson (WCC)
**Signature of Principal**

04/05/05
**Date of Delivery**
[ ] Certified Mail
[x] Hand Delivery

**Student** D█████ W███████    **Date of Birth** █████/90

**Student's Grade** 9th    **Male** [ ] **Female** [x]    **Ethnicity Code** B

**Sp. Ed. Student: Yes** [ ] **No** [x]    **Disability Code** _____    **LRE/Educational Setting** _____

**Parent/Guardian** Ms. Glennetta Pelham

**Address** 326 63rd Street, N.E., Washington, D.C. 20019

**Home Telephone** 397-5544    **Work Telephone** (202) 698-3000

**Dear** Ms. Pelham :
     Name of Parent/Guardian

As a result of the conference held pursuant to Board Rule 2505.4, D█████ W███████
                                                                  Name of Student

shall be disciplined as follows:

[x] **Excluded from** 04/11/05 _____ **to** 06/21/05 .

[x] **During this disciplinary period the student must report to:**
   CHOICE Academy _____    _____
      Name of School                     Program/Class/Time Period
   at 2600 Douglas Rd, S.E. .
        Address

[ ] **During this disciplinary period, the student is placed on home suspension. An educational package will be provided to the student. Further instructional information will be provided by this office. If your child does not receive this information within four (4) school days of your receipt of this notice, please call**
_____ **on** _____ .
        Name                              Telephone Number

[ ] **No disciplinary action will be taken.** _____ **is to return to school immediately.**

Page 1 of 1
SHO 104

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## NOTICE OF STUDENT DISCIPLINARY ACTION

## SUSPENSION LEVEL II

H.D. Woodson SHS
**School**

724-4500
**Telephone**

Aona H. Jefferson (WCC)
**Signature of Principal**

04-05-05
**Date of Delivery**
[ ] Certified Mail
[x] Hand Delivery

**Student** D██████ W████████          **Date of Birth** █████/90

**Student's Grade** 9th          **Male** [ ] **Female** [x]          **Ethnicity Code** B

**Sp. Ed. Student: Yes** [ ] **No** [x]    **Disability Code** _____    **LRE/Educational Setting** _____

**Parent/Guardian** Ms. Glennette Pelham

**Address** 326 63rd Street, N.E.   Washington, D.C.  20019

**Home Telephone** 397-5544          **Work Telephone** (202) 698-3000

**Dear** Ms. Pelham :
   Name of Parent/Guardian

**Please be advised that pursuant to the Rules of the Board of Education, Section 2500, your son/daughter is being disciplined for violating the following section(s) of the Board Rules;** 2504.3C and 2503.1H

**Brief description of incident:**
Student physically assaulted fellow student causing a major disruption in the cafeteria .

(State each section individually)

Page 1 of 4
SHO 102
August 2000

569

Da███████ W███████
───────────────────────────
**Name of Student**

I am notifying you, in accordance with Board <u>Rule</u> Section 2505.3, that
D█████ W█████ _____ is to be suspended for __49__ days, from 4/11/05
       **Name of Student**
through __6/21/05_____.

[x]  A conference was held on ___4/4/05_____ with __Da██████ W██████__.
                              **Date**                    **Name of Student**

[ ]  A conference has been scheduled on_____ at _____, in the school
                                        **Date**        **Time**
     office.

Contact __Mr. Chiselom___ on __724-4500_____ to confirm attendance.
        **(Name of Contact Person)**    **(Telephone Number)**

## CHECK WHERE APPROPRIATE

[ ]  **During this disciplinary time period the student must report to this school for in school
suspension.**

[x]  **During this disciplinary time period the student must report to the following alternative
educational placement:** __CHOICE Academy_____, **located at** _2600 Douglas Rd. S. E.
__Washington, D.C.  20020__
**The telephone number is** _576-5360_____.

[ ]  **Because of the seriousness of the offense and potential harm to your child and others, I am
initiating a home suspension in accordance with the Board <u>Rules</u>. During this disciplinary time
period, the student shall be placed on home suspension for _____ days. An educational packet
will be provided to the student. This office will provide further instructional information. If
your child does not receive this information within (4) school days of receipt of this notice,
please call:**

_____        _____
      **Name**                 **Telephone Number**

This suspension will not be made a part of the student's permanent record. The
principal has informed the Student Hearing Office of this suspension.

A copy of Chapter 25 of the Board <u>Rules</u> is attached.

Page 2 of 4
SHO 102
August 2000

570



## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### RECOMMENDATION FOR LEVEL II SUSPENSION

**Date** _____4/5/05_____

TO    :    **Assistant Superintendent**

FROM:    Aona H. Jefferson (WCC)
             **Principal of School**

**Date on which Parent/Guardian was Notified**

H.D. Woodson SHS_____          **of Proposed Level II Suspension** _4/4/05_____
**School**

**Student** _D█████ W████████_          **Date of Birth** ████/90_____

**Student's Grade** __9th__    **Male [ ] Female [X]**    **Ethnicity Code** _B_____

**Sp. Ed. Student: Yes [ ] No [X]**    **Disability Code** _____    **LRE/Educational Setting** _____

**Parent/Guardian** _Ms. Pelham_____

**Address**___326 63rd Street, N.E., Washington, D.C.  20019_____

**Home Telephone** _397-5544_____    **Work Telephone** _(202) 698-3000_____

**Pursuant to the Rules of the Board of Education Section 2505.9, I am recommending a Level II suspension for the above named student.**

**Check to  Confirm:**

[X] **Formal Administrative Conference was held on** _____4/4/05_____
                                                                    **Date of Conference**

[X] **Parent received a copy of Summary of Disciplinary Procedures** _4/4/05_____
                                                                                                    **Date**

[X] **The Notice of Proposed Level II suspension is attached.**

Aona H. Jefferson (WCC)_____
**Signature of Principal**
4/5/05_____
**Date**

**Page 1 of 2**
**SHO 103**

571

Date Received _____

## ASSISTANT SUPERINTENDENT'S USE ONLY

The recommendation for the Level II suspension of ___D██████ W███████___ in
Student

___9th___ , at ___H.D. Woodson SHS___ is:
Grade                        School

      [ ] **Approved**

      [ ] **Denied**

      [ ] **Modified**

**Reason:**

 Student physically assaulted fellow student causing a major disruption
 in the cafeteria.

_____

_____

_____

_____

_____

_____

**The Level II suspension is to begin on** _____ .

_____
**Assistant Superintendent**

**Page 2 of 2**
**SHO 103**
**August 2000**

572

D̶̶̶̶̶̶̶ W̶̶̶̶̶̶
_____
Name of Student

I am notifying you, in accordance with Board **Rule** Section 2505.3, that D̶̶̶̶̶̶ W̶̶̶̶̶̶_____ is to be suspended for __49__ days, from 4/11/05 through ___6/21/05_____.

    Name of Student

[x]  **A conference was held on** ___4/4/05_____ with __D̶̶̶̶̶̶ W̶̶̶̶̶̶_____.
                            Date                         Name of Student

[ ]  **A conference has been scheduled on**_____ **at** _____, **in the school office.**
                                              Date          Time

Contact  __Mr. Chiselom_____ on ___724-4500_____ to confirm attendance.
        (Name of Contact Person)       (Telephone Number)

## CHECK WHERE APPROPRIATE

[ ]  **During this disciplinary time period the student must report to this school for in school suspension.**

[x] **During this disciplinary time period the student must report to the following alternative educational placement:** __CHOICE Academy_____, **located at** 2600 Douglas Rd. S. E. Washington, D.C. 20020
**The telephone number is** __576-5360_____.

[ ] **Because of the seriousness of the offense and potential harm to your child and others, I am initiating a home suspension in accordance with the Board Rules. During this disciplinary time period, the student shall be placed on home suspension for _____ days. An educational packet will be provided to the student. This office will provide further instructional information. If your child does not receive this information within (4) school days of receipt of this notice, please call:**

_____     _____
      Name                             Telephone Number

    This suspension will not be made a part of the student's permanent record. The principal has informed the Student Hearing Office of this suspension.

    A copy of Chapter 25 of the Board **Rules** is attached.

573

**Keystone Newport News Youth Center/Keystone Academy
Education Department**

**Withdrawal Form – Grades**

Student Name:_____D████████ W████████ (5346)_____
DOB:_____████/90_____
Enrollment Date:___6/17/04_____
Withdrawal Date:___1/17/05_____
Grade:_____9_____

| Subject | Grade |
|---|---|
| English 9 | B |
| Algebra I, Part I | B |
| World History | B |
| Earth Science | C |
| Career Awareness | B |
| PE/Health 9 | C |
| | |

Comments:

D████████ is a general education student. She is participating in a 9th grade curriculum. The above grades represent grades earned the second marking period which ended 1/7/05.

Attached is a copy of his student schedule, academic assessment, and last report card.

*Renatta G. Marble*

Renatta G. Marble, M.Ed., Director of Education
Keystone Newport News Youth Center

**Keystone Newport News Youth Center**
**Student Class Schedule**
**2004-2005**

Student: ___D▮▮▮▮▮ W▮▮▮▮___
Grade: ___9___
Enrollment Date: ___9/7/04___
Marking Period: ___1___
Home School: ___DCPS___

| Subject | Teacher |
|---|---|
| English 9 | Maxine |
| Algebra I, Part I | Melvina |
| World History | Telly |
| Earth Science | Rick |
| PE/Health | TBA |
| Career Awareness | Fred |
|  |  |
|  |  |

575

# Keystone Newport News Youth Center/Keystone Academy
## REPORT CARD 2004-2005

| Student's Name | D██████ W██████ (5346) | Report Period | 1 |
|---|---|---|---|
| DOB ████90 | | Grade | 9 |

| Subject | 1st | 2nd | 3rd | 4th | Summer Session | Final | Rec. Credit |
|---|---|---|---|---|---|---|---|
| English 9 | C | | | | | | |
| Algebra I, Part I | C | | | | | | |
| Earth Science | D | | | | | | |
| World History | B+ | | | | | | |
| Physical Education | C | | | | | | |
| Career Awareness | D | | | | | | |

## Attendance Summary

| | 1 | 2 | 3 | 4 | Summer | Total |
|---|---|---|---|---|---|---|
| Days in Quarter | 48/47 | 34/47 | 44/45 | 39/43 | 38 | |
| Days Present | 32 | | | | | |

## Signatures

| | Teacher Signature | Date: |
|---|---|---|
| 1st Quarter | *Bettina Cromwell* | *11/10/04* |
| 2nd Quarter | | |
| 3rd Quarter | | |
| 4th Quarter | | |
| Summer | | |

## IEP Goals & Objectives – NOT APPLICABLE

### 1) Annual Goal

| Short Term Objective | Date | Progress Code |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

### 2) Annual Goal

| Short Term Objective | Date | Progress Code |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

### 3) Annual Goal

| Short Term Objective | Date | Progress Code |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

### 4) Annual Goal

| Short Term Objective | Date | Progress Code |
|---|---|---|

576

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**5) Annual Goal**

| Short Term Objective | Date | Progress Code |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**Progress Codes:**

SP – Student making <u>Sufficient Progress</u> to achieve this annual goal within the duration of this IEP

ES – Student demonstrates <u>Emerging Skill</u> but may not achieve annual goal within the duration of IEP

IP – Student demonstrates <u>Insufficient Progress</u> and may not achieve annual goal within the duration of IEP

NI – Student has <u>Not been provided Instruction</u> on this goal

M – Student has <u>Mastered</u> annual goal

## Behavior Skills

| Study Skills | | 1st | 2nd | 3rd | 4th | Summer | Final |
|---|---|---|---|---|---|---|---|
| | Uses Time Wisely | N | | | | | |
| | Follows Directions | N | | | | | |
| | Contributes to Class | S | | | | | |
| | Does Neat & Careful Work | S | | | | | |
| | Works Independently | S | | | | | |
| | Stays in Designated Area | S | | | | | |
| Social Development | Works Well with Others | N | | | | | |
| | Obeys Rules | N | | | | | |
| | Exhibits Self Control | S | | | | | |
| | Accepts Responsibility for Actions | S | | | | | |
| | Respects Others' Rights and Property | N | | | | | |
| Academic Indicators | Turns in Homework | S | | | | | |
| | Completes Class Work | S | | | | | |
| | Completes Make-up Work | N | | | | | |
| | Communicates Well | S | | | | | |
| | Completes Projects | S | | | | | |

**Progress Codes:**

S = Satisfactory

N = Needs Improvement

U = Unsatisfactory

-- = Not applicable

527

**Teacher's Comment:**

D█████ poor attendance negatively affects her grades in the classroom.

Teacher Signature: _Bettina Cromwell_    11/10/06

**HP Officejet V Series V40xi**
**Personal Printer/Fax/Copier/Scanner**

Log for
Mike Levy
703-631-0490
Jan 01 2002 5:47AM

## Last Transaction

| Date  | Time   | Type     | Identification | Duration | Pages | Result |
|-------|--------|----------|----------------|----------|-------|--------|
| Jan 1 | 5:43AM | Fax Sent | 2026260048     | 4:26     | 11    | OK     |

579

OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION
STUDENT HEARING OFFICE

```
-----------------------x
In the Matter of:       :
                        :
D▒▒▒▒▒, W▒▒▒▒▒▒▒         :
-----------------------x
```

825 North Capitol Street, NE.
Washington, D.C.

Friday, October 19, 2007

The HEARING in this matter began

pursuant to notice.

BEFORE:

SEYMOUR DuBOW

Hearing Officer

2

```
1    APPEARANCES:

2        On behalf of Complainant:

3            F. BERRIE, ESQUIRE

4        On behalf of Respondent:

5        MICHAEL LEVY, ESQUIRE
         Office of General Counsel
6        District of Columbia Public Schools
         825 North Capitol Street, NE., 7th floor
7        Washington, D.C., 20002
         (202) 442-5000
8

9

10

11                      *   *   *   *   *

12

13

14

15

16

17

18

19

20

21

22
```

581

3

```
1                    C O N T E N T S

2    WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

3    Anthony Presnal

4    Nawal Aboul-Hosm

5

6

7

8

9                     *    *    *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400     800-522-2382

4

```
 1                P R O C E E D I N G S

 2            MR. DuBOW:  On the record.  Today

 3  is October 19, 2005; this is an

 4  administrative hearing for D███████ W███████

 5  born on ████ 1990.  I'll ask the parties to

 6  introduce themselves for the record.  Mr.

 7  Levy?

 8            MR. LEVY:  Yes, good morning, sir.

 9  Michael Levy, attorney advisor, D.C. Public

10  Schools.

11            MS. BARRIE:  Good morning, (off

12  mike) Barrie, educational -- court appointed

13  educational advocate for the student.

14            MS. MCMICHAEL:  Good morning,

15  Suzanne McMichael, social worker from the

16  Child and Family Services.

17            MR. DuBOW:  This hearing is being

18  conducted pursuant to IDEA and '97 amendments

19  to IDEA and the 2004 Improvement Act as well

20  as DCPS regulations, to determine whether or

21  not DCPS acted in accordance with these

22  applicable laws with regard to D███████.
```

583

5

1    W██████.

2            I'm Sy DuBow.  I'm an impartial

3    hearing officer, a non-employee of DCPS, nor

4    am I related to or a close acquaintance of

5    the parent or student other than through the

6    hearing process for your both sides, and act

7    only on the evidence presented, is the formal

8    reading of rights waived?

9            MS. BARRIE:  Yes, sir.

10            MR. DuBOW:  Formal reading of

11    rights is waived by counsel for parent and my

12    determination will be submitted within 10-14

13    days.  As a preliminary matter, I have

14    documents ranging from 1 through 24 for the

15    parent, and I have documents ranging from 1

16    through 4 for the DCPS were entered into the

17    record at this time unless there is an

18    objection -- objection to any other

19    preliminary matter, if not opening statement,

20    Ms. Barrie.

21            MS. BARRIE:  Okay.  We're here

22    because DCPS was ordered on June -- on May

584

6

```
1    20th, I'm sorry -- 2004, and HOD ordered by

2    DCPS --

3              MR. DuBOW:  Is that in the record?

4              MS. BARRIE:  Uh-huh.

5              MR. DuBOW:  The HOD.

6              MS. BARRIE:  I thought it would be

7    in the file, but it looks like that is a copy

8    of the HOD.

9              MR. LEVY:  It's not in the record,

10   is it?

11             MS. BARRIE:  No, sir, HOD --

12             MR. DuBOW:  HOD is the --

13             MS. BARRIE:  It's on record --

14             MR. DuBOW:  -- is part of the

15   public file.

16             MS. BARRIE:  Right, it's on the

17   record.

18             MR. LEVY:  Do you have a copy for

19   me Ms. Barrie?

20             MR. DuBOW:  All right.  There is an

21   HOD, yes, okay.

22             MR. LEVY:  Thank you.
```

585

7

1          MR. DuBOW:  Go ahead.

2          MS. BARRIE:  The HOD ordering that

3    DCPS convene -- well, do an evaluation -- do

4    evaluations and then convene a meeting.  They

5    were not able to do that.  If not, we have

6    the right to independent -- the independent

7    evaluations.  Forwarded independent

8    evaluations to Tim Fitzgerald who was named

9    in the HOD to be sent to.  And that is

10   parent's exhibit -- I'm sorry -- student's

11   exhibit -- student's exhibit number DW 19,

12   May 20, 2005 -- forwarded the evaluations to

13   Mr. Fitzgerald.

14          The evaluations indicated that she

15   needed therapeutic programming, that she

16   needed a residential program.  The student

17   right now does not have an IEP.  She has not

18   been determined eligible for Special

19   Education services.  We held a meeting on

20   April of '05, and requested that the IEP be

21   completed, and that's student's exhibit

22   number DW 22.

586

8

1          But the special ed coordinator, Ms.

2     Philips, at Woodson indicated that she could

3     not do a IEP based on the evaluations we had,

4     and at the time, we had an April 2004,

5     psychological evaluation.  There was a '96

6     psychological evaluation, a '96 OT, there

7     were teacher reports, there were student

8     evaluations, these are DW 01 to DW 12.  Those

9     have been available to -- I'm sorry -- DW --

10    DW 01 to DW 14 -- those have been available

11    D.C.  Public Schools since the April 2004

12    hearing.

13          And DCPS has had them, but we held

14    the meeting in April and -- to determine

15    whether she would be expelled from Woodson

16    because of her behavior.  She was expelled

17    from Woodson and sent to Choice Academy.  She

18    went to Choice; however, there were no books

19    available for her at Choice.  And although

20    the social workers tried to get services

21    provided for her, they indicated to her that

22    she has to bring books for D███████ as

587

1    opposed to the program providing her with the

2    services.

3           All her evaluations that are on

4    record, including going back to 1996,

5    indicated that she needed services.  Up until

6    now, D▬▬▬▬ does not have an IEP, she is

7    currently at Devereux Residential Program

8    through a MAP meeting with the CFSA.

9    However, it hasn't really been decided as to

10   her Special Education needs.  And we're here

11   today --

12           MR. DuBOW:  Which area?

13           MS. BARRIE:  Florida, the area --

14   we're here today to request that the hearing

15   officer order DCPS to maintain -- well, fund

16   her placement at Devereux.  Devereux is

17   sending by telephone to testify to the

18   appropriateness of Devereux, the services

19   they offer, both academically and

20   emotionally.  And furthermore, request that

21   DCPS convene the meeting, the IEP meeting, to

22   review all the evaluations and to determine

10

1    her eligibility and provide her with the

2    services, and we would like the hearing

3    officer to find denial of FAPE and that DCPS

4    have violated the Child Find statute, by not

5    providing her with the services she still

6    requires.

7         And furthermore, her clinical

8    psychological evaluation -- I'm sorry --

9    psycho-educational evaluation recommended

10   that a neuropsychological evaluation be

11   completed for her, and that is student's

12   exhibit number DW 16.  It's a request that

13   that also be completed and it has been

14   indicated that she may need occupational

15   therapy services.  So we're asking for an

16   occupational therapy evaluation.

17        So, therefore asking for the

18   hearing officer to order that a neuropsych

19   and an OT be completed, but before even that

20   is completed for DCPS, to immediately convene

21   a meeting to do an IEP for the student,

22   because we have more than enough evaluations

589

11

1    to -- information to determine her

2    eligibility.  And we'd like the hearing

3    officer to take into consideration that

4    although DCPS had time to convene the

5    meeting, to do the evaluation, they did not

6    do so.  There was no response from DCPS even

7    upon receipt of my letter on May 20th, there

8    was no response to my complaint, nothing has

9    been done for the student.  It is like

10    everybody just ignored her.

11         As a result, we implore the hearing

12    officer to find in the student's favor and

13    determine that DCPS had denied her FAPE by

14    not providing her with services under Child

15    Find and by violating the May 20, '04,

16    hearing officer's determination, and to order

17    the school system to provide her with

18    additionally compensatory education for the

19    lack of services that she has not received

20    for the past few years, which would -- of

21    course as the documents indicate, going back

22    to 1996, but I know I'm statutorily limited

590

12

1    to go back to 1996, but just as evidentiary

2    history -- you know, historically to state

3    that they have gone all the way back.

4            And she also has a diagnosis in

5    2003 which are DCPS student's exhibit DW 06

6    to DW 08, in 2003, which indicated that she

7    needed services to be provided to her, and

8    yet nothing has happened for the student.

9    Thank you.

10           MR. DuBOW:  Mr. Levy?

11           MR. LEVY:  Yes, sir.  The complaint

12   in this matter that was filed on August 25th

13   is the one I was here for, sir.  And that is

14   obviously filed under the new law, any

15   concern to address the issue of ward, going

16   back statutorily to 1996, I wasn't entirely

17   clear on the point that was being made --

18           MR. DuBOW:  I think, she can see

19   that there is a statute problem.

20           MR. LEVY:  -- and the statute

21   limits were 2 years from the date of the

22   filing of that complaint, Individuals with

591

13

1    Disabilities Educational Improvement Act of

2    2004.  So any claims going back before that,

3    we would claim are statutorily required to

4    appear 2 years, no more than 2 years prior to

5    the date of the filing of the complaint,

6    which was August 25th of 2005.  With regard

7    to the issue of -- certainly DCPS is not

8    going to concede that DCPS has done nothing

9    for the child as has been suggested.  There

10   is a meeting -- there are meeting notes which

11   are reflected in the record as DW 22 where

12   our meeting was held --

13            MR. DuBOW:  Wait.  What -- 20 what?

14            MR. LEVY:  DW 22, sir.  This is the

15   meeting notes for a meeting held with Ms.

16   Katie Philips at Woodson Senior High School.

17            MR. DuBOW:  Okay, DW 22.  What was

18   this now?  Suspension meeting?

19            MS. BARRIE:  Yes.

20            MR. DuBOW:  The one that says

21   suspension meeting at the time?

22            MR. LEVY:  That is correct, sir.

14

1    That's the same document.  And the special

2    education coordinator says -- asked about

3    completing as many evaluations as necessary.

4    This was in April -- April 11th of 2005.  And

5    so at that -- as recently as April of 2005,

6    the concern was the currency of the

7    evaluation of this, and of the need for

8    additional evaluations.  In addition to that,

9    it is my understanding that a meeting -- I

10   don't know if there -- that there is any real

11   dispute that the student is in a residential

12   setting in Devereux, but this is one of the

13   most curious cases I have come across where

14   the student has not even been found eligible

15   for Special Educational services, but has

16   been placed in a residential facility.

17          I mean that's very curious to me,

18   and it appears that they were ordered there

19   by the court, not by a hearing officer's

20   determination, or by something --

21          MR. DuBOW:  To Devereux?

22          MR. LEVY:  To Devereux, that's

593

15

```
 1    correct, sir.

 2              MR. DuBOW:  Do we have some -- what

 3    is the step -- how did the child get to

 4    Devereux?

 5              MS. BARRIE:  They held a MAP

 6    meeting.

 7              MR. LEVY:  The MAP -- a MAP meeting

 8    was convened by CFSA.

 9              MS. BARRIE:  Right.  It wasn't a

10    court order.  It was the CFSA held a MAP

11    meeting because she was so out of control.

12              MR. DuBOW:  Is there any paper on

13    the --

14              MR. LEVY:  I don't have any paper,

15    sir.

16              MR. DuBOW:  Do you have the chart

17    -- I assume, it must be -- you had something

18    from Devereux --

19              MS. BARRIE:  Right.  A letter of

20    acceptance.

21              MR. DuBOW:  Twenty three.

22              MS. BARRIE:  The letter accepting
```

594

16

1    her into the program.

2              MR. DuBOW:  Do we have anything

3    else regarding Devereux?

4              MS. BARRIE:  As far as Devereux can

5    testify as to their program, they --

6              MR. DuBOW:  No, no, I know that,

7    but --

8              MS. BARRIE:  Okay.

9              MR. DuBOW:  How did they stop the

10   student ending up at Devereux?

11             MS. BARRIE:  Because CFSA held a

12   MAP meeting and determined that she needed

13   residential -- or her evaluations said that

14   she needed residential --

15             MR. DuBOW:  And they sent her here?

16             MS. BARRIE:  Yes, they've already

17   sent her there.

18             MR. DuBOW:  So Child and Family

19   Services sent her.

20             MS. BARRIE:  Correct.

21             MR. DuBOW:  Okay.  Today -- there

22   is some paper relating -- I mean, is there

595

17

```
 1    any documentation relating to that --
 2            MR. LEVY:  I don't --
 3            MR. DuBOW:  -- process or
 4    procedure?
 5            MS. BARRIE:  I don't have any, but
 6    she is there already.
 7            MR. DuBOW:  I assume Devereux has
 8    something they wouldn't accept.
 9            MR. LEVY:  I appreciate the source,
10    sir, but -- I think the difficulty is, it
11    seems to me that this is really CFSA's claim.
12            MR. DuBOW:  Is what?
13            MR. LEVY:  This is really CFSA's
14    claim.
15            MS. BARRIE:  Uh-huh?
16            MR. LEVY:  Not -- in order to --
17    they've already been -- they were the ones
18    responsible for sending the child there.
19            MR. DuBOW:  Right.
20            MR. LEVY:  They are really the
21    party who is seeking to help --
22            MR. DuBOW:  Was there -- was this
```

596

18

1    student involved in a court proceeding

2    somehow under the court --

3              MS. BARRIE:  Well, she is a ward --

4    she is a D.C. ward.

5              MR. LEVY:  She is a ward.

6              MR. DuBOW:  Well, so she is a ward?

7              MS. BARRIE:  She is a D.C. ward.

8              MR. LEVY:  Right.

9              MR. DuBOW:  And then -- Child and

10   Family Services then --

11             MS. BARRIE:  Right.  Because she

12   was in -- she needed it -- all her

13   evaluations indicated she needed a

14   residential, the meeting had not been held

15   with DC.

16             MR. DuBOW:  So they decided -- they

17   decided to order a hearing.

18             MS. BARRIE:  CFSA decided, not the

19   court, because everything was being held up.

20             MR. DuBOW:  Okay.  And there has

21   never been any MDT meeting determining

22   eligibility?

597

1          MR. LEVY:  That's right.

2          MS. BARRIE:  We held -- except for

3    the meeting in April, where we tried to have

4    them to do the IEP and he said he couldn't do

5    it.  But they had a 2004 psychological --

6          MR. DuBOW:  Now what document is

7    that?

8          MS. BARRIE:  DW 22, the same

9    document that DCPS pointed to.

10          MR. DuBOW:  That doesn't look like

11    a meeting.

12          MS. BARRIE:  Yeah, it was the

13    special coordinator principal, me, and the

14    social worker.

15          MR. DuBOW:  Very well, oh, I see.

16          MS. BARRIE:  She wouldn't do notes,

17    she said.  There was no reason for her to do

18    notes.  So I said, well --

19          MR. DuBOW:  So there were no notes

20    --

21          MS. BARRIE:  So I wrote --

22          MR. DuBOW:  Yeah, so we just have

20

1    one page --

2            MS. BARRIE:  Right.  So I wrote,

3    what happened?  And she signed it, Ms. Katie

4    Phillip, she signed it at the bottom.

5            MR. DuBOW:  It's just that one

6    page?

7            MS. BARRIE:  Correct.  That's about

8    how long the meeting took.

9            MR. DuBOW:  Signed by -- it's only,

10   Ms. Philips, Special Ed coordinator, is that

11   her signature?

12           MS. BARRIE:  Correct, yes, K.

13   Philips, because she wouldn't --

14           MR. DuBOW:  That was a suspension

15   meeting.

16           MS. BARRIE:  Right.  She wouldn't

17   do notes.  I said, well, we need to do notes

18   to document what we're discussing, and she

19   wouldn't do it.

20           MR. DuBOW:  These are -- so these

21   are your notes.

22           MS. BARRIE:  Precisely.  She

599

21

```
 1   wouldn't do them, so I did them, and had her

 2   sign it.  We discussed it, and I asked her to

 3   do an IEP, call to meet and do an IEP, she

 4   said no.  And she said they couldn't even do

 5   the evaluations this school year.  They said

 6   they needed more, I said, then why don't you

 7   do them?  And she said, no, they can't do

 8   anymore -- they cannot do any evaluations at

 9   this -- that school year, I said okay, but

10   she needs services.  But instead, they sent

11   her to Choice.

12           MR. DuBOW:  All right, now you say

13   that evaluation -- independent evaluations

14   had been done --

15           MS. BARRIE:  They've been done.

16           MR. DuBOW:  -- pursuant to this

17   HOD.

18           MS. BARRIE:  HOD, correct.  And I

19   sent it to --

20           MR. DuBOW:  And there was an

21   agreement there.

22           MS. BARRIE:  It was an order.
```

600

22

1          MR. DuBOW:  I know, but it was --

2          MS. BARRIE:  No, it's an agreement.

3          MR. DuBOW:  -- incorporating an

4    agreement.

5          MS. BARRIE:  Right, right, exactly.

6          MR. DuBOW:  Okay.  And the

7    agreement --

8          MS. BARRIE:  To send it to Tim

9    Fitzgerald.

10          MR. DuBOW:  The agreement said that

11    in the event they fail to do it by 02-07-04,

12    that they could do independent.  So you did

13    an independent.

14          MS. BARRIE:  Did independent.

15          MR. DuBOW:  And those are which

16    forms?

17          MS. BARRIE:  The independents are

18    the psychiatric, the psycho-ed, the clinical,

19    the social worker --

20          MR. DuBOW:  Yeah, what number?

21          MS. BARRIE:  DW 15 to DW 18.

22          MR. DuBOW:  DW --

601

23

1           MS. BARRIE:   Fifteen to eighteen.

2           MR. DuBOW:   Sixteen?

3           MS. BARRIE:   DW 15, one-five.

4           MR. LEVY:   Fifteen, sixteen,

5     seventeen, and eighteen.

6           MR. DuBOW:   Fifteen, okay.

7           MS. BARRIE:   To 18.   There were

8     four of them, one, two, three, four, they

9     were four of them.

10          MR. DuBOW:   All right.   Now,

11    assuming that the child is at Devereux -- the

12    child -- well of course, all right, so the

13    child -- I assume that the child is at

14    Devereux --

15          MS. BARRIE:   Correct.

16          MR. DuBOW:   -- because of

17    behavioral issues.

18          MS. BARRIE:   And --

19          MR. DuBOW:   So the suspected area

20    of disability is emotional disturbance, is

21    that correct?

22          MS. BARRIE:   Yes, it is.

602

24

```
1              MR. DuBOW:  So what evaluation --

2              MS. BARRIE:  -- there is even worse

3     of an LD, ED --

4              MR. DuBOW:  What evaluation relates

5     to that?  The first one, the psychiatric?

6              MS. BARRIE:  The psychiatric

7     recommended a residential at the psycho ed --

8              MR. DuBOW:  Well, this is the

9     agreement.

10             MS. BARRIE:  Okay.

11             MR. DuBOW:  But did they make a

12    finding as to his diagnosis of ADHD,

13    oppositional defiance disorder, or bipolar?

14             MS. BARRIE:  The psychiatry

15    diagnosed ADD, mood disorder, ODD, conduct

16    disorder, and LD.  So she is multiply

17    disabled, she has a whole bunch of things

18    going on with her.  And in my letter to Mr.

19    Fitzgerald --

20             MR. DuBOW:  Wait.  Wait a minute.

21             MS. BARRIE:  Oh, I'm sorry.

22             MR. DuBOW:  So that's the
```

603

25

1    psychiatrist, then on -- is there clinical,

2    is that 17?

3             MS. BARRIE:  Yes.

4             MR. DuBOW:  Now, you want her to --

5    DCPS to fund at Devereux, continue funding at

6    Devereux.

7             MS. BARRIE:  Precisely.

8             MR. DuBOW:  However, the

9    evaluations recommend the residential

10   program.

11            MS. BARRIE:  The psychiatry did --

12            MR. DuBOW:  The clinical recommends

13   the Special Ed program.

14            MS. BARRIE:  Psychiatry did.

15            MR. DuBOW:  Okay, then the

16   psychiatry -- and then the MAP met with these

17   children's -- it's -- Child and Family

18   Services had all these evaluations, is that

19   what you are saying?

20            MS. BARRIE:  Right, yes, it did.

21            MR. DuBOW:  And then they made a

22   decision based on the evaluation.

604

26

```
 1              MS. BARRIE:  Precisely, and they
 2    were waiting on me, but the hearings were --
 3    it was taking -- the hearing day was taking
 4    too long.  So they went ahead and held a
 5    meeting.  So she was -- she has only been
 6    placed there for about a month or so, because
 7    they were waiting for me to go into the
 8    hearing but -- or for a meeting to take
 9    place, but nothing happened.  So they had to
10    go ahead and do what they had to do.
11              MR. DuBOW:  All right.  Mr. Levy,
12    you wish to present any evidence or rely on
13    the documents?
14              MR. LEVY:  I will rely on the
15    documents.
16              MR. DuBOW:  All right.  So DCPS
17    rests on the documents.  And as -- do you
18    wish to call any witnesses?
19              MS. BARRIE:  As to the
20    appropriateness of Devereux --
21              MR. DuBOW:  Right.  The woman from
22    Devereux --
```

605

27

1          MS. BARRIE:  Devereux.

2          MR. DuBOW:  Well, that's a

3    long-distance call, so you have to have them

4    call in here.

5          MS. BARRIE:  Oh, yeah.  Oh, wait --

6    there is an 800 number, that's right.

7          SPEAKER:  I know the number.

8          MR. DuBOW:  I don't think this --

9    that's the 800 number.  It doesn't --

10          MS. BARRIE:  It doesn't?

11          MR. LEVY:  I think you can, sir.

12          MR. DuBOW:  You can?

13          MR. LEVY:  An 800 number, yeah.

14    You dial 9 and 1 and the 800 number.

15          MR. DuBOW:  All right.  Take a

16    recess while you try to get this person.

17    Look up on that.

18          MR. LEVY:  And in this --

19              (Recess)

20          MR. DuBOW:  On the record.

21          MS. BARRIE:  Can you hear me?

22          MR. TRESNAL:  I can, yeah.

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

606

28

1              MR. DuBOW:  Okay.  This is the

2    hearing officer, I'm going to swear you in

3    right now, how are you doing?

4              MR. TRESNAL:  Very good, how are

5    you doing?

6              MR. DuBOW:  Good.  Please, raise

7    your right hand.

8    Whereupon,

9                    ANTHONY PRESNAL

10   was called as a witness and, having been first

11   duly sworn, was examined and testified as follows:

12             MR. DuBOW:  I never know in these

13   phone calls.  All right.  Please, state your

14   name.

15             THE WITNESS:  Anthony Presnal,

16   P-r-e-s-n-a-l.

17             MR. DuBOW:  P-r --

18             THE WITNESS:  Yes, I'll start over

19   again.  It's P-r-e-s-n-a-l.

20             MR. DuBOW:  N-a-l?

21             THE WITNESS:  Right.

22             MR. DuBOW:  And Anthony?

607

29

```
 1              THE WITNESS:  Right.

 2              MR. DuBOW:  And what's your

 3   position?

 4              THE WITNESS:  I'm education

 5   coordinator.

 6              MR. DuBOW:  And -- at Devereux?

 7              THE WITNESS:  Right.

 8              MR. DuBOW:  Devereux Residential of

 9   Florida or something like that?

10              THE WITNESS:  Devereux School -- we

11   are part of the -- the Devereux school is

12   part of the Devereux Florida Treatment

13   Network.

14              MR. DuBOW:  Devereux School of

15   Devereux Treatment Network.

16              THE WITNESS:  Right.

17              MR. DuBOW:  Network of Florida?  Is

18   that what --

19              THE WITNESS:  Devereux Florida

20   Treatment Network.

21              MR. DuBOW:  Devereux Florida

22   Treatment.  Where are you located?
```

608

30

1           THE WITNESS:  Viera, Florida.

2           MR. DuBOW:  Where is that?

3           THE WITNESS:  About 45 miles east

4    of Orlando or around the east coast, maybe --

5           MR. DuBOW:  Okay.  So we'll know

6    where to get you.

7           THE WITNESS:  -- seven-eight miles

8    from the Atlantic.

9           MR. DuBOW:  Okay.  All right, so

10   you're out of harms way.

11          THE WITNESS:  So far, yeah.  I'm

12   hoping that either the state is far to the

13   south or -- that's something weird, but yeah,

14   it's -- it doesn't look good.

15          MR. DuBOW:  All right, thank you,

16   I'm sorry for that interruption.  Okay, Ms.

17   Barrie is going to ask you some questions --

18          THE WITNESS:  Okay.

19          MR. DuBOW:  -- to be followed by

20   Mr. Levy.

21          THE WITNESS:  Okay.

22          MS. BARRIE:  Are you aware of

609

31

1    Dayshawn Williams?

2            MR. LEVY:  Well, before you --

3            THE WITNESS:  Yes, I am.

4            MR. LEVY:  I'd like to establish

5    his connection with the name of the witness

6    -- the name of the witness.  I'd like to

7    establish his connection to her.

8            MR. DuBOW:  I don't have the

9    disclosures.

10           MS. BARRIE:  It is on my

11   disclosure.

12           MR. LEVY:  This is the disclosure,

13   here.

14           MR. DuBOW:  It says Linda Brooks or

15   her designee --

16           MS. BARRIE:  And/or designee.

17           MR. DuBOW:  Uh-huh?

18           MS. BARRIE:  Right.  And/or

19   designee?

20           MR. LEVY:  Can we put it on --

21           MR. DuBOW:  And he is the education

22   coordinator?

610

32

1          MS. BARRIE:  Right.

2          MR. LEVY:  Can we put it on mute

3    for a second please, sir?

4          MS. BARRIE:  Can you hold on for me

5    please?

6          THE WITNESS:  Sure.

7          MR. DuBOW:  No, that's all right.

8    You can put it on the record.  I would like

9    to keep things on the record.

10          MR. LEVY:  Okay, so that's fine --

11          MR. DuBOW:  Okay, so who is Linda

12    Brooks?

13          MS. BARRIE:  Director.

14          MR. LEVY:  Let him speak, let him

15    testify.

16          THE WITNESS:  Yeah, she is the

17    admissions coordinator, admissions director

18    for our facility here.

19          MR. DuBOW:  Admission -- oh, she is

20    the admissions director?

21          THE WITNESS:  Right.

22          MR. DuBOW:  And you are the

611

33

1    educational coordinator.

2              THE WITNESS:  Right, correct.

3              MR. DuBOW:  I see.  Okay.  And

4    what's the relationship between the two of

5    you, I mean, in terms of administrative

6    structure?

7              THE WITNESS:  Well, she is --

8    there's not much of a relationship, she is in

9    our administrative offices dealing with new

10   clients, and I'm kind of here, doing my best

11   to run the school as well as we can.

12             MR. DuBOW:  All right, I

13   understand.

14             THE WITNESS:  So while I am in

15   Devereux, I work with her and I deal with her

16   --

17             MR. DuBOW:  All right.  So she does

18   the admissions part --

19             THE WITNESS:  -- and I kind of

20   focus on the academic parts of it, and the

21   admissions part of it.

22             MR. DuBOW:  I understand.

612

34

1          THE WITNESS:  Okay.

2          MR. DuBOW:  All right, you go

3    ahead.  I understand Mr. Levy may have an

4    objection, but it's overruled.

5          THE WITNESS:  Okay.

6          MR. DuBOW:  Okay, go ahead.

7          MR. LEVY:  I'd like to put my

8    objection on the record, sir.

9          MR. DuBOW:  He puts an objection on

10   the record.

11         MR. LEVY:  That's right.  My

12   objection, sir, is that this witness has been

13   called as a designee of someone with whom, he

14   has just admitted, he has little relationship

15   in a working environment.

16         MR. DuBOW:  Right.

17         MR. LEVY:  My understanding of a

18   designee is someone who would have the

19   knowledge that a person who is named will

20   have, but because of some circumstance that

21   person is not available and this person has

22   the same information, and therefore he is

613

35

1    able to testify in that person's stead.  This

2    gentleman does not meet that definition.

3              MR. DuBOW:  I understand.

4              MR. LEVY:  Okay.

5              MR. DuBOW:  The objection is so

6    noted for the record.  Go ahead, Ms. Barrie.

7              MR. LEVY:  And this -- the same

8    objection will be raised regarding any other

9    witnesses that are sought to be called.

10             MR. DuBOW:  Continuing objections,

11   so noted for the record.  Okay, now that

12   you've heard that mumbo-jumbo, you can go

13   ahead.

14             MS. BARRIE:  Can you hear me?

15             THE WITNESS:  Yes, I can.

16             DIRECT EXAMINATION

17             BY MS. BARRIE::

18        Q    Okay.  Can you describe your

19   program at the school for me, please?

20        A    Sure, we have approximately 100

21   students that are at our facility, it's a

22   campus that -- it's a residential facility,

614

1    so the students live here; attend school

2    Monday to Friday from 9 to 3.  All of the

3    classes are fairly small, we limit classes --

4    well, it's between -- 8 and 11 is usually the

5    class size.  There is a little teacher to

6    pupil ratio, obviously.  It's -- usually we

7    have -- well, we do have a staff in the

8    classroom with the teacher.

9            The classroom that D███████ is in,

10   there is a little teacher-pupil ratio, I

11   think there is 9 students in her class.  And

12   with the teacher and the behavioral staff,

13   it's a therapeutic environment.  We have

14   group and individual therapy, group -- group

15   therapy two times per week, and individual

16   therapy one time per week.  We have a -- we

17   also have a strong behavioral component for

18   the school where students can earn points for

19   proper behaviors and are reinforced for

20   remaining on task, completing work, doing

21   homework, that sort of thing.

22       Q    So, you also provide her with a

37

1    self-contained classroom, with a small

2    teacher-student ratio?

3            MR. LEVY:  Don't lead the witness.

4    If you're going to hear this witness, don't

5    lead him.

6            THE WITNESS:  That's correct, yes.

7            MR. LEVY:  Don't ask him a question

8    that suggests the answer please.  Thank you.

9    Ask a an open- ended question, ask a proper

10   question.

11           MR. DuBOW:  Thank you, professor,

12   go ahead.

13           MS. BARRIE:  Okay.  I thought I'd

14   finish -- anyway.

15           MR. LEVY:  Finish -- no more

16   leading questions or questions that suggest

17   the answer.

18           MS. BARRIE:  Okay, all right.  Can

19   you provide the student with the small

20   classroom setting?

21           MR. DuBOW:  I think he's already

22   answered to that setting -- that's already

616

38

1      answered.

2              MS. BARRIE:  With a self -- okay,

3      with a self- contained --

4              BY MS. BARRIE::

5         Q    Can you provide the student with a

6      self- contained classroom?

7         A    Yes, all of our students are in

8      self-contained classrooms, including

9      D███████.

10        Q    Okay, all right.

11             MS. BARRIE:  No more questions.

12             MR. DuBOW:  Mr. Levy?

13             CROSS-EXAMINATION

14             BY MR. LEVY::

15        Q    Good afternoon, I guess it is now

16      --

17        A    Good afternoon.

18        Q    My name is Michael Levy, I'm an

19      attorney for DCPS.

20        A    Hi, how are you doing?

21        Q    I am doing all right, thanks.  Have

22      you met D███████ personally?

617

1      A    I know who she is.  I don't think

2    I've personally met her, but I know of her.

3      Q    Have you observed her in a

4    classroom setting?

5      A    No, I haven't.

6      Q    Are you a part of the admissions

7    process for Devereux?

8      A    I am not.

9      Q    Have you reviewed her evaluations

10    or any evaluations for her?

11      A    I have reviewed -- when students

12    come to a state, we assess them with -- it's

13    called the Kaufman Test of Educational

14    Achievement, and I've seen D███████████

15    assessment, her scores in math and reading.

16    And that we use that as the basis of where to

17    place her academically, in which class she

18    would be -- we felt she would best be suited.

19      Q    So, the only evaluation that you've

20    seen is a KT for her in math and reading.  Is

21    that correct?

22      A    Yes.  Now there are --

40

```
1              MR. DuBOW:  Excuse me.

2              THE WITNESS:  -- there maybe -- if

3    I could just state --

4              MR. DuBOW:  One second, one second.

5              THE WITNESS:  -- there maybe others

6    in her chart that -- other evaluations in her

7    chart, the psychological --

8              MS. BARRIE:  Okay.

9              THE WITNESS:  -- psychiatric

10   evaluations that I have not personally

11   reviewed, but they may be in there, I just

12   haven't considered that yet.

13             MR. LEVY:  I see.  Does the student

14   have an IEP to your knowledge?

15             THE WITNESS:  I believe she does.

16             BY MR. LEVY::

17        Q    Do you have any details on such an

18   IEP?  Well, how many hours of services, if

19   any, she is supposed to receive?  What kind

20   of related services, if any, she is supposed

21   to receive?

22        A    I would have to grab her chart,
```

619

41

```
 1    which I don't have it in front of me right

 2    now.

 3         Q    I see.  Okay.  What are your duties

 4    specifically as educational director --

 5    educational coordinator?

 6         A    Mainly with -- we have a number of

 7    our counties, students at the county down

 8    here Florida, and it's to ensure that they

 9    have current IEPs that they -- to schedule

10    those meetings, to make sure the -- the

11    3-year reevaluations are done in a timely

12    manner.

13             Those are the main responsibilities

14    in addition to the numerous things that come

15    up everyday as far as, you know, the students

16    in the classroom.  If there is issues, if

17    there is grievances, if -- making sure staff

18    is in the classrooms.  There is a number of

19    issues that I deal with on a day-to-day

20    basis.

21         Q    I see.  You're not in a direct

22    reporting relationship with Ms. Linda Brooks,
```

620

42

```
 1    are you?  She doesn't report to you.   You

 2    don't report to her.   Is that correct?

 3         A    No.  We have a principal here.

 4    Pamela Kenny is our principal and she is my

 5    direct boss.  We also have a campus

 6    administrator, Patty Hearst.

 7              MR. DuBOW:  Who?

 8              MR. LEVY:  So tell me their names?

 9              SPEAKER:  Sorry.

10              THE WITNESS:  Sorry.

11              SPEAKER:  Okay.

12              SPEAKER:  That's nothing, nothing.

13              BY MR. LEVY::

14         Q    Yeah, okay.  Now, with regard to --

15    how long, if you know, how long has D████████

16    been at your school?

17         A    Yeah.  D████████ has been here since

18    the end of September, just about a month.

19         Q    Since the end of September?

20         A    Right.

21         Q    And do you know the circumstances

22    under which she came to your school?
```

621

43

```
 1       A    No, I don't.

 2       Q    So you don't know how she got to be

 3   sent here at all?

 4       A    No.

 5       Q    Do you know who is paying for her

 6   to be there?

 7       A    I am not 100 percent sure.  I am

 8   assuming it's D.C. Public Schools.

 9       Q    Okay, but you don't have any

10   personal knowledge of that.

11       A    No.

12       Q    What -- does she have a specific

13   teacher to whom she is assigned?

14       A    Yes.  His name is Bryan Henderson.

15       Q    Bryan Henderson and are classes set

16   up where children rotate from class to class

17   as they would in a high school, or they are

18   with the same teacher pretty much all day?

19       A    They are pretty much with the same

20   teacher all day.  There is one exception, I

21   think, for math, I believe.  D██████ rotates

22   to another class with her -- her class
```

622

44

1    rotates to another teacher and they get a

2    teacher -- class goes to Mr. Henderson.  So,

3    I believe, for one period a day she would go

4    to Donna Burlew, is the teacher, B-u-r-l-e-w.

5         Q    I see.  And are either of these

6    teachers, Mr.  Henderson or Ms. Burlew,

7    certified in special education?

8         A    Ms. Burlew is a substitute.  Mr.

9    Henderson has applied and I believe he has

10   his temporary certificate.

11        Q    In special education?

12        A    Yeah.

13        Q    Are either of them certified in

14   their content areas?

15        A    I am not certain.  I would have to

16   pull Mr.  Henderson and so -- as to what he's

17   certified in, I'm not sure.

18        Q    I see.

19        A    Could you hear me?

20        Q    Yes, I can.

21        A    Okay.

22        Q    And you mentioned earlier that the

623

45

```
 1        -- in addition to the teacher, there are some

 2   behavioral staff.  Are those people -- you

 3   said that D███████ current class has nine

 4   students.

 5        A    Right.

 6        Q    With a teacher and behavioral

 7   staff.  Who are we talking about for the

 8   behavioral staff?

 9        A    It varies.  D██████ is in one of

10   the residential units that the staff, I

11   couldn't say a name that would be there

12   consistently on a regular basis.  It varies

13   -- they schedule them as best they can to be

14   there on a consistent basis, but it could be

15   three different staffs in one week that are

16   in that classroom.

17        Q    And is that person when they are

18   there, there for the whole day or they are

19   kind of rotating in and out during the whole

20   --

21        A    No, they are there for the whole

22   day.
```

624

46

1        Q    Okay.  I see.

2             MR. LEVY:  Okay, I have no further

3   questions of the witness.

4             MR. DuBOW:  Thank you very much,

5   sir.

6             THE WITNESS:  Okay, you're welcome.

7   Have a good day.

8             MR. DuBOW:  You too.

9             MS. BARRIE:  Thank you.

10            THE WITNESS:  Bye, bye.

11                 (Witness excused)

12            MR. DuBOW:  Is that it, Ms. Barrie?

13   Is that your --

14            MS. BARRIE:  I have her therapist.

15            MR. DuBOW:  You have the what?

16            MS. BARRIE:  Her therapist.

17            MR. DuBOW:  Her therapist?

18            MS. BARRIE:  Yes.

19            MR. DuBOW:  All right.  Is she

20   here?

21            MS. BARRIE:  No, I'm going to call

22   her.

625

47

```
 1          MR. DuBOW:  You're going to come
 2   back?
 3          MS. BARRIE:  No, I'm calling her.
 4   I'm going to have to use my phone, because
 5   she is long distance, and --
 6          MR. DuBOW:  She is long distance?
 7          MS. BARRIE:  Yes.
 8          MR. DuBOW:  All right.  I'll go off
 9   the record.  Well, I'm going to tell you I
10   have my concern like you.
11          MS. BARRIE:  Okay.
12          MR. DuBOW:  Mr. Levy has
13   interviewed this DCPS Board.  This -- now
14   this student was at Keystone Newport,
15   somewhere in -- is that in Virginia?
16          MS. BARRIE:  Virginia.  Newport
17   News.
18          MR. LEVY:  That's right, sir.
19   Newport, yeah.
20          MR. DuBOW:  All right.  If you look
21   at that, a student who gets D grades as of
22   1/7/05, the child from 6/17/04 and 1/17/05,
```

626

48

```
1       in the ninth grade got a B in English, B in

2       algebra, B in world history, B in career

3       work.  Now, how does this child fit into the

4       definition of emotionally disturbed?  This is

5       supposed to be for long term or a long

6       duration that adversely impacts education.

7       How is this child eligible?

8               MS. BARRIE:  May I?

9               MR. DuBOW:  Yes, answer.

10              MS. BARRIE:  Okay.  All right.  If

11      you look at all of her evaluations including

12      her psychoeducational evaluation, even going

13      back to 1996, it indicated as such, and the

14      only reason we even had -- I had a question

15      to Keystone about those grades, and

16      unfortunately, I couldn't get them to be

17      here, I guess, is the only way I can put it,

18      because if you look at her scores, her IQ is

19      at 60.  Her reading scores are very low.  Her

20      math are low.  Everything is pretty much low

21      for the student.  And I understand what those

22      -- what those grades may say.  But all
```

627

49

```
1    documentation including teacher

2    documentation; there is a functional

3    behavioral assessment in '04 that clearly

4    indicates that she was not doing well,

5    because she was disruptive in the classroom.

6    She needs a structured environment.  Nobody

7    is saying she is not smart.  She is a smart

8    student.  But without -- right --

9              MR. DuBOW:  But you're arguing two

10   different -- I mean, you're really

11   conflicting me.

12             MS. BARRIE:  No, being a special ed

13   --

14             MR. DuBOW:  First you're telling me

15   she got a 60 IQ, and then you're telling me

16   she is smart.  Now, either one or the other.

17             MS. BARRIE:  Okay, being in special

18   education does not mean that you're stupid

19   and that's just a fact.  All it means is that

20   you need a structured environment.

21             MR. DuBOW:  No.  But to be

22   emotionally disturbed, you have to be -- the
```

628

50

1    definition under the idea is that it has to

2    be for a marked degree and to a long

3    duration.

4            MS. BARRIE:  2000?  I'm sorry.

5            MR. DuBOW:  And January '05, is

6    recent.

7            MS. BARRIE:  2004, 2005 --

8            MR. DuBOW:  No, no, going back to

9    January -- from 6/17/04, to 1/17/05, did not

10   have an adverse impact on this child.

11           MS. BARRIE:  Because she was in a

12   residential program.  When she came to D.C.

13   --

14           MR. DuBOW:  Well, I don't know.

15   What is this -- what is Keystone Newport?

16           MS. BARRIE:  It's a residential

17   program.  When she came to D.C., again the

18   issue was --

19           MR. DuBOW:  What kind of a

20   residential program?

21           MS. BARRIE:  It's Keystone Newport

22   News.  It's a residential program.  That's

629

51

1    what -- you know, she came in --

2              MR. DuBOW:  Who put her there?

3              MS. BARRIE:  CFSA.  Not DCPS.  She

4    came out, she went to Woodson -- she got to

5    Woodson.  She was disruptive, she was

6    failing.  They kicked out of Woodson, sent

7    her to Choice Academy, same thing.

8              MR. DuBOW:  And why was she exited

9    from this place?

10             MS. BARRIE:  I'm not sure either --

11             MR. LEVY:  They said she was good

12   to come out.  They said she was fine to

13   leave.  She was --

14             MS. BARRIE:  She left in what

15   February?

16             SPEAKER:  January.

17             MR. LEVY:  They didn't know what's

18   wrong with her in there.

19             MS. BARRIE:  She left in January.

20             MR. DuBOW:  Where is that?

21             MR. LEVY:  Well, wait a second, in

22   my bound -- well, I think it's the last

52

1    document that says --

2            MS. BARRIE:  February, March,

3    April -- March, she was out of Woodson.

4            MR. DuBOW:  Wait.

5            MR. LEVY:  If I may sir, I don't

6    have a comment?

7            MR. DuBOW:  All right.

8            MR. LEVY:  Withdrawal of all

9    grades.

10           MR. DuBOW:  Normally, they withdraw

11   that.  Was that what you're referring?

12           MR. LEVY:  Yes, sir.

13           MS. BARRIE:  In February, she was

14   out.  In March, she was kicked out of Woodson

15   and sent to Choice.  She went -- she went to

16   the classroom in Woodson, she wasn't doing

17   well either.

18           MR. DuBOW:  Yeah, the reasons, you

19   know, there are a lot of people who are

20   socially maladjusted or have problems, are

21   not emotionally disturbed or necessarily

22   eligible.  Now --

631

53

1        MS. BARRIE:  Every single

2    evaluation said she is eligible for services.

3    Even her functional behavioral assessment

4    that was done, and this was done in Maryland

5    and Maryland is the most difficult place to

6    get services out of.  And even they indicated

7    that she needed services.

8        MR. DuBOW:  Well, yeah, but you

9    know then you look at the Keystone progress

10    code, she is satisfactory on study skill,

11    social development, academic indicators --

12        MS. BARRIE:  And she left that

13    program, I mean, let's be real.  She left

14    that program in February.  In March, she was

15    being kicked out of school.  She was out of

16    control again.

17        MR. DuBOW:  Yeah, but people get

18    kicked out of school for drugs.

19        MS. BARRIE:  For the same behavior.

20        MR. DuBOW:  But they don't get

21    kicked out of school for -- and she has had

22    problems.

632

54

```
1              MS. BARRIE:  For the same behavior.

2              MR. DuBOW:  And they can be kicked

3    out for a variety of reasons, for fighting,

4    but that doesn't make them all of a sudden

5    eligible for special ed.

6              MS. BARRIE:  Every single

7    evaluation --

8              MR. DuBOW:  And isn't somebody

9    accountable for their own behavior around

10   here?

11             MS. BARRIE:  Of course, every

12   single evaluation indicates that she needs

13   services.  Even for the special ed

14   coordinator indicated that she needed

15   services, but they couldn't do it.

16             MR. DuBOW:  I think that's pretty

17   extreme, the child has never been found

18   eligible.  Then all of a sudden we got her in

19   a residential -- the most restrictive

20   alternative -- we got her in a residential

21   place in 24 hours.  You put on a witness that

22   doesn't even know this student.  And I'm
```

633

55

1    supposed to be funding this child at a place

2    they don't even know this child.

3        MS. BARRIE:  And I'm about to call

4    a therapist who knows the child, who sees her

5    twice a week.

6        MR. DuBOW:  I'm saying the place

7    where she is at, they don't know her.

8        MS. BARRIE:  Right, at the place

9    she is at.

10       MR. DuBOW:  You're calling a

11   therapist from --

12       MS. BARRIE:  The therapist.

13       MR. DuBOW:  -- from Devereux?

14       MS. BARRIE:  Correct.  And she is

15   listed.  She is a psychological therapist.

16       MR. LEVY:  That's the vaguest of

17   vague definitions.

18       MS. BARRIE:  Well she is a -- and

19   that's what she is.

20       MR. LEVY:  How are we to know this?

21       MS. BARRIE:  She will testify she

22   is a mental health therapist.

634

56

1          MR. DuBOW:  All right.  I'm just

2      saying.

3          MS. BARRIE:  She is going to

4      testify today.  I'm sure she is not going to

5      --

6          MR. DuBOW:  You know, okay, I'm

7      just saying that there I had these concerns

8      here based on the record -- the written

9      record.  I mean things are not --

10          MS. BARRIE:  And that's, I mean,

11      and you look at and this from the same place

12      that she came out of and was completely out

13      of control.  So we've always had concerns

14      even about the program at Keystone to begin

15      with.  Because even after she left, nothing

16      really changed with her.  She came to H.D.

17      Woodson and the same thing continued.  She

18      was not doing well in school.  They kicked

19      her out of the school and even her special ed

20      coordinator said she needed an IEP, but that

21      they could not do it right then, because they

22      needed another -- more evaluation.

635

57

1          MR. DuBOW:  All right.

2          MS. BARRIE:  And that's the special

3    ed coordinator, DCPS.

4          MR. DuBOW:  All right.  I'll let

5    you put on your person, but this is the

6    person from Devereux?

7          MS. BARRIE:  Correct.  She is a

8    therapist.

9          MR. LEVY:  They're in Devereux or

10   they are in Florida.  They are there in

11   Florida?

12         MS. BARRIE:  Right.  She is her

13   therapist.  She sees every two weeks -- twice

14   a week.

15         MR. LEVY:  Whether she is a

16   Devereux employee is what I'm trying to

17   clarify.  Because --

18         MR. DuBOW:  That the question

19   whether she is a therapist is one thing.  I

20   want to know who is the person that deals

21   with the educational component, because

22   that's what we're dealing with.  We're

636

58

1    dealing with whether this has an adverse

2    impact on her educational performance or not.

3    So how can I -- you put on this first witness

4    from Devereux.  He has no idea what she is

5    doing, how she is doing.  He hasn't even met

6    her, hasn't observed her.  So --

7              MS. BARRIE:  Well, the therapist

8    will even talk about it, in fact, she has

9    been in seclusion.  She has only been there a

10   month, and she has already been taken out and

11   put in seclusion a few times that she has

12   been there.  And she sees her twice a week

13   for at least an hour-and-a-half to two hours

14   a week.  And the evaluations all indicate the

15   services she needs.

16             MR. DuBOW:  All right.  Go ahead

17   and call her.  I just --

18             MR. LEVY:  Do you want to call her

19   and ask her to call in here?

20             MR. DuBOW:  She will have to call

21   in, so we'll take a recess if she has to call

22   --

637

59

```
1              MS. BARRIE:  If she can --

2              MR. DuBOW:  She doesn't have an 800

3    number?

4              MS. BARRIE:  No.

5              MS. BARRIE:  Hi, this is F. Barrie,

6    calling.  Hi, how are you?  Okay, that's

7    okay.  I'm going to put you on speaker phone.

8    Okay.  Can you call into D.C. or would you

9    rather I just put you on speaker on my cell

10   phone, because --

11             MR. DuBOW:  I don't know if that

12   will work.  Is that kind -- your speaker

13   phone has an earphone?

14             MR. LEVY:  It's not powerful.

15             MS. BARRIE:  Hold on, okay.  Can

16   you hear me?

17             MS. ABOUL-HOSM:  Yeah.

18             MR. DuBOW:  Okay.

19             MS. BARRIE:  Okay.

20             MR. DuBOW:  Wait a minute.

21             MS. BARRIE:  Okay.

22                  (Discussion off the record)
```

60

1            MS. BARRIE:  Can you hear me?

2            MS. ABOUL-HOSM:  Yes, I do.

3            MS. BARRIE:  Okay.  Can you say

4    your name for the record, please?

5            MS. ABOUL-HOSM:  Yes.  Nawal

6    Aboul-Hosm.

7            MR. DuBOW:  What?

8            MS. BARRIE:  Nawal, N-a-w-a-l.

9    Okay.  Can you spell your name?

10            MS. ABOUL-HOSM:  Ab -- Nawal,

11    N-a-w-a-l.

12            MR. DuBOW:  N-a-w --

13            MS. ABOUL-HOSM:  -- a-l.

14            MR. DuBOW:  And your first name is

15    Nawal?

16            MS. BARRIE:  That's her first name.

17    Nawal is the first name.

18            MR. DuBOW:  And your position?

19            MS. BARRIE:  The last name, her

20    last name is different.

21            MS. ABOUL-HOSM:  My last name.

22    Aboul, A-b-o-u- l.

639

61

1           MR. DuBOW:  Oh, sorry, what's the

2    last name?  A --

3           MS. ABOUL-HOSM:  --b --

4           MR. DuBOW:  Yes.

5           MS. ABOUL-HOSM:  -- o-u-l.

6           MR. DuBOW:  -- o-u-l?

7           MS. ABOUL-HOSM:  H-o-s-m.

8           MR. DuBOW:  H-o-s-m?

9           MS. ABOUL-HOSM:  Yes.

10          MR. DuBOW:  Okay.  And what's your

11   position?

12          MS. ABOUL-HOSM:  Licensed mental

13   health counselor.

14   Whereupon,

15              NAWAL ABOUL-HOSM

16   was called as a witness and, having been first

17   duly sworn, was examined and testified as follows:

18          MR. DuBOW:  Okay, your witness Ms.

19   Barrie.

20          MS. BARRIE:  Okay.

21          DIRECT EXAMINATION

22          BY MS. BARRIE::

640

62

```
 1        Q    Do you know D████████, W██████?

 2        A    I do, yeah.

 3             MR. LEVY:  Well, before you get

 4   into D███████, we must make sure she is right

 5   with her background?

 6             BY MS. BARRIE::

 7        Q    What's your educational background?

 8        A    I'm a first year, Ph.D. in marriage

 9   and family counseling.

10        Q    Okay.  And --

11             MR. DuBOW:  I didn't hear.  Repeat

12   please.

13             BY MS. BARRIE::

14        Q    Okay.  Can you repeat that?

15        A    I am a Ph.D. student in marriage

16   and family counseling.

17        Q    Okay.  And do you counsel D███████

18   W████████?

19        A    Yes, I do.

20        Q    Okay.  And how often do you see

21   D████████?

22        A    Once or twice a week.
```

641

63

```
1        Q    Okay.  For how long?

2        A    One hour to two hours if I have any

3    testing.

4        Q    Okay.  And in your visits with

5    D█████, can you --

6        A    I'm sorry.

7        Q    Excuse me?

8        A    I'm sorry, what did you ask?

9        Q    Okay.  In your visits with

10   D█████, are you -- can you tell us a little

11   bit about her -- about D█████ and the

12   program she is in right now?

13       A    Yes.  I am actually a contractor

14   with Devereux Day School.  I do not work in

15   the Devereux Day School -- like with them on

16   a daily basis.  I just go two days a week

17   basically, and work with D█████.

18       Q    Okay.

19       A    I do counseling with her, and I did

20   her master treatment plans, her

21   biopsychosocial.  I did some testing the ones

22   they all required for Devereux.  And again I
```

642

64

1    want to state, I am a contractor and I am a

2    temporary basically, so I don't know when

3    they will tell me -- I'm working with her

4    now, because they were interviewing for

5    full-time position therapist.

6        Q    Okay.  As far as Dayshawn is

7    concerned, in the -- can you tell us a little

8    bit about your opinion as to her placement at

9    Devereux?

10            MR. LEVY:  I object to that

11   question.  No foundation mainly.

12            MR. DuBOW:  Sustained.

13            MR. LEVY:  Thank you, sir.

14            MS. BARRIE:  Okay.

15            BY MS. BARRIE::

16        Q    In your dealings with Dayshawn, as

17   her therapist counselor, what is your

18   recommendation as far as her placement is

19   concerned?

20            MR. LEVY:  I object to that

21   question as well, sir.

22            MR. DuBOW:  Sustained.

643

65

1             MR. LEVY:  Thank you.

2             BY MS. BARRIE::

3      Q    Okay.

4      A    Do you want me to answer now?

5      Q    No, no, no.  It's objected to.  Do

6  you have an opinion, well, as a therapist --

7  okay, what kind of services do you think

8  D██████ needs?

9             MR. LEVY:  Well, foundation enough

10  in the -- what review -- she serviced.  Well,

11  has she reviewed any evaluations for the

12  student?  We don't know anything about that.

13             MS. BARRIE:  She even did her own

14  evaluation.  She testified already to that.

15  She even did her own testing.

16             MR. DuBOW:  All right.

17             THE WITNESS:  You want me to answer

18  those now?

19             MS. BARRIE:  No, hold on.

20             MR. DuBOW:  Can you lay a

21  foundation, please, for this witness making

22  such a statement.


BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382


644

66

```
 1              MS. BARRIE:  Okay.  She has been

 2      seeing her, so she has been there.

 3              MR. DuBOW:  Well, no, no, don't ask

 4      me.  Ask her?  Lay a foundation with your

 5      witness, please.

 6              BY MS. BARRIE::

 7      Q    Okay.  How long have you been

 8      seeing D████████?

 9      A    About four weeks.

10      Q    Okay.  And you testified that you

11      see her at least once or twice a week for

12      about an hour or to two hours?

13      A    Yes.

14      Q    Okay.  And you said you did some

15      evaluations on her?

16      A    Yes, I did.

17      Q    Okay.  Some psychological testings?

18      A    I just did BASC test.  The

19      depression BASC testing and the bipolar.

20              MR. DuBOW:  Okay.

21              MS. BARRIE:  Bipolar testing and

22      the BASC.
```

645

67

1          MR. DuBOW:  The BASC?  What's the

2    first test you did?

3          MS. BARRIE:  What's the first test

4    you did?

5          THE WITNESS:  The depression BASC.

6          MS. BARRIE:  Depression.

7          MR. DuBOW:  A test for depression?

8          BY MS. BARRIE::

9      Q    Okay.  In your evaluations and in

10   your daily or weekly dealings with Dayshawn,

11   what's your opinion as to what sort of

12   program ▉▉▉▉▉ needs?

13         MR. LEVY:  I still have one

14   objection, sir.  I don't --

15         MR. DuBOW:  Sustained.

16         MR. LEVY:  Thank you.

17         MS. BARRIE:  Why are you objecting

18   to -- I don't -- what's the --

19         MR. LEVY:  A proper foundation has

20   not been made for her to give an opinion.

21         MR. DuBOW:  She is not an expert

22   witness.  She is not able to make an expert

646

68

1    opinion as to what should be a replacement.

2              MS. BARRIE:  In her dealings with

3    her --

4              MR. DuBOW:  She can testify as to

5    what she has observed or what she's -- how

6    she thinks or she feels she can testify from

7    her own the fact observation.  But she is not

8    qualified or is not an expert, so she can't

9    give an opinion.

10             MS. BARRIE:  As a therapist, she

11   can give an opinion as to what her client

12   needs.

13             MR. DuBOW:  She is a Ph.D. student.

14             MS. BARRIE:  She deals with her on

15   a weekly basis.  She is the only one that has

16   testified here as to that.

17             MR. DuBOW:  I understand, but she

18   hasn't risen to the level of being an expert

19   witness.

20             MS. BARRIE:  Okay.

21             MR. DuBOW:  All right.

22             MS. BARRIE:  The role is clear that

647

69

1    as an expert witness, an expert witness can

2    be someone who has knowledge about the

3    subject being presented and indicates that a

4    witness qualifies as expert by knowledge,

5    skill, experience, training, or education may

6    testify thereto in the form of an opinion or

7    otherwise.  And it is clear that she has the

8    knowledge of the issue at hand, and she has

9    had the experiences and with D██████ --

10          MR. DuBOW:  Mr. Levy is entitled to

11    voir dire.

12          MR. LEVY:  Thank you and I would

13    wish to voir dire, her if she is going to be

14    certified.

15          MS. BARRIE:  Okay, go ahead.

16          MR. DuBOW:  If you're going to ask

17    her -- she be an expert, and when you start

18    asking her to given an opinion, I assume

19    you're asking her for her expert opinion.

20    And if that -- then you have to qualify her

21    and he is entitled to ask questions as to her

22    qualifications.

648

70

```
 1            MS. BARRIE:  Okay, go ahead.

 2            MR. DuBOW:  Go ahead, Mr. Levy.

 3            VOIR DIRE EXAMINATION

 4            BY MR. LEVY::

 5        Q    I'm sorry.  Miss can you pronounce

 6   your last name for me to make sure I'm doing

 7   it justice?

 8        A    A-b-o-u-l H-o-s-m.

 9        Q    Yeah I know how it's spelled.  I

10   want to know how it's pronounced?

11        A    Aboul-Hosm.

12        Q    Aboul-Hosm.  Okay.  Ms. Aboul-Hosm,

13   my name is Michael Levy.  I'm an attorney for

14   DCPS.  I want to ask you some questions about

15   your professional background and experience.

16   You said that you are a Ph.D. student.  What

17   are your underlying degrees?

18        A    Master of Arts in Counseling, M.A.

19   in Counseling.

20        Q    Where from?

21        A    From Webster University.

22        Q    Say the name?
```

649

71

```
 1        A    Webster University.

 2        Q    Western University?

 3        A    University, yes.

 4        Q    I see.

 5             MR. DuBOW:  Where is that?

 6             BY MR. LEVY::

 7        Q    Where is that?

 8        A    Merrit Island.

 9             MS. BARRIE:  Merrit Island.

10             BY MR. LEVY::

11        Q    Merrit Island, what state?

12        A    Florida.

13        Q    I see.

14             MR. DuBOW:  Western University in

15   Florida?

16             MS. BARRIE:  Webster.

17             MR. DuBOW:  Webster?

18             BY MR. LEVY::

19        Q    Is it Webster or Western?

20        A    Webster.

21        Q    Webster.  I see.

22             MR. DuBOW:  Webster University in
```

650

72

 1    Florida.  Okay.

 2              BY MR. LEVY::

 3        Q    Okay.  And you said you have an

 4    M.A. in counseling?  Okay.

 5        A    M.A. in Counseling, yes.

 6        Q    Okay.  And what is your bachelor

 7    degree?

 8        A    Psychology.

 9        Q    From where?

10        A    B.S. in Psychology.

11        Q    B.S. in Psychology, uh-huh, and

12    where is that from?

13        A    University of Lebanon.

14        Q    Okay.  And where are you doing your

15    Ph.D.  Studies?

16        A    At Barry University.

17        Q    Baylor?

18        A    Barry, B-a-r-r-y.

19        Q    Oh, Barry, in Florida?

20        A    Yes.

21        Q    I see.  And how long have you had

22    your degrees, can you just tell me what year

651

73

```
 1    you graduated in each of that?

 2         A    The second year.

 3         Q    You're in second year in Ph.D., but

 4    when did you get your M.A., when did you get

 5    your B.S.?

 6         A    I got my B.S. in the '80s, I don't

 7    have the exact dates, but I think in the

 8    '80s.

 9         Q    And M.A.?

10         A    I got my M.A. in 2000.

11         Q    Okay.  Have you written any papers

12    or been published in any publications,

13    journals?

14         A    Not published yet.

15         Q    Are you --

16         A    It's in the process.

17         Q    You are talking about your

18    dissertation?

19         A    Yes.

20         Q    Okay.  You are not published.  Are

21    you a member of any organizations in your

22    field?  I mean, psychologic --
```

652

74

```
 1      A    NCC, National Counseling --

 2   National Certified Counselor, NCC.

 3      Q    And are you as a regular member or

 4   you hold an office in that organization?

 5      A    I'm a member.

 6      Q    Okay.  Have you ever been certified

 7   as an expert in this jurisdiction, meaning

 8   the District of Columbia?

 9      A    No.

10      Q    Have you ever testified in a

11   hearing before, in this jurisdiction before?

12      A    Have I ever testified before?  One

13   time, yes.

14      Q    In this jurisdiction?  In D.C.

15      A    No, I don't think so.

16      Q    Okay.

17           MR. LEVY:  Sir, I object to this

18   witness being certified as an expert.

19           MR. DuBOW:  I'm going to ask you

20   some questions because I'm not -- how long --

21   you got your master's degree you said in

22   2000, right?
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400     800-522-2382

653

75

```
1              THE WITNESS:  Yes.

2              MR. DuBOW:  How many years have you

3   been employed as a counselor providing

4   counseling services?

5              THE WITNESS:  How long have I been

6   providing counseling?

7              MR. DuBOW:  Yes.

8              THE WITNESS:  Since I graduated

9   this 2000.

10             MR. DuBOW:  Where?

11             THE WITNESS:  I have already

12  provided some counseling at Wuesthoff

13  Hospital.

14             MR. DuBOW:  Where?

15             THE WITNESS:  Wuesthoff Hospital.

16  I did my internship there, and at Devereux

17  outpatient.

18             MR. DuBOW:  Do you have any

19  background in special education?

20             THE WITNESS:  I'm sorry, I didn't

21  hear.

22             MR. DuBOW:  Do you have any
```

```
 1    background in special education?

 2            THE WITNESS:  No.

 3            MR. DuBOW:  I'm here in a lot of

 4    difficulty certifying her as an expert -- I

 5    mean, she can testify as to what she

 6    personally does -- what she observed, but I'm

 7    not going to give any weight to her opinion

 8    as an expert opinion.  I don't have

 9    sufficient -- it's not sufficient that -- to

10    meet the test.

11            MS. BARRIE:  But she has the

12    knowledge.  She has the knowledge of the

13    issue, which is D██████ in this case.  She

14    has the skill as the counselor, and she has

15    been dealing with D██████.  And according to

16    Rule 702, that is what -- those are the

17    qualifications that are required to qualify a

18    person who can make a professional opinion as

19    to an issue at hand.

20            MR. DuBOW:  I don't think she's

21    risen to that level of being an expert.  She

22    has not -- she doesn't have her Ph.D., she
```

77

1    has not worked -- she's worked only in an

2    outpatient setting at Devereux.  I mean -- I

3    don't see how I can give her testimony much

4    weight.

5            So I'm going to allow say, however,

6    what she does with the student.  That's fine.

7    But I don't -- I can't -- I don't see how I

8    can qualify her as an expert.  I will sustain

9    your objections.

10           MR. LEVY:  Thank you, sir.

11           DIRECT EXAMINATION CONTINUED

12           BY MS. BARRIE::

13      Q    And you -- you provide Dayshawn

14   with counseling services, correct?

15      A    Yes, yes.

16      Q    Okay.  At this time, what behaviors

17   are you observing in D██████?

18      A    Lot of depression --

19      Q    Uh-huh.

20      A    -- and a lot of aggression.

21   Aggression reported by staff on sites daily.

22      Q    Okay.  Have there -- has she ever

656

78

1   been, I guess, restrained as -- in reference

2   to her aggression?

3        A    Yes, she has.

4        Q    Okay.  Has it been -- and that's

5   since her, of course, admission a month ago.

6   Okay.  And you've been seeing her for the

7   past month, correct?

8        A    Yes.

9        Q    Okay.

10            MS. BARRIE:  All right.  No more

11  questions.

12            MS. DuBOW:  Mr. Levy.

13            THE WITNESS:  Okay.

14            MR. LEVY:  Yes, I mean, thank you,

15  sir.

16            CROSS-EXAMINATION

17            BY MR. LEVY::

18        Q    Ms. Aboul-Hosm.

19        A    Yes.

20        Q    I just wanted to be clear.  You --

21  did you know D██████ at all, prior to four

22  weeks ago?

657

79

1       A    No.

2       Q    Okay.

3       A    The first time I met her, at

4    Devereux Day School.

5       Q    I see.  And have you received or

6    reviewed any evaluation of the student?

7    Apart from the testing that you yourself did,

8    have you reviewed any others?

9       A    I did review her chart, yes.

10      Q    Her chart.  This is the chart

11   that's kept for her at the school?

12      A    Yes.

13      Q    I see.  And have you observed her

14   in a classroom setting?

15      A    No, I haven't.

16      Q    So when you see her, it is on a

17   pull-out basis from her regular classes.  Is

18   that correct?

19      A    When I see her -- I'm sorry?

20      Q    When you see her at Devereux, she

21   pulled out of the class to be with you?

22      A    Well, she has been -- she skipped

658

80

1    classes the whole time.  When I go there, and

2    she is out of class, I have a chance to see

3    her.  And I see her on the weekend.  I see

4    her every Sunday.

5        Q    I see.  Now, how is it possible for

6    her to skip classes if she is in a

7    residential facility?  Do you know?

8        A    I cannot give you information about

9    her school, because I'm not -- as far as I

10   know, it's just, you know, to ask her how did

11   she do, and like why she skipped today, and

12   stuff like that.

13       Q    I see.  And what reason did she

14   give you?

15       A    One time she stated that she had

16   pinkeye.

17       Q    Uh-huh.

18       A    And the other time -- I recall only

19   one time that she stated she had pinkeye.

20   That's when I first met her, the first time.

21       Q    You recall only one time when what?

22            MS. BARRIE:  She had pinkeye.

659

81

```
 1                THE WITNESS:  Sorry.

 2                BY MR. LEVY::

 3        Q    She had pinkeye.  But she skipped

 4   more than one class.

 5        A    She told me that she has pinkeye.

 6   Her eyes were blood red -- pink.  But I --

 7        Q    Yes, I heard that part -- I heard

 8   that.

 9        A    I don't know.

10        Q    Yeah, I was asking about the other

11   time or times.  Did you get an explanation?

12        A    No.

13        Q    Okay.

14        A    This is all I got.

15        Q    Okay.

16                MR. LEVY:  I have no further

17   witnesses.

18                MR. DuBOW:  Thank you very much.

19                MS. BARRIE:  Can I have a redirect?

20                MS. DuBOW:  Yes.

21                MS. BARRIE:  Please -- Okay.

22                REDIRECT EXAMINATION
```

660

82

1          BY MS. BARRIE::

2      Q    Did she ever miss school because of

3   behavior?

4      A    I cannot give this information,

5   because I'm not aware of it.  I don't go,

6   like, regularly there.

7      Q    Uh-huh.

8      A    Once or twice a week.  That's it.

9   And one of those days is on the weekend.

10     Q    Okay.  All right, thank you.

11     A    Thank you.

12          MR. DuBOW:  Thank you.

13          MR. LEVY:  Thank you.

14              (Witness excused)

15          MR. DuBOW:  Anything further, Ms.

16   Barrie?

17          MS. BARRIE:  No.  Except to --

18          MR. DuBOW:  I mean, a witness, any

19   further witnesses?

20          MS. BARRIE:  Oh, no, no, no, no,

21   no.

22          MR. DuBOW:  Okay, closing

661

83

1    statement, Mr. Levi.

2         MR. LEVY:  Sir, I think there are

3    some grave concerns regarding placing and

4    funding the student at Devereux, Florida.  It

5    is very concerning to me that Mr.  Presnal's

6    testimony was -- essentially, he doesn't know

7    the child.  He's not -- he doesn't -- didn't

8    even know whether or not she had an IEP.  He

9    personally had not reviewed any evaluations

10   for the student.  He'd never observed her, he

11   never met her, he only knows of her.  He had

12   not seen her in a classroom setting at all.

13   He was not a part of the admissions process.

14         He said the only thing that he had

15   seen was a Kaufman Test of emotionally -- KT,

16   and saw the scores in math and reading, and

17   that he used to place her in a class, but he

18   had not seen any of the other evaluations

19   that the student has that are in the record

20   marked as exhibits DW - 15 to 18.  The -- I

21   mean, he doesn't know the child.  I mean,

22   that's just the bottom line on it, and

84

1    there's no testimony from anyone at Devereux

2    who supposedly knew the child.

3            And that's even if you get over my

4    initial concern that this is not in a

5    reporting relationship, either up or down

6    with the named witness Linda Brooks.  So

7    even, you know, if Linda Brooks had been

8    here, maybe we would have had some different

9    -- a different situation.  But that's not the

10   case.

11           Furthermore, we heard -- you just

12   heard a testimony from Ms. Nawal Aboul-Hosm.

13   And her testimony is again -- she doesn't --

14   she can't treat her in the school.  She has

15   come to see the child a few times at the

16   school, and she had skipped classes, which

17   again is very concerning, if a student is in

18   the most restrictive environment possible, a

19   residential facility, and she's missing

20   classes, and there's no clear explanation as

21   to why that is.  One suggestion may be

22   pinkeye, but that's -- so would sore eye be

663

85

1    the basis for an excused absence rather than

2    skipping a class.  So that's really

3    questionable.  And no explanation for any

4    other skipped classes.  She did refer to more

5    than one occasion when the child skipped

6    classes.  That leaves really grave concerns

7    about the program at Devereux.

8              Further more, the student is a

9    student without an IEP.  The school doesn't

10   seem to understand that the student doesn't

11   have an IEP, and yet they are prepared to

12   have him -- have her there.  That raises lots

13   and lots of concerns.  In addition to that

14   testimony from Mr. Presnal, was that he felt

15   that one teacher, Mr. Henderson, has

16   potential.  Apparently he's not even quite

17   sure, some kind of a provision or licensing

18   and special ed -- certification in special

19   education.

20             So the other person, Ms. Donna

21   Burlew, is not a teacher, is a substitute

22   teacher, and is not certified.  And she was

664

86

1    totally unclear as to whether either of them

2    was certified in their content areas.  And

3    her testimony was Mr. Burlew -- sorry, Mr.

4    Henderson is a teacher she has almost all of

5    her day.  The only time that she's not with

6    him is when she's with Ms. Burlew.  So I

7    think we have a very untidy, unhappy

8    situation for the student based on the

9    testimony of Ms. Barrie's witnesses.

10            It is apparent that there are

11   evaluations that need to be reviewed, and it

12   will be my recommendation, my urging to the

13   hearing officer that what needs to happen is

14   that a team needs to be convened to review

15   the evaluations as they exist.  She is, it

16   appears, a captive audience there at the

17   school.  It shouldn't be too difficult to

18   pull together a meeting and determine

19   eligibility, which is the first step, that I

20   think needs to be taken.

21            And if indeed she is eligible,

22   which is not clear, be it certainly on the

665

87

1     documents, as the hearing officer has already

2     noted, in DCPS's disclosures, there are

3     report cards and withdrawal documents from

4     Keystone, in Newport News, which is a

5     separate residential facility where the

6     student was getting very good grades.  I

7     mean, relative to many of the grades that we

8     see here, Bs, and think, one C.  So you know,

9     in the circumstances, it does not appear that

10    there is a basis here, but a hearing officer

11    jumping the process to determine the student

12    "eligible" today, and then further going to

13    finding that the student should be placed and

14    funded at Devereux by DCPS.

15            And the last thing I'll say is

16    this, sir, that even if the hearing officer

17    can jump all of these hurdles and get to a

18    finding that the student ought to be placed

19    and funded there, DCPS's position would be --

20    at most, DCPS would be responsible only for

21    the educational component of the student's

22    stay at Devereux, and not for any therapeutic

666

88

1    component, which would be the responsibility

2    of CFSA and/or the Department of Mental

3    Health.

4            Thank you, sir.

5            MR. DuBOW:  Ms. Barrie.

6            MS. BARRIE:  Okay.  Since 1996,

7    which it is in parent's exhibit -- I mean,

8    the student's exhibit number DW-02, it's been

9    clear that the student needed special

10   education services.  In fact, in May 11, '05,

11   the special coordinator at Woodson Senior

12   High School admitted as such.  Her only

13   problem was that she could not get the

14   evaluations done, according to her, right

15   there and then, and so, left it up to the

16   educational advocate to do the evaluations

17   and provide the evaluations.

18           Per the hearing officer's

19   determination of May 2004, DCPS was to

20   complete the evaluations or else give the

21   student the right to complete evaluations.

22   The independent evaluations were completed,

89

1    forwarded to D.C.  Public Schools as

2    indicated in the HOD, DCPS have yet to hold

3    the meeting.  We filed a due process hearing

4    request, DCPS did not even respond to the due

5    process hearing request.  DCPS did not even

6    try to convene a resolution session meeting

7    to even resolve the issues.  DCPS has had

8    numerous opportunities to give the student

9    what she apparently needs.  And yet they have

10   done absolutely nothing.

11           There has been no response from

12   D.C. Public Schools in reference to giving

13   the student the services that she needs.

14   Their evaluations, even in 2004, which were

15   available to D.C. Public Schools, the

16   psychological evaluation, which determined

17   that she has a difficult time functioning in

18   a regular school environment, and so would --

19   will need to be referred for special

20   education.  And that is on page 7 of DW-01, 7

21   and 8.

22           It's been clear from day 1 that the

668

90

1    student needs a structured environment.  She

2    needs services where she can get -- so she

3    can progress academically.  She hasn't been

4    in the appropriate setting.  She came back to

5    D.C., put her at Woodson, again, starts to

6    fail.  As long as she is in a regular school

7    environment, she's failing, she's acting out,

8    she's being kicked out.  And that's just a

9    fact.  DCPS may have --

10            MR. LEVY:  Are you testifying now

11    Ms. Barrie?

12            MS. BARRIE:  I'm stating a fact.

13    It's indicated in all the evaluations -- that

14    indicates, in a regular school setting, she's

15    not functioning appropriately.  DCPS's own

16    disclosure, if the hearing officer wants to

17    go by the grades, it's at Keystone Newport

18    News, which is a structured environment,

19    which is a residential program.  Obviously,

20    she does better when she's in a structured

21    environment.  It's clear.  Obviously, she

22    would not do any -- she would not do good for

669

91

1    herself if she is in a regular class room,

2    where she is in a regular setting.  She's in

3    a class of -- more than likely, most

4    residential programs, and as Devereux has

5    testified, four-to-one ratio.  And if that's

6    the case, that's what she needs, and as a

7    result, that's what she should have.

8           DCPS had the opportunity in 2004 to

9    do the evaluations.  They did not do it.  Got

10   tired of waiting -- the system got tired of

11   waiting, placed her in a residential program

12   in Newport News.  She comes back from Newport

13   News.  As her education advocate, I took it

14   upon myself to go to a meeting at Woodson,

15   and at the same time request that they do

16   evaluations, or do an IEP.  Special

17   coordinator tells me she cannot do the

18   evaluations, and told me to do the

19   evaluations, so I indicate about the notes.

20          MR. LEVY:  Now you are definitely

21   testifying.

22          MS. BARRIE:  Well, it's in the

670

1    notes.  It's the parents -- student's exhibit

2    DW-22 --

3              MR. LEVY:  Well, it speaks for

4    itself.

5              MR. DuBOW:  I thought you were

6    making a closing argument.

7              MS. BARRIE:  I am.

8              MR. DuBOW:  So make it based on the

9    evidence presented.

10             MS. BARRIE:  Which is the note,

11   DW-22, as indicated by the special ed

12   coordinator --

13             MR. DuBOW:  Where you went and you

14   got independent evaluation.  That's here.  I

15   have them.  They are in the record already.

16             MS. BARRIE:  -- and I went and got

17   independent evaluations.  And on May 20th --

18   May 20th, coordinator Tim Fitzgerald.  Have

19   yet to hear anything from Tim Fitzgerald or

20   anyone from D.C. Public Schools as far as

21   convening the meeting.  So DCPS has violated

22   the hearing officer's determination, and as a

93

1    result, that is a -- we request that the

2    hearing officer make a finding that DCPS did

3    violate the HOD in not convening the meeting

4    upon receipt of the evaluations within the 15

5    days as indicated in the HOD.

6         Furthermore, we ask the hearing

7    officer to find that every single evaluation

8    that is on file for this student, even

9    teacher comments, that is on student's

10   exhibit number DW-04, is the teacher comments

11   even going back to 2003, which indicates her

12   behavior, and how it affected her in the

13   classroom.  Nothing has changed.  Unless

14   she's in a structured environment, according

15   to DCPS's own documents, she's failing, and

16   she's misbehaving, and she's acting up.

17        As a result, we'll request the

18   hearing officer to follow the evaluations

19   that are on record, which is what has always

20   been indicated, needs to be completed in

21   order to determine any services for the

22   student.  The psychiatric evaluation, parent

672

94

1    -- student's exhibit DW-15 indicate she needs

2    a residential program.  The psychoeducational

3    evaluation determined that she needs to be in

4    a smaller classroom setting, found out to be

5    ADHD, and had multiple disabilities.

6              As a result, we ask the hearing

7    officer to find that she -- she is a student

8    who is in need of services.  She is a student

9    who does qualify for special education

10   services, according to the evaluations

11   documented with -- in the record, and to find

12   that DCPS violated the hearing officer's

13   determination, and to fund her placement at

14   Devereux residential program.

15             I would like to take the -- put the

16   hearing officer -- rather put Florence County

17   School District versus Carter on record, in

18   that although DCPS is stating that the person

19   who testified may not know her, and that they

20   may not -- they can't -- they don't know

21   about providing her with services, Florence

22   County indicated clearly that although -- in

673

95

1    that case, the school system indicated that

2    it is a major financial burden, the court,

3    the Supreme Court stated that the school

4    system had two choices, either give the child

5    a fair appropriate public education in a

6    public setting or place the child in an

7    appropriate private setting of the state's

8    choice.  This is IDEA's mandate.  And school

9    officials who conformed to it did not worry

10   about reimbursing the claims.

11          As a result, we ask the hearing

12   officer to apply it to this case, in that

13   DCPS may argue that they should not have to

14   pay for Devereux because there has not been

15   enough testimony that -- or from people who

16   would provide her with the services.

17   However, according to Florence County, all we

18   have to do was show that she could get

19   educational benefit that testifies to the

20   program, and it goes directly with what the

21   evaluations indicated, the kind of program

22   that she would be receiving, and she does

674

96

1    receive at Devereux Residential.

2            So therefore, in conformity with

3    Florence County, and the Supreme Court

4    decision on Florence County, we ask the

5    hearing officer to find that, yes, she does

6    need a placement like -- as Devereux, and for

7    her to remain at Devereux, and for DCPS to

8    fund it -- for DCPS to convene the meeting

9    that's been ordered by the previous HOD to do

10   an IEP for the student, and --

11           MR. DuBOW:  But we have a threshold

12   question.

13           MS. BARRIE:  Uh-huh.

14           MR. DuBOW:  Before you could even

15   come under IDEA, you first have to be found

16   eligible.  So this student has never been

17   found eligible --

18           MS. BARRIE:  Uh-huh.

19           MR. DuBOW:  -- and now resides --

20   has now been placed there by Child and Family

21   Services in a residential placement.

22           MS. BARRIE:  Yes, sir.


BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

675

97

1          MR. DuBOW:  All right.  So are you

2     asking me to make the determination of

3     eligibility?

4          MS. BARRIE:  Because every document

5     says so, and DCPS has failed to.  So --

6          MR. DuBOW:  I'm not going to make

7     that determination.

8          MS. BARRIE:  Okay.

9          MR. DuBOW:  I think a group of

10    professionals should review it and to see

11    whether or not she has an emotional

12    disturbance or not.  Whether it is of

13    long-term nature, and whether it's to a

14    marked degree, I'm not going to make that

15    decision.  I'm going to send it back to an

16    MDT team to make that decision.  It's not

17    that -- it's not for me to -- I think that

18    it's appropriate for professionals to review

19    all the evaluations, and then make a

20    decision.  If they reach the threshold

21    question in the affirmative that she is

22    eligible, then that's -- then we come to the

676

98

1    question of placement.

2            I have serious doubts about -- the

3    first time you find a person eligible, you

4    put him in the most restrictive setting

5    without trying some other settings.  I think

6    that there's a question whether that's in

7    compliance with the LRE reference of the

8    IDEA.  But be that as it may, there's still a

9    threshold question here.  I can't order

10   reimbursement and a placement when the child

11   hasn't been found eligible yet.

12           MS. BARRIE:  And in any other

13   situation, I would agree with the hearing

14   officer.  My only issue is that DCPS has had

15   enough opportunities to where they should

16   have taken advantage of the situation and

17   convened this meeting.  They had several

18   opportunities to do it.  The law has given

19   them more opportunities --

20           MR. DuBOW:  Well, I'll order --

21   I'll order them to hold the meeting, okay, to

22   review all the evaluations --

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

677

99

1           MS. BARRIE:  And if they don't --

2           MR. DuBOW:   -- and make a

3     determination.

4           MS. BARRIE:  And if they don't

5     within the timeframe required, we ask the

6     hearing officer to order that they do fund

7     her placement.  If they do not convene this

8     meeting within the timeframe required and

9     violated again --

10          MR. DuBOW:  No, because then again,

11    I still haven't answered that threshold

12    question.

13          MS. BARRIE:  So then that means she

14    just stays hanging for however long DCPS

15    decides to do it.

16          MR. DuBOW:  Well no, Child and

17    Family Services is paying for her there.

18    They put her there.  They pay the dollar.

19          MS. BARRIE:  And if the funding

20    comes out, then she just comes back to a D.C.

21    public school and continues to fail.  And

22    because they have -- DCPS has yet to take

678

100

1    responsibility and do an IEP for her, convene

2    the meeting appropriately, that means she

3    just stays hanging, and does not receive

4    appropriate services.

5                MR. DuBOW:  No, she does not stay

6    hanging.  She's at Devereux, and Child and

7    Family Services are paying for that.

8                MS. BARRIE:  And what if that

9    funding runs out, as they usually do with --

10   with government agencies?

11               MR. DuBOW:  Well that's a, you know

12   --

13               MS. BARRIE:  Does she --

14               MR. DuBOW:  That's not for me.  I'm

15   going to enter an order that they hold an MDT

16   meeting.  Now, the question is where to hold

17   the MDT meeting.

18               MR. LEVY:  I mean, it would seem to

19   make sense to hold it there in Devereux.  I

20   mean, DCPS could only participate by phone at

21   best, but, I mean, we'd obviously prefer it

22   to be closer to home, those who are here.

679

101

1    But we are amenable to whatever the hearing

2    officer orders in that direction.

3            MR. DuBOW:  If it was to be done

4    here, how would you put together a team --

5    appropriate team?  I mean, you put -- I mean

6    --

7            MS. BARRIE:  It will be difficult

8    to --

9            MR. LEVY:  Well, it would most

10   likely be held here at 825 North Capitol

11   Street, sir.  I believe Ms. Deidre counseled

12   --

13           MR. DuBOW:  Well, I guess then

14   there gets to be a question.  How -- where

15   was the last school -- the child was at

16   Choice.  Before the Choice, it was just a

17   couple of months at --

18           MR. LEVY:  Woodson.

19           MS. BARRIE:  Woodson.

20           MR. DuBOW:  -- Woodson.

21           MR. LEVY:  Yes, sir.

22           MR. DuBOW:  So they don't know her

680

102

1    too well either.

2           MR. LEVY:  Not really, no.

3           MS. BARRIE:  No.  So --

4           MR. DuBOW:  She was sent to Choice,

5    like in April --

6           MS. BARRIE:  Uh-huh.

7           MR. LEVY:  That's correct, sir.

8           MR. DuBOW:  -- until the end of

9    June.

10          MR. LEVY:  That's right.

11          MS. BARRIE:  Correct.

12          MR. DuBOW:  Then started in

13   September at Devereux.

14          MR. LEVY:  That's correct, sir.

15          MS. BARRIE:  Uh-huh.

16          MR. DuBOW:  So we -- it's only been

17   a month at Devereux.

18          MR. LEVY:  This is one of those

19   cases where -- well I don't know if enough

20   time has passed, but --

21          MS. BARRIE:  Well --

22          MR. LEVY:  -- maybe some of the

681

103

1    folks at Keystone may even be helpful,

2    because she was there for a little while as

3    well.  But they most likely would only

4    participate by phone, since they are down in

5    Newport News.

6              MS. BARRIE:  And I think the best

7    place will be where she is now, people who

8    are servicing her right now, because

9    especially the way the system is, it may not

10   even happen.  Well, I don't want to second

11   guess.  But I'm worried that the meeting may

12   not take place for a while.  And at the same

13   time she's -- then she's not -- she doesn't

14   have a working service plan.  I guess is one

15   way to put it.

16             MR. DuBOW:  All right.  Well, are

17   there people from -- if we do the MDT meeting

18   at Devereux, are there -- who would be

19   designees from -- to participate in it, I

20   assume, the teleconference, who would have an

21   opportunity to review all the evaluations and

22   -- I mean, you need somebody -- the issue is,

104

1    obviously, ED.

2         MR. LEVY:  Uh-huh.

3         MR. DuBOW:  The issue is -- they

4    certainly have to make an eligibility

5    decision based on the review of the

6    documents, on whether or not she has ED.

7    That's the first threshold question.  So you

8    need somebody --

9         MS. BARRIE:  To review the

10   evaluation --

11        MR. DuBOW:  -- who has had an

12   opportunity -- who has a background in

13   emotional disturbance, and can -- and able to

14   review this.  There's been no DCPS review of

15   these independent evaluations.

16        MR. LEVY: No, sir.

17        MS. BARRIE:  No.

18        MR. DuBOW:  So that would have to

19   be -- I would put that in the order, because

20   whoever is going to participate in this

21   meeting has to be qualified to review these

22   evaluations and be able to, I mean, this --

683

105

1    we have to make this determination.

2         MR. LEVY:  Right.

3         MR. DuBOW:  Because what I have in

4    the record is conflicting as to whether it's

5    -- the extent of time that she's had this.

6    So --

7         MR. LEVY:  I would -- if I may

8    suggest, sir, what we would suggest to the

9    hearing officer would be that a meeting be

10   convened here, because that would also afford

11   Ms. Barrie the opportunity to participate in

12   a meeting locally, to have -- to use the line

13   that the hearing officer is suggesting that

14   certain people be present who are able to

15   discuss the evaluations that already have

16   been done, and with the staff from Devereux

17   being conferenced in.

18        Because most of the relevant

19   parties are here, in our view, including the

20   Woodson folks who to the extent that they

21   know her, the folks at Choice, to the extent

22   they know her, and the staff here in DCPS.

684

106

1    So -- and Ms.  Barrie, obviously, and the

2    CFSA social worker -- we are all here.  So

3    the nexus -- the strongest nexus seems to be

4    here.

5              MS. BARRIE:  Well, in my

6    experience, even though the students are in

7    residential, my IEPs for my kids in

8    residential have always been held at the

9    school where they are, and they'll conference

10   me in.  And it used to be Arthur Fields that

11   would do it by a teleconference.

12             MR. DuBOW:  And I'm saying,

13   frequently in these situations you have a

14   placement monitor, who is the only person

15   from DPCS is speaking --

16             MR. LEVY:  That is correct.

17             MS. BARRIE:  Right.

18             MR. DuBOW:  This is not the

19   situation here.  You need somebody who is

20   capable --

21             MS. BARRIE:  Clinician?

22             MR. DuBOW:  -- who make -- a

685

107

1    clinician, to review a clinical --- the

2    independent clinical evaluation, and to weigh

3    all -- to be -- evaluate that, and you can

4    bring whoever you have, and then make a

5    decision as to the eligibility.

6            MS. BARRIE:  Well if it's one

7    clinician, they usually -- even from here,

8    they usually -- because the thing is there'll

9    be the teacher, there'll be the related

10   service providers, and they are all over

11   there.  None of them will be over here.

12   That's the problem.  The related service

13   providers will be over there, and they are

14   saying she may need OT, they are saying she

15   may need special service ed --

16           MR. DuBOW:  All right, this is the

17   age of technology.

18           MS. BARRIE:  So --

19           MR. DuBOW:  We can probably work

20   out something.

21           MS. BARRIE:  Right.

22           MR. DuBOW:  But I would -- I'll ask

686

108

```
1    both counsels submit to me the list of who

2    they think should be an appropriate team, so

3    that I'll put in the order, people who should

4    be in attendance, and then -- when we'll do

5    it.

6              MS. BARRIE:  So you -- okay, fine.

7    So you are saying the clinician --

8              MR. DuBOW:  In other words, it may

9    not be a particular individual's name, but

10   that --

11             MS. BARRIE:  Okay.  Right.

12             MR. DuBOW:  -- whether -- the type

13   of professional --

14             MS. BARRIE:  Person -- right.

15             MR. DuBOW:  -- that has to be

16   present.

17             MS. BARRIE:  Okay.

18             MR. DuBOW:  So, I mean, we know who

19   required members they have to be --

20             MS. BARRIE:  Uh-huh.

21             MR. DuBOW:  -- but I want to -- I

22   would accept any feedback from both counsel,
```

687

109

1    as to who they would suggest --

2            MR. LEVY:  Okay.

3            MR. DuBOW:  -- to make sure we can

4    get a comprehensive determination whether she

5    is ED or not.

6            MR. LEVY:  Okay.

7            MR. DuBOW:  Okay.  So I'll give you

8    -- today is Wednesday.  You can just submit

9    to me by Friday the list of people that, you

10   know, not the individuals, but the --

11           MS. BARRIE:  Right, not the names.

12           MR. DuBOW:  -- but the type of

13   people who should be at the MDT meeting,

14   including the requisite members that are

15   required by IDEA.

16           MS. BARRIE:  Okay.

17           MR. DuBOW:  In other words, IDEA

18   requires you have a professional who can

19   interpret the data.

20           MS. BARRIE:  Right.

21           MR. LEVY:  Yes, sir.

22           MR. DuBOW:  So I assume that would

688

110

1    be one person.  But if you have any other --

2    whatever, you know, and any other suggestions

3    on holding this conference, I would

4    appreciate if you think about it.  Not right

5    now, but if you can think about it --

6            MR. LEVY:  That's right sir.

7            MR. DuBOW:  -- let me know by

8    Friday.  I'll be open to -- whatever.

9            MR. LEVY:  Just a letter with a

10   list is sufficient?

11           MR. DuBOW:  A one-page letter,

12   whatever is fine.

13           MR. LEVY:  Right, sir.

14           MR. DuBOW:  Nothing formal.

15           MR. LEVY:  Right.

16           MR. DuBOW:  Just -- so any

17   suggestions you have for holding a proper

18   MDT-IEP meeting, eligibility meeting, I will

19   entertain that, and put that in the order

20   after consideration of it.  This case is

21   adjourned.

22           MR. LEVY:  Thank you, sir.

689

111

```
1              MS. BARRIE:   Thank you.

2                   (Whereupon, the HEARING was

3              adjourned.)

4                      *   *   *   *   *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

690